1  Hilmija Dzebic and Fikreta Osmankic

2  1832 ReaslingDrive

3  Lodi, CA 95240

4  Telephone: (209) 224-8265

5  *In Pro Per*

**FILED**

JUL 1 3 2011

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND

6

7  ## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
8  ## OAKLAND DIVISION

9  ~~HILMIJA DZEBIC,~~ *FD*          ~~No. 4:10-CV-02363-PJH~~ *FD*
**FIKRETA OSMANKIC,**                No. **4:10-CV-02364-PJH**
10

11          Plaintiff,

12  vs.                              **PLAINTIFF'S RESPONSE TO**
                                     **DEFENDANT'S MOTION TO**
13  **ROANOKE COMPANIES**            **DISMIS AND MEMORANDUM**
    **GROUP, INC., now known as**    **IN SUPORT**
14  **BRTT, INC.,HOME DEPOT**
    **U.S.A., INC.,  AEROFIL**       **Trial Date:**  November 14, 2011
15  **TEHNOLOGY, INC.**
16                                   **Noticed Hearing Date/Time:**
                                     August 10, 2011 at 9:00 AM
17          Defendants

18  _____/

19

20  ## PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION TO
    ## DISMISS AND MEMORANDUM IN SUPORT

21

22

23          COMES NOW the Plaintiffs, Hilmija Dzebic and Fikreta  Osmankic  (Dzebic)

24  without any Assistant Attorney, and submits this opposition to Defendant's motion filed to

25  Dismiss,  and Memorandum in Support .

26
        In support of said Response, Plaintiff would state as follows:
27
                          4:10-CV-02363-PJH; 4:10-CV-02364-PJH
28                PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION TO
                     DISMIS, AND MEMORANDUM IN SUPORT
                                    - 1 -

# I. INTRODUCTION

This is a tort action arising from serious personal injuries suffered by Hilmija Dzebic, and Fikreta Osmankic, after using a defective product known as "Tile Perfect Stand 'n Seal 'Spray-On' Grout Sealer" that is designed, developed, manufactured, marketed, labeled and/or distributed by Roanoke Companies Group, Inc. d/b/a Tile Perfect, Inc., n/k/a BRTT, Inc. and SLR, Inc. d/b/a Easy Care Products ("SLR"). Innovative Chemical Technologies, Inc. ("ICT") and Ortec, Inc. ("Ortec") provided at least one of the raw materials and Aerofil Technology, Inc. ("Aerofil") aerosolized the ingredients into cans of "Tile Perfect Stand 'n Seal 'Spray-On' Grout Sealer" that were sold at retail stores owned, operated and controlled by Home Depot USA, Inc. a/k/a The Home Depot, Inc. ("Home Depot").

# II. SUMMARY OF THE FACTS

1. July 1, 2011 Defendants, ROANOKE COMPANIES GROUP, INC., now known as BRTT, INC.,HOME DEPOT U.S.A., INC., and AEROFIL TEHNOLOGY, INC. jointly filed mentioned motion for Dismiss. The defendants cite five factors as a reason, as set out in this order.

2.      In their Exhibit "A" Exhibit "B" and Exhibit "C" attached letters from Defendants, I did not get, but  I cannot say that defendats did not send attached letter too . Especially in Exhibit "C" where the Defendants say that the FedEx delivery tracking result for the letter was delivered to Plaintiff's residence on May 20, 2011. Where the Report of the FedEx said: "Left at front door, package delivered to recipient address-release Authorized. If I was at home at that time, I would probably sign received  mail, because I understand these things are very serious, and I know very well that such post is relevant to my interests.


3.      Defendant's known or should have known that Expert's will not admit a patient without referrals from a lawyer. Plus, Defendants have not admitted Dr. Gershwin report, and Ph.D.Tatjana Novakovic, neuropsychological Consultation, with whom they already had a deposition. Attached hereto  as  Exhibit  " 1 "  is true and correct copy of  Dr. Gershwin and Ph.D.Tatjana Novakovic Report.

4.      It is true that we as a Plaintiff's respond to Judge Walker's Order by filing a submission letter, and we've talked with nearly 100 lawyers, and that it is impossible to find a defense attorney. Even I want to specify that I have not stopped to find a defense attorney, because this case is too complicated for lawyers, and as a *pro se* was even impossible.


5.      The defendant's need to understand  that  As Plaitiff's *Pro se*,  are not versed in legal rules, and it's not surprising when someone makes a mistake who is ignorant of or not

qualified for something. Also  It is normal that the Defendant's not willing to help Plaintiffs about resolving their problem, which I did not expect from them, but I think they should notify the Plaintiffs in a way that is safe, as they do now, and be sure that the Plaintiffs informed properly .

6.      Plaintiff Fikreta Osmankic (Dzebic)  responded on Defendants' Motion for Summary Judgement on time, but unfortunately, delivered by mistake to the wrong place, in the same building. I understand that no  Court accepts excuses and that I am breaking the rules. As soon as I learned of the workers in the office, that my documents are not  in the process,  I made other documents, which were delayed by one day.

## III.   **THE STANDARDS  FOR DECIDING A MOTION TO DISMISS**

7.      In making a determination on whether to dismiss a case, the court must "take all the allegations in the complaint as true, and view the complaint in the light most favorable to the plaintiff." Martinez v. Am. Airlines, Inc.., 74 F.3d 247, 248 (11th Cir.1996) (quoting Peterson v. Atlanta Hous. Auth., 998 F.2d904, 912 (11th Cir.1993). The court must treat the complaint's factual allegations-including mixed questions of law and fact-as true and draw all reasonable inferences in the plaintiff's favor. Macharia v. United States, 334 F.3d 61, 64, 67

(DCCir.2003); Holy Land Found. for Relief & Dev. v. Ashcroft, 333 F.3d 156, 165 (DCCir.2003).

8.    A motion to dismiss under Rule 12(b)(6) tests the sufficiency of the complaint. Novarrov. Black, 250 F.3d 729, 732 (9th Cir.2001); Bassett v. Ruggles, 2010 WL 1525554, *5 (E.D. Cal.2010). Dismissal is warranted under Rule 12(b)(6) where the complaint lacks a cognizable legal theory or where the complaint presents a cognizable legal theory yet fails to plead essential factsunder that theory. Robertson v. Dean Witter Reynolds, Inc., 749 F.2d 530, 534 (9th Cir.1984). Inreviewing a motion to dismiss under Rule 12(b)(6), the court must assume the truth of all factual allegations and must construe all inferences from them in the light most favorable to the nonmoving party. Thompson v. Davis, 295 F.3d 890, 895 (9th Cir.2002). However, legal conclusions need not be taken as true merely because they are cast in the form of factual allegations. Ileto v. Glock, Inc., 349 F.3d 1191, 1200 (9th Cir.2003). "A district court should grant a motion to dismiss if plaintiffs have not pled 'enough facts to state a claim to relief that is plausible on its face.'" Williams ex rel. Tabiu v. Gerber Products Co., 523 F.3d 934, 938 (9th Cir.2008), quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007). "'Factual allegations must be enough to raise a right to relief above the speculative level.'" Id. "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Bell Atlantic, id. at 555. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw

4:10-CV-02363-PJH; 4:10-CV-02364-PJH
PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION TO
DISMIS, AND MEMORANDUM IN SUPORT
- 5-

1    the reasonable inference that the defendant is liable for the misconduct alleged. Id. at 556.

2    The plausibility standard is not akin to a "probability requirement," but it asks for more than

3
4    a sheer possibility that a defendant has acted unlawfully.

5    9.    "In general, one who has been tortiously injured is entitled to be compensated for the

6    harm and the injured party must establish 'proof by the extent of the harm and the amount of

7
8    money representing adequate compensation with as much certainty as the nature of the tort

9    and the circumstances permit. "However, '[t] here is no general requirement that the injured

10    person should prove with like definiteness the extent of the harm that he has suffered as a

11    result of the tortfeasor's conduct. It is desirable that responsibility for harm should not be

12
13    imposed until it has been proved with reasonable certainty that the harm resulted from the

14    wrongful conduct of the person charged. It is desirable, also, that there be definiteness of

15    proof of the amount of damage as far as is reasonably possible. It is even more desirable,

16
17    however , that an injured person not be deprived of substantial compensation merely because

18    he can not prove with complete certainty the extent of harm he has suffered. ""(Clemente v.

19    State of California (1985) 40 Cal.3d 202, 219 [219 Cal.Rptr. 445, 707 P.2d 818], internal

20
21    citations omitted.)  Id.

22        In Ashcroft v. Iqbal,, 129 S.Ct. 1937, 1949-1950 (2009), the Supreme Court explained:

23
24        Two working principles underlie our decision in [Bell Atlantic]. First, the tenet that a court
        must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.
25        Threadbare recitations fo the elements of a cause of action, supported by mere conclusory statements,
        do not suffice . . . . Rule 8 marks a notable and generous departure from the hyper-technical, code-
26        pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with
        nothing more than conclusions. Second, only a complaint that states a plausible claim for relief
27

28

survives a motion to dismiss . . . . Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense . . . . But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not 'show [n]'—'that the pleader is entitled to relief.' . . . .

In keeping with these principles, a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.

10.   "[A] federal court generally may not rule on the merits of a case without first determining that it has jurisdiction over the category of claim in suit (subject-matter jurisdiction) and the parties (personal jurisdiction)." Sinochem Intern. Co. Ltd. v. Malaysia Intern. Shipping Corp. 549 U.S. 422, 430-31, 127 S.Ct. 1184, 1191 (2007). Therefore, the court must be certain that federal subject-matter jurisdiction is proper before entertaining a defendant's motion to dismiss the plaintiff's complaint for failure to state a claim upon which relief can be granted. 14CWRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE, § 3739 (2010), citing In re Bear River Drainage Dist., 267 F.2d 849, 851 (10th Cir. 1959); Harden v. Field Memorial Community Hosp., 516 F.Supp.2d 600, 605 (S.D. Miss. 2007), aff'd, 265 Fed. Appx. 405 (5th Cir. 2008). Because "jurisdictional questions must ordinarily precede merits determinations in dispositional order" (Sinochem, supra).

## IV.   **FACTUAL BACKGROUND**

11.   According to 28 U.S.C. § 1406 (b), "... nothing shall impair the jurisdiction of a district court of any matter involving a party who does not timely and sufficient untitled

objection to the venue." Since Defendant has not contested the proper venue for action brought by this case , Defendant's failure amounts to a waiver. Defendant's motion is not "sufficient objection to the venue" and should not impair the jurisdiction of this Court.

12.      As seen in the Defendants Motion for Summary Judgement, the defendant refuses to offer a fair settlement for the Plaintiff Fikreta Osmankić (Dzebic) . They know that their statement is incorrect because they state that  there is no evidence that she used the item, and that the Plaintiff cannot prove the batch number, which is absolutely not true, Because we have used between 250-300 bottles of their product, it should be clear to them that I certainly have proof.

13.      The defendants also falsely claim statement from deposition of Dr.  Naim Katiby, where they are hiding the Paragraph where Dr. Katiby certifies that the X-ray image shows old inflamation on Plaintiff's lungs.

14.      When the defendants received a response to their Motion for Summarri Judgement , and when they saw that in Opposed Summary Judgment plaintiff's show the true  evidence, and that there is evidence that Defendants acted falsely and illegally, they state in Defendants Motion To Dismiss, that the X-ray image not showed that the Old inflamation is caused by their  product.  This is a bit funny, and ultimately pathetic and sad, when an experienced lawyer, said such an unprofessional thing, because we all know that technology is progressing, but has not yet reached this level, that the X-ray imaging show a picture of the item.

15.  The defendants also try to correct their false and fictitious statement, as they falsely stated in the Defendant Motion for Summary Judgement' about Dr. Naim Katiby deposition, that Dr. Naim Katiby failed to show that the cause of the old inflamation was the cause of their product. Of course the doctor did not, and can not be sure what the cause is, but Dr.Naim Katiby, According to Old Inflamations shown on the X-ray, it may be largely caused by inhaling chemical substances. I certify that I am not aware what was happening, and what exactly is the cause, until April 16th, 2007, see Deposition of Dr.Naim Katiby and deposition of Plaintiff 'Fikreta Osmankic.

16.  Plaintiff's Hilmija Dzebic and Fikreta Osmankic (Dzebic) claim that their rights were violated due to process caused by a negative decision from the Federal Court of Georgia, and from the Judge who was the head of the case. The judge rejected the evidence of the only two Expert's, Dr.Gershwin and Ph.D.Tatjana Novakovic who tested Plaintiff's Hilmija Dzebic and Fikreta Osmankic (Dzebic). In defiance of the fact that such a test to prove the truth, and that is the exact result, the defendants make up stories and falsely informing the Judge, of course, where Judge rejects statements from the above experts. Indeed, looking at the verdict of the judges , clearly shows plaintiff's that they had no rights in Georgia, which means that there is a reason for the question: (Why it was decided, a majority of the defendants, that this case is leading in Georgia )? Attached hereto  as  Exhibit  " 2 "  is true and correct copy of. ORAL ARGUMENT REQUESTED.

## V.  **ARGUMENTS AND AUTHORITIES**

17.     This Court should grant Plaintiff damages and other relief the Court deems appropriate, Under Civil Code section 3333, "[t]ort damages are awarded to compensate a plaintiff for all damages of the legal suffered as a result of the defendant's wrongful conduct." (North American Chemical Co.. V. Superior Court (1997) 59 Cal.App.4th 764, 786 [69 Cal.Rptr.2d 466], italics omitted.)

18.     The husband of Plaintiff Fikreta Osmankic (Dzebic) has a lifelong disability and unable to work. We live in an isolated area far from relatives and friends. We are helpless to find at least a similar life as the time when Plaintiff Hilmija Dzebic was able to work. Inattention by the Defendants caused Plaintiff Hilmija Dzebic to suffer lung damage, mental anguish, anxiety, emotional distress, depression, lost memory, or in short "brain damage" caused by hypoxia resulting from poisoning with chemical substances. As a result, Plaintiff succumbed to new ailments, such as coma.

19.     All Defendants, at all times mentioned only item that contain Flexipel because they want to hide other chemical ingredients, which are equally poisonous, and cause most of the same disease, excluding Flexipel. Defendants are well aware of the other poisonous and dangerous ingredients, but they keep it a secret among themselves, and if they are aware that all the ingredients in any item, including food, non toxic, especially poisonous items must be listed on each item, as a warning, and if there is no place for it. Manufacturers, and especially the seller must have a Safety Data sheet wrapped in each article, or at least, have a

trained worker who can give instructions to the buyer, with which the buyer will be carefull and take all precautions. Only ICT Defendants acted properly. ICT has produced and sold Flexipel in liquid form, that is not toxic at that time, and as a non-toxic liquid ICT Sold to the other defendants who were manufacturers. By looking at the correct process of ICT, which has given all notices and procedures with the sold item, Other defendnts were intended, to put the burden on the ICT, and in such a way to hide personal mistakes and committed crimes. Attached hereto as Exhibit " 3 " is true and correct copy of Safety Data Sheet's .

20.   For how long shall Defendant's harassment of Plaintiff's continue and at what price? Defendant did not prove that it acted legally levy to Plaintiff's assets, on the Defendants' Motion for Summary Judgement. Even if they did, did, Defendants levy more than what was necessary and their action proved their wrongdoing. Then, for what reason and based on what legal justification does continue to refuse Defendant rectifying its, by imposing a bogus and fraudulent data, and with such illegal actions, conceal the commission of a crime? When will the Defendants, specifically Home Depot, will stop the poisoning and killing people, and whether there is a law to stop it, or they have their own constitution? Attached hereto as Exhibit " 4 " .

21.   This Court should grant Plaintiff damages according to 26 U.S.C. §7433 and other relief the Court deems appropriate.

## VI.   THE U.S. DISTRICT COURT FOR THE DISTRICT OF CALIFORNIA   HAS PROPER JURISDICTION TO HEAR THIS CASE

22.   In making a determination on whether to dismiss a case, the court must "take all the allegations in the complaint as true, and view the complaint in the light most favorable to the plaintiff." Martinez v. Am. Airlines, Inc., 74 F.3d 247, 248 (11th Cir.1996) (quoting Peterson v. Atlanta Hous. Auth., 998 F.2d 904, 912 (11th Cir.1993).   The court must treat the complaint's factual allegations-including mixed questions of law and fact-as true and draw all reasonable inferences in the plaintiff's favor. Macharia v. United States, 334 F.3d 61, 64, 67 (D.C.Cir.2003); Holy Land Found. for Relief & Dev. v. Ashcroft, 333 F.3d 156, 165 (D.C.Cir.2003).

23.   Plaintiff's is entitled to all the protections and immunities under the law. If Plaintiff does not have an attorney to represent her in her district, and if Plaintiff's is incapable of representing herself before a court, then it would be in the interest of justice to hear Plaintiff's case in any jurisdiction where they can be represented and heard.

24.   "The fundamental requisite of due process of law is the opportunity to be heard." Grannis v. Ordean, 234 U.S. 385, 394; Louisville & N. R. Co. v. Schmidt, 177 U.S. 230, 236, 44 S. L. ed. 747, 750, 20 Sup. Ct. Rep. 620; Simon v. Craft, 182 U.S. 427, 436, 45 S. L. ed. 1165, 1170, 21 Sup. Ct. Rep. 836. "It is an opportunity which must be granted at a meaningful time and in a meaningful manner." Armstrong v. Manzo, 380 U.S. 545, 552. (1965). "The right to be heard before being condemned to suffer grievous loss of any

kind, even though it may not involve the stigma and hardships of a criminal conviction, is a principle basic to our society." Matthews v. Eldridge, 424 U.S. 319 (1976).

25.    Even if the Court still considers venue to be improper, improper venue does not require this Court to dismiss the case.  A district court may transfer a case to the Claims Court "if it be in the interest of justice." Hondros  v. United States Civil Service Com'n, 720 F.2d 278, 299  (3d Cir.1983).  In Hondros, the court stated that it is impossible to "conclude ... that Congress intended to handcuff the federal courts by prohibiting them from transferring a case improperly filed in the district courts to the Claims Court when the interests of justice so require." Id. at 299 n. 41. Krapf v. U.S., 604 F. Supp. 1164 (D.C.Del., 1985).

26.    For reasons listed herein, the U.S. District Court for the District of California has a jurisdiction to adjudicate this case and grant Plaintiff damages and other relief the Court deems appropriate.

27.    According to Plaintiff's letter for her parents that she had not seen for over 17 years (Exhibit 5), Plaintiff Fikreta Osmankic (Dzebic) says:

### VII.   CONCLUSION & PRAYER

28.    WHEREFORE Plaintiffs respectfully pray that the Court deny Defendants' Motion to Dismiss and grant them such other and further relief to which they may show themselves to be justly entitled.

29.   Plaintiff's also asking the court to approve filling the second Amended Complaint, with which the Court would have got much more exact data, and thereby facilitate the entire process. For several reasons, a second Amended Complaint, contributed a great help, for the court, for the jury, for the Plaintiff's and even for the defendant, and in such a manner second Amended Complaint should be granted.

30.   Plaintiff's also want to ask this Court, that all *material safety data sheet* (MSDS) to be reviewed by the Court, and by a jury.

I declare under penalty of perjury that the foregoing is true and correct.

***Respectfully submitted this 13th day of July, 2011***
***by Plaintiff's Fikreta Osmankic and Hilmija Dzebic***

**Plaintiff's:**

**Hilmija Dzebic**   *Hilmija  Dzebic*

**Fikreta Osmankic/Dzebic**   *Fikleta  Dali*

4:10-CV-02363-PJH; 4:10-CV-02364-PJH
PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION TO
DISMIS, AND MEMORANDUM IN SUPORT
- 14-

## CERTIFICATE OF COMPLIANCE

*Undersigned Plaintiff certifies the foregoing document has been prepared with one of the font and point selections (Times New Roman, 14 point) approved by the Court in Local Rule 5.1(C) and 7.1(D).*

This 13th day of July, 2011.

## CERTIFICATE OF SERVICE

I, Fikreta Dzebic, do hereby certify that a true and exact copy of the foregoing PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION TO DISMIS AND MEMORANDUM IN SUPORT on this day, filed by hand through the United States District Court for the Northern District of California (the "Northern District"). of appropriate jurisdiction, with notice of same was served by United States mail, postage prepaid, addressed as follows:

John P. MacNaughton, Esq.
Seslee S. Mattson, Esq.
Morris, Manning & Martin, LLP
1600 Atlanta Financial Center
3343 Peachtree Road, N.E.
Atlanta, GA 30326
Telephone: (404) 233-7000
**Counsel for Defendant Home Depot U.S.A., Inc.**

Edward B. Ruff,III (SBN 6181322)
Michael P. Turiello (SBN 6238272)
Crystal L. Leghton (SBN 6290021)
Pretzel & Stouffer, Chartered
I South Wacker Drive,Ste. 2500
Chicago, IL 60606
Telephone: (312) 346-1973
**Attorney for Roanoke Companies Group, Inc., n/k/a BRTT, Inc. And
Home Depot U.S.A inc.**


Richard M.Williams (SBN 68032)
Gray Duffy, LLP
702 Marshall Street, Suite 600
Redwwood City California 94063
Telephone: (650) 365-7343
Facsimile: (650) 365-6225
**Attorney for Roanoke Companies Group, Inc., n/k/a BRTT, Inc. And
Home Depot U.S.A inc.**


Denise  A. Dickerson
Sutter O'Connell &Farchione  Co., LPA
1301 East  9th Street, Ste 3600
Cleveland, OH 44114
Telephone: (216) 928-2200
**Counsel for Defendant Aerofil Technology, Inc.**


Ralph W. Robinson (SBN 51436)
Catherine E. Koss (SBN 244857)
Wilson Elser Moskowitz Edelman & Dicker , LLP
525 Market St. 17th FL.
San Francisco, Ca 94105
Telephone: (415) 433-0990
**Counsel for Defendant Aerofil Technology, Inc.**

This 13th day of July, 2011.

# EXHIBIT   1

Case No.: No. 4:10-CV-02363-PJH; Case No.: No. 4:10-CV-02364-PJH
Plaintiff's HILMIJA DZEBIC, AND FIKRETA OSMANKIC
**PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION TO DISMISS AND MEMORANDUM IN SUPORT**

# UNIVERSITY OF CALIFORNIA, DAVIS

BERKELEY  DAVIS  IRVINE  LOS ANGELES  RIVERSIDE  SAN DIEGO  SAN FRANCISCO  SANTA BARBARA  SANTA CRUZ

DIVISION OF RHEUMATOLOGY/ALLERGY AND CLINICAL IMMUNOLOGY
451 HEALTH SCIENCES DRIVE
GENOME AND BIOMEDICAL SCIENCES FACILITY (GBSF), SUITE 6510
DAVIS, CALIFORNIA 95616-8660
Tel: (530) 752-2884
Fax: (530) 752-4669

M. Eric Gershwin, M.D.
megershwin@ucdavis.edu

October 31, 2009

Meghan Johnson Carter
Attorney at Law
Motley Rice LLC
28 Bridgeside Blvd.
Mt. Pleasant, SC 29464
Fax: 843-216-9450

RE:  Hilmija Dzebic

Dear Ms. Carter:

I reviewed medical records and documents on Hilmija Dzebic. These include: Deposition of Hilmija Dzebic, Neuropsychological consultation from Dr. Tatjana Novakovic, Eden Medical Center medical records, Zulfiqar Ali, M.D., Psychiatric medical report from Dr. Arkady Oreper, Washington Hospital, Washington Medical Group, Sunnybrook Medical Group, San Francisco General Hospital, Carmen Agcaoili, M.D., Exhibit B: Chemical examination of Stand'n Seal Grout Sealer samples - presentation by David R. Hurst, Hurst Research, Exhibit B: Material Safety Data Sheet on Flexipel S-22WS from Innovative Chemical Technologies, Inc., Exhibit C: Letter and CV from Henry A. Spiller, M.S. (Director of the Kentucky Regional Poison Center); Exhibit C: Material Safety Data Sheets on Stand'n Seal; Exhibit E: Letter from Roger L. Wabeke, President, Chemical Risk; Exhibit G: Letter and danger stickers from Roger L. Wabeke, President, Chemical Risk; Exhibit H: Case reports; Exhibit J: Project S.E.N.S.O.R. and miscellaneous articles. I understand he is being evaluated by Dr. Doswami and I will subsequently revise my report.

Firstly, by way of introduction, I am Chief of the Division of Rheumatology, Allergy and Clinical Immunology at the University of California at Davis School of Medicine. My official title is Distinguished Professor of Medicine and a copy of my CV is attached. I have three sets of medical boards, including internal medicine, allergy and immunology and rheumatology. I have published extensively in all fields, including pulmonary disease. I have been an advisor and a consultant for multiple government agencies, including the Food and Drug Administration, the Federal Trade Commission, the Department of Defense and the U.S. Department of Agriculture.

I saw and examined Mr. Dzebic on March 19, 2008 at the Allergy and Immunology Clinics at the University of California. Ms. Dzebic was born on May 1, 1963 in Bosnia. He immigrated to the United States approximately May 1996. He came as a refugee. Mr. Dzebic received training in Bosnia as an electrician and worked primarily as an electrician and doing some construction in Bosnia. In the United States he worked primarily installing tiles and counter tops. Much of his work was through self-employment in which

1

# UNIVERSITY OF CALIFORNIA, DAVIS

BERKELEY  DAVIS  IRVINE  LOS ANGELES  RIVERSIDE  SAN DIEGO  SAN FRANCISCO  SANTA BARBARA  SANTA CRUZ

DIVISION OF RHEUMATOLOGY/ALLERGY AND CLINICAL IMMUNOLOGY
451 HEALTH SCIENCES DRIVE
GENOME AND BIOMEDICAL SCIENCES FACILITY (GBSF), SUITE 6510
DAVIS, CALIFORNIA 95616-8660
Tel:  (530) 752-2884
Fax:  (530) 752-4669

**M. Eric Gershwin, M.D.**
megershwin@ucdavis.edu

people recommended him to do a variety of jobs in homes. This occurred primarily in the San Jose area. He worked until approximately April 16, 2007. Ms. Dzebic describes himself as a hard working individual who worked every day. He had to stop work because of breathing problems and lack of energy because of the breathing difficulties. He also indicates that he is now depressed and has had major cognitive impairment. In fact, this history was somewhat difficult to obtain because he was not clear on answers due to forgetfulness. Mr. Dzebic, upon my questioning, indicated that he used to buy 100 cans of a special sealant at a time and was constantly exposed during his work day.

Mr. Dzebic's family history is that he has one brother and four sisters. The age ranges are 42 to 54. They are in good health; he has lost one brother but is not clear of the cause of death. Mr. Dzebic says that he has eight children, none of whom have asthma. His father was killed in the Bosnian war. Neither his mother nor his father have had asthma or respiratory problems. He said that in the past he smoked about 5-6 cigarettes per day for many years but he is currently not smoking. He has no history of allergies and no use of either illicit drugs or alcohol abuse. He was not certain of the names of his doctors but believes they are Dr. Ali, a Dr. Agcaoili and Dr. Oreper. Dr. Oreper has been his psychiatrist and has treated him for his depression. In addition to these physicians, he has also been treated at Eden Medical Center.

Mr. Dzebic indicates that he has trouble with words and thus his ability to answer my questions is with some difficulty. This appears to be more than a language issue. It seems as if he has to think before stringing words together. He does note that he has a one year old child and that sometimes he forgets to wake her up and take care of her.

The other significant components of the review of systems are that his shortness of breath becomes worse with exercise. It should be emphasized that the shortness of breath is a new problem for him and is particularly significant because he appeared to have a significant work ethic before his acute problems with exposure to the sealant.

Mr. Dzebic says his current medications are Advair, Albuterol and Zoloft. He thinks he may be taking something else but is not sure of it. He uses Albuterol for rescue and this can be up to 8 times per day. He is unable to walk up stairs and if he stops his breathing medication, he becomes increasingly short of breath. Mr. Dzebic also describes a daily cough and produces considerable phlegm in the morning.

On physical examination, Mr. Dzebic appears older than his stated age and chronically ill. He weighs 233.4 pounds. He is 68 3/4" tall. His temperature is 97.5. Blood pressure is 114/80. Pulse is 100. His head, eyes, ears, nose and throat were benign. His pupils reacted equally well to light and accommodation. There was no nystagmus. His chest was clear to percussion. It was also clear to auscultation but he did have fine wheezes on forced expiration. He was in RSR without murmur or gallop. His abdomen was soft and nontender and neither the liver nor spleen was felt. His gait was normal but slow. The neurologic exam was benign with normal reflexes, normal vibration sense and normal fine sensation. He was oriented to time, place and person but seemed to have difficulty recalling distant events, i.e. what he did last week and where

2

# UNIVERSITY OF CALIFORNIA, DAVIS

BERKELEY DAVIS IRVINE LOS ANGELES RIVERSIDE SAN DIEGO SAN FRANCISCO SANTA BARBARA SANTA CRUZ

DIVISION OF RHEUMATOLOGY/ALLERGY AND CLINICAL IMMUNOLOGY
451 HEALTH SCIENCES DRIVE
GENOME AND BIOMEDICAL SCIENCES FACILITY (GBSF), SUITE 6510
DAVIS, CALIFORNIA 95616-8660
Tel: (530) 752-2884
Fax: (530) 752-4669

M. Eric Gershwin, M.D.
megershwin@ucdavis.edu

he spent Christmas last year. Mr. Dzebic had problems with simple directions. For example, it took me several minutes to explain and be able to do an examination for fine sensation. It was also difficult for him to understand forced expiration. For example, he did it once but then when I tried to get him to repeat it, he had forgotten how and I had to repeat the directions.

Pulmonary function tests were performed on three occasions. His FVC ranged from 66 to 76.6% but there was no evidence of obstruction and his FEF 25-75 was normal. However, he was taking pulmonary medications and used an inhaler during the examination, which was prior to the pulmonary function testing.

Review of his medical records confirms the cough and respiratory problems he has had since April 2007. There are notations of a persistent cough and comments that he has not improved despite treatment. An evaluation by the Sunnybrook Medical Group on December 9, 2008, was similar to my examination, indicating the presence of cough. The shortness of breath was exacerbated upon exposure to chemicals or dust. Review of the records also indicates recurrent problems of pains in his chest, sometimes associated with palpitations. In addition, Mr. Dzebic is also noted to have forgetfulness as well as problems with depression and anxiety.

Mr. Dzebic was admitted on April 16, 2007, at Eden Medical Center in Castro Valley. I will quote from the hospitalist admission note. Please note that the Xerox copy is not optimal but will be typed as close to verbatim as possible, beginning with the history of the present illness, with the patient described as a 43-year-old male admitted secondary to hypoxia. "Patient reports feeling well PTA. Earlier today he was working with grout and spraying sealant. After ten hours he noted sudden onset SOB with mild chest discomfort. Wife called paramedics because lips were blue. Currently reports SOB and mild CP with cough only. All other ROS negative including ... URI symptoms, stridor, wheezing. He does have chronic cough (non productive).

On physical exam, the doctor noted "tachycardia and a ? loud P2." He also noted wheezing with forced expiration. Chest x-ray showed diffuse miliary nodules. Arterial blood gases were reported as being abnormal. There was also a notation of an increased white blood cell count.

The admitting history on April 16, 2007, by Dr. Cattamanchi, was noteworthy for the following comments in the admission note. "The patient is a 43-year-old man who is admitted secondary to hypoxia... Earlier today, he was working with a grout and spray sealant, known as Stand-'n'-Seal Grout Sealer, for several hours. He noted the sudden onset of shortness of breath and mild chest discomfort. His wife called paramedics because his lips were blue. He currently reports some shortness of breath and mild chest pain with cough only." The smoking history provided in this evaluation was a 30 pack year history of smoking cigarettes and a current consumption of 5 cigarettes per day. The laboratory data included the following: "White count is 19.7, hematocrit 50, platelet count 308, neutrophils 80%, 1.6% bands. Chem-7 is unremarkable. LFTs are normal. His ABGs on 4 liters by nasal cannula were 7.46, 28, and 61. Carboxyhemoglobin was 3% and methemoglobin was 0.2%. EKG showed sinus tachycardia at a rate of 110.

3

# UNIVERSITY OF CALIFORNIA, DAVIS

BERKELEY  DAVIS  IRVINE  LOS ANGELES  RIVERSIDE  SAN DIEGO  SAN FRANCISCO  SANTA BARBARA  SANTA CRUZ

DIVISION OF RHEUMATOLOGY/ALLERGY AND CLINICAL IMMUNOLOGY
451 HEALTH SCIENCES DRIVE
GENOME AND BIOMEDICAL SCIENCES FACILITY (GBSF), SUITE 6510
DAVIS, CALIFORNIA 95616-8660
Tel:  (530) 752-2884
Fax:  (530) 752-4669

M. Eric Gershwin, M.D.
megershwin@ucdavis.edu

There was a possibility of left atrial enlargement. There were no ST or T-wave changes." The doctor's impression focused on the two issues of hypoxia and elevated white cell count. In particular, it was noted that "The patient's arterial blood gases show an elevated A-a gradient and acute hyperventilation. Interestingly, the Stand-'n'-Seal Grout Sealant, which he had been using, is associated with a chemical inhalation injury leading to hypoxia, known as grout vapor inhalation injury leading to hypoxia, known as grout vapor inhalation injury. There was recently a recall of this product in Michigan, secondary to this type of injury. However, common symptoms associated with chemical inhalation injury include chest tightness and cough, neither of which the patient has. Other possibilities for his hypoxia should also be entertained, and include pulmonary embolus, given his sudden onset of shortness of breath associated with chest pain and tachycardia; pulmonary vascular disease; and pulmonary parenchymal process. His chest x-ray is suggestive of a miliary spread of infection versus malignancy, although he does not have any symptoms to suggest either of these possibilities. His chest x-ray could also be consistent with an interstitial lung disease process. All of these possibilities will be better evaluated with a CT scan. The patient will be treated with oxygen to support his oxygen saturation and intravenous fluids to help his tachycardia. A pulmonary embolism protocol chest CT has also been ordered."

Dr. Cattamanchi also commented on the abnormal elevated white cell count. "The presence of increased bands is strongly suggestive of infection. However, once again, the patient is not symptomatic in any way. At this point, until he manifests further symptoms, in particular fever or further increase in white cell count, no further action will be taken. The patient was given ceftriaxone in the emergency room for the possibility of pneumonia."

There was no evidence of pneumonia found. Importantly, however, a chest CT reported the following: "The heart and mediastinal contour are within normal limits. No definite evidence for a pulmonary embolism is seen. The lung fields demonstrate a diffuse ground glass opacification involving the majority of the lung fields bilaterally. This may be on the basis of inhalational exposure. Parenchymal scarring is noted at the left posterior lung base. Mild underlying emphysematous change is evident. Scattered small mediastinal lymph nodes, most likely reactive in nature are identified. In the left lobe of the liver, there is a 2.0 cm hypervascular area which may represent a transient profusion abnormality." The official impression was that there was "diffuse ground glass opacification of the majority of the lung fields bilaterally. This may be on the basis of inhalational exposure." He also noted the absence of pulmonary embolism and the presence of underlying emphysematous changes in the lung fields bilaterally. Finally, scattered mediastinal lymph nodes, most likely reactive in nature.

Review of Mr. Dzebic's deposition is essentially consistent with the history provided to me and to his other providers. On the day of his acute injury, he reported that he had used approximately two cans of Stand 'n Seal and began feeling "vertigo, difficulty breathing, and a temperature in the lungs, dizziness, and then I stopped using Stand 'n Seal."

4

# UNIVERSITY OF CALIFORNIA, DAVIS

BERKELEY  DAVIS  IRVINE  LOS ANGELES   RIVERSIDE  SAN DIEGO  SAN FRANCISCO  SANTA BARBARA  SANTA CRUZ

DIVISION OF RHEUMATOLOGY/ALLERGY AND CLINICAL IMMUNOLOGY
451 HEALTH SCIENCES DRIVE
GENOME AND BIOMEDICAL SCIENCES FACILITY (GBSF), SUITE 6510
DAVIS, CALIFORNIA 95616-8660
Tel:  (530) 752-2884
Fax:  (530) 752-4669

M. Eric Gershwin, M.D.
megershwin@ucdavis.edu

Stand 'n Seal is a water proofing agent and there is documentation in the literature of acute injury in the lung after inhalation. For example, there is a case report published in Respiration 65:486, 1998. " A 34-year-old Japanese woman developed acute lung injury soon after inhaling a water-proofing spray which she applied onto her ski suit while smoking a cigarette at the same time. She initially demonstrated arterial hypoxemia (PaO2 = 59 mm Hg) and ground-glass opacities in both lung fields on the CT scan, which both returned to normal without any medication. Several water-proofing sprays, which are easily obtainable in Japan, contain 1,1,1-trichloroethane, liquefied petroleum gas and fluoride resin. Although these components have not been reported to be toxic to the lung yet, high concentrations of these components and/or the pyrolytic products of fluoride resin may have caused acute lung injury in this case" (1).

There is also extensive discussion of respiratory problems after inhalation in an evaluation of 102 cases from the Institute of Occupational Health Sciences in Switzerland. I will quote from this text. "There is strong evidence that inhalation of waterproofing spray can lead, in certain circumstances, to respiratory disorders. Outbreaks of respiratory failure following the use of waterproofing sprays occurred in Germany between 1979 and 1983 (2, 3) and in the United States, Canada, and Japan in 1992-1993 (4-6). A recent case was also reported in Japan (7). Each outbreak closely followed the marketing of a product that had undergone a formulation change of the solvent (to eliminate ozone-depleting solvents) and the fluorinated polymer (to increase solubility in the new solvent). Clinical and experimental findings of previous studies suggest that the reformulation of the products may have played a central role in pathogenesis because of the direct pulmonary toxicity of the new fluorinated resins or a possible increase in the amount of respirable fluororesin particles emitted (8, 9). Short-term management of previous outbreaks was based mainly on the removal of incriminated products from the market, but this strategy did not prevent new outbreaks from occurring later with similar waterproofing agents. Instead, the periodic recurrence of toxicity outbreaks suggests that safety issues in the development of coating mixtures have so far followed a trial-and-error process, rather than a long-term anticipatory and preventive strategy. A new outbreak of respiratory illness due to waterproofing sprays occurred recently in Switzerland (10, 11). More than 180 cases were reported between October 2002 and March 2003, whereas 10 cases per year had been observed in the previous years. Although various commercial products were involved, they had a common waterproofing agent - a mixture of fluorinated polymer and isoparaffinic hydrocarbons that had undergone a formulation change in both solvent and polymer shortly prior to the outbreak. Unlike the former one, the new polymer is a fluoro-acrylate polymer. The same waterproofing agent appeared to be involved in a simultaneous outbreak reported in The Netherlands (12) and in a fatal case reported from France (13). A fatal case occurred also in the United Kingdom (14) at about the same period and under similar conditions."

My opinions, within a reasonable degree of medical certainty, are that Mr. Dzebic has suffered an acute and chronic pulmonary injury secondary to exposure to Stand 'n Seal. In addition, the solvent properties of Stand 'n Seal are a significant contributor to his cognitive impairment. Furthermore, these functional impairments are irreversible and will lead to continued problems of disability and future medical needs. These opinions are based on my examination, the review of the medical records, and the literature/documents cited above. My opinions are all stated as being more likely than not and may be modified based upon additional data.

UNIVERSITY OF CALIFORNIA, DAVIS

BERKELEY DAVIS IRVINE LOS ANGELES RIVERSIDE SAN DIEGO SAN FRANCISCO SANTA BARBARA SANTA CRUZ

DIVISION OF RHEUMATOLOGY/ALLERGY AND CLINICAL IMMUNOLOGY
451 HEALTH SCIENCES DRIVE
GENOME AND BIOMEDICAL SCIENCES FACILITY (GBSF), SUITE 6510
DAVIS, CALIFORNIA 95616-8660
Tel: (530) 752-2884
Fax: (530) 752-4669

M. Eric Gershwin, M.D.
megershwin@ucdavis.edu

Please note that I do plan to examine Mr. Dzebic again as well as continue my review of the literature and documents and will issue a supplemental report as needed.

If you have any additional questions, please contact me.

Sincerely,

M. Eric Gershwin, M.D.
Distinguished Professor of Medicine
The Jack and Donald Chia Professor of Medicine
Chief, Division of Rheumatology, Allergy and Clinical Immunology

MEG/nrp

**References**

1.      Jinn Y, Akizuki N, Ohkouchi M, Inase N, Ichioka M, Marumo F. Acute lung injury after inhalation of water-proofing spray while smoking a cigarette. Respiration 1998;65:486-488.
2.      Muller-Esch G, Brunk E, Djonlagic H, Hoffmann J, Wiessmann KJ. [Pulmonary effect of inhaling leather-impregnation sprays (author's transl)]. Dtsch Med Wochenschr 1982;107:692-695.
3.      Okonek S, Reinecke HJ, Fabricius W, Preussner K. [Poisoning with leather-impregnation sprays. A retrospective analysis of 224 cases of poisoning]. Dtsch Med Wochenschr 1983;108:1863-1867.
4.      Burkhart KK, Britt A, Petrini G, O'Donnell S, Donovan JW. Pulmonary toxicity following exposure to an aerosolized leather protector. J Toxicol Clin Toxicol 1996;34:21-24.
5.      Smilkstein M, Burton B, Keene W. Acute respiratory illness linked to use of aerosol leather conditioner. Morb Mortal Wkly Rep 1993;41:965-967.
6.      Tanino M, Kamishima K, Miyamoto H, Miyamoto K, Kawakami Y. [Acute respiratory failure caused by inhalation of waterproofing spray fumes]. Nihon Kokyuki Gakkai Zasshi 1999;37:983-986.
7.      Tagawa A, Ikehara K, Tsuburai T, Nishiyama H, Miyazawa N, Hashiba T, et al. [Acute lung injury caused by inhalation of waterproofing spray]. Nihon Kokyuki Gakkai Zasshi 2003;41:123-126.
8.      Hubbs AF, Castranova V, Ma JY, Frazer DG, Siegel PD, Ducatman BS, et al. Acute lung injury induced by a commercial leather conditioner. Toxicol Appl Pharmacol 1997;143:37-46.
9.      Yamashita M, Tanaka J. Pulmonary collapse and pneumonia due to inhalation of a waterproofing aerosol in female CD-1 mice. J Toxicol Clin Toxicol 1995;33:631-637.
10.     "Sprays imperméabilisants pour le cuir et les textiles: Frequence inhabituelle de troubles respiratoires (waterproofing sprays for leather and textiles: Uncommon frequency of respiratory troubles),".

6

# UNIVERSITY OF CALIFORNIA, DAVIS

BERKELEY  DAVIS  IRVINE  LOS ANGELES  RIVERSIDE  SAN DIEGO  SAN FRANCISCO  SANTA BARBARA  SANTA CRUZ

DIVISION OF RHEUMATOLOGY/ALLERGY AND CLINICAL IMMUNOLOGY
451 HEALTH SCIENCES DRIVE
GENOME AND BIOMEDICAL SCIENCES FACILITY (GBSF), SUITE 6510
DAVIS, CALIFORNIA 95616-8660
Tel: (530) 752-2884
Fax: (530) 752-4669

M. Eric Gershwin, M.D.
megershwin@ucdavis.edu

11.     Kupferschmidt H, Namer E, Lazor R. Acute respiratory toxicity after use of waterproofing textile and leather sprays: patient and exposure data. Swiss Med Wkly 2004;134:50.

12.     Bonte F, Rudolphus A, Tan KY, Aerts JG. [Severe respiratory symptoms following the use of waterproofing sprays]. Ned Tijdschr Geneeskd 2003;147:1185-1188.

13.     Testud F. Toxicite des impermeabilisants pour le cuir et les tissus (Toxicity of waterproofing agents for leather and textiles). . VIGhox, journal du centre antipoison de Lyon 2004;24:1-2.

14.     Tizzard Z, Edwards J. Acute respiratory effects following use of waterproofing sprays. Some UK experience. Thorax; 2004.

## CURRICULUM VITAE

NAME:             M. Eric Gershwin, M.D., M.A.C.P. (Master, American College of Physicians)

ADDRESS:          Division of Rheumatology, Allergy and Clinical Immunology
                  University of California at Davis
                  Genome and Biomedical Sciences Facility
                  451 Health Sciences Drive, Suite 6510
                  Davis, CA  95616-8660
                  (530) 752-2884 Telephone; (530) 752-4669 Fax
                  email: megershwin@ucdavis.edu

DATE AND PLACE
OF BIRTH:         January 19, 1946, New York, New York

MARITAL           Married, three children; wife D.V.M., Ph.D.: UC Vet School Faculty
STATUS:

COLLEGE:          Syracuse University, Syracuse, New York
                  A.B., 1966 (summa cum laude), Phi Beta Kappa, Pi Mu Epsilon (mathematics)

MEDICAL           Stanford University, Stanford, California
SCHOOL            M.D., 1971 (Alpha Omega Alpha)

GRADUATE          Centre for Astrophysics and Supercomputing, Melbourne, Australia
SCHOOL            M.S., 2002 (Astronomy and Astrophysics)

HONORARY          Doctor of Philosophy, Honoris Causa, University of Athens.
DEGREE            2009. Awarded by the Rector for a lifetime contribution in immunology and medicine,
                  the highest honor bestowed by the University of Athens.

## PROFESSIONAL EXPERIENCE:

2003-present    Distinguished Professor of Medicine, Division of Rheumatology/Allergy and Clinical
                Immunology, University of California, Davis, California
1994-present    The Jack and Donald Chia Professor of Medicine, Division of Rheumatology/Allergy and
                Clinical Immunology, University of California, Davis, California
1989-2001       Chairperson, Graduate Group in Immunology, University of California, Davis, California
1985-1986       Guggenheim Fellowship and Visiting Scientist, Walter and Eliza Hall Institute of
                Medical Research, Melbourne, Australia.
1982-present    Chief, Division of Rheumatology/Allergy and Clinical Immunology, University of
                California School of Medicine, Davis, California.
1981-present    Professor of Medicine (Rheumatology and Allergy), University of California School of
                Medicine, Davis, California.
1977-present    Director, Allergy-Clinical Immunology Program, University of California School of
                Medicine, Davis, California.
1977-1981       Associate Professor of Medicine (Rheumatology and Allergy), University of California
                School of Medicine, Davis, California.
1976-1979       Director, Special Immunology Diagnostic Laboratory, University of California School of
                Medicine, Davis, California.

| | |
|---|---|
| 1975-1977 | Assistant Professor of Medicine (Rheumatology and Allergy), University of California School of Medicine, Davis, California. |
| 1973-1975 | Clinical Associate, Immunology, National Institutes of Health, Bethesda, Maryland. |
| 1971-1973 | Internship, Residency: Tufts-New England Medical Center, Boston, Massachusetts. |
| 1970 | January-May: Smith, Kline and French Fellowship in Tropical Medicine, Memorial Christian Hospital, Sialkot, West Pakistan. |
| 1967 | Summer: Department of Pharmacology, University of Switzerland. Dr. Peter Waser: Uptake and distribution of drugs using autoradiography. |
| 1966-1971 | Clinical pharmacology research - Dr. N. Ty Smith, Stanford Medical School. |
| 1965 | Summer - Institute of Arctic Biology, University of Alaska, College of Alaska. Drs. Peter Morrison and Larry Irving: Comparative electrophoretic and immunodiffusion patterns of arctic rodents. |

LICENSING AND CERTIFICATION:

| | |
|---|---|
| Certified: | American Board of Internal Medicine - 1974 |
| | American Board of Internal Medicine, subspecialty of Rheumatology - 1978 |
| | American Board of Allergy and Clinical Immunology - 1980 |
| Licensed: | California (active) |
| | Maryland (inactive) |
| | Massachusetts (inactive) |
| | New York (inactive) |

PATENTS (INVENTIONS):

"Recombinant Autoantigen of Primary Biliary Cirrhosis" with Walter and Eliza Hall Institute for Medical Research and the Commonwealth of Australia. Patent Act 1952 (Davies and Collison, Patent Attorneys) 1987.

"Use of Recombinant Cloned Antigens as Diagnostic Reagents". Patent Act 1952 (Davies and Collison, Patent Attorneys), 1988.

"Primary Biliary Cirrhosis Autoantigens" with AMRAD Corporation Ltd. Serial No. 25919, 1990.

"Nonmethylene Interrupted Fatty Acids As Immuno-Modulators", University of California, patent pending 93-125-1 (United States; Mexico; Europe), 1993.

"Recombinant Fusion Protein Comprising PDC-E2, and OGDC-E2 and Uses Thereof" (U.S. Patent No. 6,111,071, Issued: August 29, 2000).

"Xenomice-derived Human Monoclonal Antibodies" (U.S. Patent ABX-UCD1 PCT, pending), filed by Fish and Neave, April 2002.

"Antibodies Against Autoantigens of Primary Biliary Cirrhosis and Methods of Making and Using Them" (U.S. Patent 60/279,052; 60/323,920; US02/09694), filed by OTT, University of California, 2001/2002.

"Autoantibodies and Primary Biliary Cirrhosis" (European Patent #02723662.9-2108 PCT/US0209694), filed by OTT, University of California, accepted August 8, 2003.

"Identification of *Novosphingobium Aromaticivorans* and Primary Biliary Cirrhosis" (U.S. Patent pending), filed by University of California, August 2003.

"Discovery of the Microorganism That Causes the Human Autoimmune Disease, Primary Biliary Cirrhosis" (U.S. Patent No. 10/893,608), filed by University of California, July 15, 2004.

## HONORS, AWARDS:

Phi Beta Kappa:  Syracuse University, 1965
Mary Marshall Award:  Syracuse University, 1966
Pi Mu Epsilon (Mathematics):  Syracuse University, 1966
Witco Chemistry Award in Organic Chemistry, Syracuse University:  1964, 1965, 1966
Stanford Award for Outstanding Student Research, 1968
Association of American Medical College Recognition in Tropical Medicine:  1970
Robert Shelton Alumni Scholar Award (for outstanding graduating medical student), Stanford
   University School of Medicine:  1971
Dermatology Prize, Stanford University:  1971
Alpha Omega Alpha:  Stanford University, 1971
Guggenheim Fellowship, 1986
Distinguished Medal: Japanese Society of Hepatology, 1988
Professorial Award: Kagawa University, 1998
Alfred Cahen Memorial Lecturer, Case Western Reserve University, 2003
Best Doctors in America, 2001-2002, 2002-2003, 2003-2004, 2005-present
Life Sciences:  Top 1% of all quoted researchers in medical sciences, 2005
Distinguished Medal, University of Milan, 2006
Henry Kunkel Society, 2006
Honorary Professor, Immunology, Shanghai University, May 2007-April 2010
AESKU Prize for Lifetime Contribution in Autoimmunity, September 2008
Doctor of Philosophy, Honoris Causa, University of Athens, 2009.
The Carbone Visiting Professor, University of California at San Francisco, 2009.
Master, American College of Physicians, 2009

Travel Awards:
Eleventh Leukocyte Culture Conference, Tucson, Arizona: 1976; International Congress of
Immunology, Sydney, Australia, 1977; American Association of Immunologists, 1977; Twelfth
Leukocyte Culture Conference Beersheba, Israel, 1978; International Congress on Immunodeficient
Animals, Lausanne, 1982; International Congress on Animal Models, Kyoto, 1985; International
Congress on Mucosal Immunity, Berlin, 1991.
Research Career Development Award (NIAID):  1977-1982.
University of California Faculty Research Award, 1979, 1985.
Senior Investigator, American Rheumatism Association, 1982-1987.
Fogarty Senior International Fellowship, 1985.
John Simon Guggenheim Memorial Fellowship, 1985-1986.
Joan Oettinger Memorial Award, 1988.
Amrad Fellow, Melbourne, Australia, 1990.

## MEMBERSHIPS:

American Association of Physicians
American Academy of Allergy and Immunology, Fellow
American Association of Immunologists
American Association for the Study of Liver Diseases
American College of Physicians, Fellow
American College of Rheumatology, Fellow
American Society of Clinical Investigation
Transplantation Society
Western Society for Clinical Research

Western Association of Physicians

PUBLIC SERVICE:

Reviewer, VA Career Development Awards, 1976-present.
Medical-Scientific Director, American Lupus Society, Sacramento Valley Chapter, 1977-1982.
Member, Medical-Scientific Committee, National Foundation for Ileitis and Colitis, Sacramento Valley Chapter, 1977-1980.
Immunogenetics Council Member End Stage Renal Disease Network, 1977-1985.
Nominating Committee, Comparative Immunology Division, 1977-1981.
Consultant, World Health Organization Genetic Control of Autoimmunity, Michigan, Wisconsin, 1978.
American Rheumatism Review Subcommittee, 1979-1981.
American Academy of Allergy Primer Group, 1980.
Council Member, Immunopharmacology Division of American Society of Pharmacology and Experimental Therapeutics, 1980-1983.
Immunology Study Section NIH, 1980, 1982.
Ad Hoc Reviewer National Science Foundation, 1979-present.
Consultant (Grants), Canadian Rheumatism Society, 1982-present.
Consultant, Kroc Foundation, 1980-1984.
Treasurer, International Society of Developmental and Comparative Immunology, 1980-1984.
Chairperson, Division of Comparative Immunology of the American Society of Zoologists, 1983-1987.
Council Member, American Rheumatism Association (Western Division), 1984-1986.
Immunology Subcommittee Western Society for Clinical Research, 1985.
Council Member, Myasthenia Gravis Foundation, 1984-1986.
Laboratory Refinement Committee, American Academy of Allergy and Clinical Immunology, 1985-1988.
State of California Committee on Arthritis Manpower and Resources, 1985-1987.
Vice President, American Rheumatism Association (Western Division), 1986-1987.
President; American Rheumatism Association (Western Division), 1987-1988.
Council Member, Western Society for Clinical Investigation, 1987-1990.
Council Member, Professional Information; American Academy of Allergy and Clinical Immunology, 1988-1990.
Board of Directors Member:  American Rheumatism Association, 1988-1991.
Special Reviewer, National Research Council, National Academy of Sciences, Washington, DC, 1988.
Advisor, United States Food and Drug Administration (Nutrition and Immunity), 1991.
Council Member, Western Association of Physicians, 1992-present.
Member, National Institutes of Health, General Medicine Study Section A, 1990-1992.
Chairperson, National Institutes of Health, General Medicine Study Section A, 1992-1994.
Reviewer, Austrian Society for Allergy and Immunology, 1993-present
Reviewer, Thrasher Research Fund, 1993; 1996-present.
Consultant, California Environmental Protection Agency, Immunotoxicology Work Group (OEHHA, Cal/EPA), 1994-present.
National Institutes of Health Reviewers Reserve (NRR), 1994-present.
American Liaison, 4th International Conference on Systemic Lupus Erythematosus, 1994-1995.
Reviewer for John Simon Guggenheim Memorial Foundation Fellowships in Medicine, 1996-present.
Special Reviewer:  University of Tel Aviv Sackler Faculty of Medicine, 1996-1998
Chair, American Liver Foundation Committee on Primary Biliary Cirrhosis, 1997-present.

External Advisor: University of Western Australia (Immunology), 1998.
External Advisor: Monash University Research Grants and Ethics Branch, Clayton, Australia, 1998.
Advisory Board, Liver Unit, Mt. Sinai Medical Center, New York, 1998-present.
Advisory Board, Physicians' Desk Reference, 1999-present.
Consultant, The Wellcome Trust, 2001-present
Member, Allergy and Immunology Scientific Committee of the California Medical Association's Council of Scientific Affairs, 2001-2005
Consultant, Federal Trade Commission, U.S. Government, 2002
Member, Scientific Advisory Board, American Autoimmune Diseases Association, 2003-present
Advisor, The Netherlands Organisation for Health Research and Development (ZonMw), 2003
Member, Academic Advisory Board of UC Davis CONNECT, 2003-present
Reviewer, United States-Israel Binational Science Foundation, 2002, 2003, 2004
Reviewer, Medical Research Council of the United Kingdom, 2002-2004
Consultant, Life Sciences Research Office (LSRU) and Center for Devices and Radiological Health, FDA (CDRH) Immunotoxicology, 2003-2004.
Reviewer, American Liver Foundation, 2004-present
Reviewer, Doris Duke Foundation, 2004-present
Reviewer, Austrian Science Foundation, 2004-05
Reviewer, French Science Foundation, 2005
Reviewer, University Grants Committee, Research Grants Council of Hong Kong, 2005
Consultant and Reviewer, Medical University of Graz, Austria, Ph.D. Program, 2006
External Reviewer for National Institute for Occupational Safety and Health (NIOSH), 2008
Reviewer, Israel Science Foundation, 2008-present
Reviewer, Swish National Science Foundation, 2009-present

JOURNAL EDITOR:

Editor-in-Chief, Clinical Reviews in Allergy, 1983-present
Co-Editor, Allergologia et Immunopathologia, 1986-1998
Editor-in-Chief, Healthline-Allergies & Asthma, 1990-2000
Co-Editor, Reviews in Autoimmunity, 2001-present
Editor-in-Chief, Developmental Immunology, 2003-2006
Co-Editor-in-Chief, Autoimmunity Reviews, 2005-present
Editor-in-Chief, Journal of Autoimmunity, 2006-present

ASSOCIATE EDITOR:

Developmental and Comparative Immunology, 1986-1989
International Archives of Allergy and Immunology, 1992-1998
Journal of Autoimmunity, 1996-2006; currently Editor-in-Chief
Journal of Medicinal Foods, 2001-present
Experimental Biology and Medicine 2002-2005
Developmental Immunology, 2002-present

EDITORIAL BOARD SERVICE:

Immunopharmacology, 1977-1990
African Journal of Immunology, 1979-1984
Western Journal of Medicine, 1983-1990
Allergologia et Immunopathologia, 1985-present

American Zoologist, 1986-1990
Modern Medicine, 1988-present
Human Antibodies and Hybridomas, 1989-present
Current Medical Literature - Rheumatology, 1990-1992
Journal of Allergy and Investigative Immunology, 1991-present
Journal of Clinical Immunology, 1992-present
Seminars in Clinical Immunology, 1995-present
Turkish Journal of Immunology, 1996-present
Cellular Immunology, 1996-present
The Guide: A Time-Saving Summary of Clinical Guidelines, 1996-present
Clinical Therapeutics, 1997-present
International Medicine (Russia), 1997-present
PDR (Physician's Desk Reference) Advisory Board, 1998-present
inScight (Science Magazine), 1998-present
Seminars in Liver Disease, 1999-2002
Society for Experimental Biology and Medicine, 2001-2004
Clinical and Experimental Medicine, 2001-present
Journal of Traditional Medicine, 2002-present
Autoimmunity 2003-present
Seminars in Liver Disease, 2005
Gastroenterology, 2006-present
Journal of Gastroenterology, 2007-2009
Archives of Medical Science, 2007-present
Gerontology, 2007-present
World Journal of Gastroenterology, 2008-present
Chinese Medicine, 2008-present
Journal of Gastroenterology, 2008-2009
Hepatology Research, 2009-present
Liver Disease Review Letters, 2009-present

## OCCASIONAL REVIEWER:

American Family Physician
American Journal of Clinical Nutrition
American Journal of Enology and Viticulture
American Journal of Medicine
American Journal of Pathology
American Journal of Reproductive Immunology
Annals of Internal Medicine
Applied Genomics and Proteomics
Archives of Internal Medicine
Arthritis and Rheumatism
Arthritis Care and Research
Biochimica et Biophysica Acta
Biochemical Pharmacology
Blood
British Journal of Cancer
British Medical Journal
Cancer
Cancer Letters
Cancer Research

Cellular and Molecular Life Sciences
Cellular Immunology
Chest
Circulation
Clinical and Experimental Immunology
Clinical and Experimental Rheumatology
Clinical Chemistry
Clinical Immunology and Immunopathology
Clinical Infectious Diseases
Clinical Therapeutics
Critical Reviews in Immunology
Developmental and Comparative Immunology
Digestive and Liver Disease
Digestive Diseases and Sciences
Environmental Health Perspectives
European Journal of Gastroenterology and
  Hepatology
Experimental Eye Research
FASEB Journal

Gastroenterology
Gut
Immunity
Immunopharmacology
International Immunology
International Journal of Cancer
International Journal of
  Immunopharmacology
International Journal of Medicinal
  Mushrooms
International Pharmacology
Journal of Acquired Immune Deficiency
  Syndromes
Journal of Agricultural and Food Chemistry
Journal of Allergy and Clinical Immunology
Journal of American Medical Association
Journal of Biomedical Science
Journal of Chromatography
Journal of Clinical Epidemiology
Journal of Clinical Investigation
Journal of Clinical Immunology
Journal of Experimental Medicine
Journal of Gastroenterology and Hepatology
Journal of Hepatology
Journal of Infectious Diseases
Journal of Immunologic Methods
Journal of Immunology
Journal of Investigational Allergology and
  Clinical Immunology
Journal of Laboratory and Clinical
  Immunology
Journal of Maternal-Fetal Medicine
Journal of Molecular Biology
Journal of Molecular Medicine

Journal of the National Cancer Institute
Journal of Neuroimmunology
Journal of Nutrition
Journal of Nutritional Immunology
Journal of Pharmacy and Pharmacology
Journal of Respiratory Diseases
Journal of Rheumatology
Journal of Viral Hepatitis
Kidney International
Life Sciences
Liver
Liver International
Liver Transplantation
Lupus
Nature Reviews Immunology
Neurobiology of Aging
New England Journal of Medicine
Nutrition
Oncogene
Pathology Research and Practice
Pharmacological Research
Physiology and Behavior
Proceedings of the Society for Experimental
  Biology and Medicine
Pulmonary Pharmacology and Therapeutics
Science
Science of the Total Environment
Southern Medical Journal
Thymus
Trends in Biotechnology
UpToDate
Western Journal of Medicine
Women's Health and Primary Care

**EXHIBIT 3**
**Fee Schedule**

Pursuant to Fed.R.Civ.P. 26(a)(2)(B)(vi), Dr. M. Eric Gershwin's

statement of compensation to be paid for the study and testimony in the case.

October 28, 2009

To:   Meghan Johnson Carter

From: Nikki Phipps

RE:   To work with Dr. Eric Gershwin on legal reports, October 31, 2009

8 hours x $50/hr           —        $400.00

*Nikki Phipps*

October 26 2009

Meghan Johnson Carter
Motley Rice LLC
28 Bridgeside Blvd
Mt Pleasant SC 29464
Fax 843 216 9450

Re:  Dzebic case (two reports)


To work on Saturday x 8 hrs @$500/hr-=$4000.00

M. Eric Gershwin M.D.

W9 attached



**TNA**   Tatjana Novakovic-Agopian, Ph.D.
Clinical Psychology and Neuropsychology

## NEUROPSYCHOLOGICAL CONSULTATION

March 15, 2010
Anna Dubrovsky, ESQ.
Choulos, Choulos & Wyle
425 California, Suite 1800
San Francisco, CA 94104

| | |
|---|---|
| **Name:** | **Hilmija Dzebic** |
| **Date of Birth:** | **05/01/1963** |
| **Education:** | **13 years** |
| **Handedness:** | **Right** |
| **Referral Source:** | **Ana Dubrovsky, Esq** |

Dear Ms Dubrovsky,

The following represents my report of neuropsychological evaluation of Mr. Hilmija Dzebic on November 25 2009. Mr Dzebic is a 46 year old Bosnian man with a history of exposure to Stand and Seal grout sealer in April 2007, and multiple medical problems including acute and chronic lung injury, hypoxia, cognitive impairment and depression. He was previously seen for neuropsychological evaluation in March and April of 2008 by this evaluator, and was found to have significant cognitive difficulties in the domains of memory, executive functioning and psychomotor speed, and to be clinically depressed. Mr Dzebic was referred for a repeat neuropsychological evaluation to asses for changes in his cognitive and emotional functioning.

## Procedures and Tests Administered

Review of available medical records; Clinical interview and history with patient and his wife Fikreta ; Hopkins Verbal Learning Test Revised- (HVLT-R); Brief Visual Memory Test- Revised (BVMT-R); Color Trails, Color- Word Interference Test (D-KEFS); Verbal Fluency Test (DKEFS);   Design Fluency (D-KEFS); Grooved Pegboard; Test of Memory and Malingering (TOMM); Beck Depression Inventory II (BDI- II)

Office Address :   2299 Post Street, Suite 104A,     San Francisco, CA 94115     (415) 753-3888
Mailing Address:  PO BOX 225307,                        San Francisco, CA 94122

## History of Presenting Problem

### April 2007-April 2008- Abbreviated Summary – (Please see neuropsychological evaluation from April 2008 and medical records)

Mr Dzebic and his wife reported that on April 16 2007 he was using Stand and Seal spray grout sealer on tile work in their kitchen that was reportedly not well ventilated. After being away for several hours, his wife indicated that she found Mr Dzebic having difficulty breathing, experiencing chest tightness, and that his lips were blue. Per Dr Eggleston report from April 16 2007, Mr Dzebic was placed on oxygen by paramedics and taken to the Eden Medical Center Emergency. He was admitted to Eden Medical Center ER with a diagnosis of hypoxia secondary to chemical inhalant exposure and leukocytosis, and maintained on oxygen supplementation. After being medically stabilized, he was discharged home in the afternoon of April 17 2007 with a diagnosis of acute chemical pneumonitis.

Following discharge, per Mr Dzebic and his wife, he continued to experience a number of symptoms including shortness of breath, fatigue, severe depression, irritability, decreased sleep, difficulty concentrating and being forgetful. Mr. Dzebic and his wife reported several ER visits for the above symptoms between April and September 2007. On September 28 2007 Mr Dzebic was evaluated by Dr Ali Zulfiquar at Washington Hospital in Freemont, and diagnosed with exertional dyspnea - possible coronary artery disease, bronchial asthma, pulmonary hypertension and depression.

On September 13, 2007 he was seen by a psychiatrist, Dr Oreper, who diagnosed him with major depressive disorder, severe, with psychotic features and placed him on disability. Dr Oreper's has been psychiatrically following Mr Dzebic since September 2007 for medications management and brief psychotherapy. In his report from March 7 2008 he noted a slow and gradual improvement in symptoms of sadness, energy and less somnolence. Dr Oreper also noted that Mr Dzebic continued to experience symptoms of depression, fatigue, anxiety, forgetfulness, and impaired concentration, and recommended disability. Mr Dzebic's dose of Zoloft was gradually increased to a current level of 200mg, Risperidal 1.5 mg at night, and since January 2009 he had also been prescribed Aricept 10mg for memory problems.

In March and April 2008 Mr Dzebic had neuropsychological evaluation by this examiner and was diagnosed with cognitive disorder likely related to hypoxia and major depression. He was found to have significant cognitive difficulties in the domains of memory, executive functioning and psychomotor speed and to be clinically depressed. His performance was impaired on tasks requiring learning and recall of new information, initiation, sustained attention, psychomotor speed, generative ability, inhibition, mental flexibility, and multitasking.

### Summary of Available Medical Records: April 2008-January 2010

In January 2009 Mr Dzebic had a comprehensive psychiatric evaluation by Dr Debattista of Sunnybrook Medical Group. He was diagnosed with major depression and unspecified cognitive disorder possibly related to hypoxic injury and recommended for social security disability.

In his report from October 31 2009, Dr Gershwin's indicated that "My opinions, within a reasonable degree of medical certainty, are that Mr Dzebic has suffered an acute and chronic pulmonary injury secondary to exposure to Stand 'n Seal. In addition, the solvent properties of Stand 'n Seal are a significant contributor to his cognitive impairment."

In November 2009 he was evaluated by Dr Prasad for symptoms numbness and tingling in the left hand and diagnosed with possible left ulnar neuropathy. EMG studies were recommended.

In his report from   December 1 2010, Dr. Goswami diagnosed Mr Dzebic with: asthma, asthma with chronic exacerbation, dyspneas, major depression, chronic cough, and pulmonary fibrosis.

On December 4th , in a telephone consultation between this examiner and Mr Dzebic's treating psychiatrist Dr Oreper who has been following the patient since September 2007, Dr Oreper stated that Mr Dzebic's functioning has not improved over the past year. Dr Oreper indicated that Mr Dzebic continues to be clinically depressed and to have significant cognitive problems, and that his wife is a full time caregiver. Dr Oreper also recommended brain MRI.

Mr Dzebic's brain MRI from   January 27, 2010 indicated no infarct, masses, hemorrhage, edema, or midline shift. Small punctate hyperintensities were noted in white matter in the subcortical frontal and peri ventricular parietal areas bilaterally.

### November 25 2009 Evaluation

On November 25 2009 Mr Dzebic was seen by this evaluator. He was accompanied by his wife. Both Mr Dzebic and his wife indicated that he continues to experience significant difficulties in remembering, initiating, and planning daily activities. He has been spending most of his time at home with his wife who is a full time caregiver. He is independent in basic ADLs, but his wife continues to manage most other household tasks including shopping, cooking, finances, as well as his medical appointments and driving him. He has not driven since April of 2007 due to concentration difficulty and fear of getting lost. He reported being very forgetful, easily distractible, irritable, loosing track of thought, and having difficulty planning and initiating daily tasks. He also indicated feeling depressed and having difficulty sleeping.

Mr Dzebic was oriented to month, year and place but not to date. He was not able to name his medications and said that his wife gives him medications for lungs, memory and depression. Patient's wife noted that on a couple occasions when he did not take Aricept he seemed more confused.

### Medical and Psychiatric  History

Mr Dzebic's current medical history is described above.  He indicated that his past medical history is significant for heartburn.

Mr Dzebic reported experiencing depressive symptoms in 2005, and that he was prescribed an antidepressant, Zoloft 50mg, by his primary care physician which helped.  He denied history of any additional psychiatric treatment and/or hospitalizations prior to April 2007.

He reported no current tobacco use. He indicated that he smoked tobacco for a number of years in the past (approximately 5-6 cigarettes per day). He denied any alcohol or nonprescription drug use.

### Current Medications

Zoloft, Risperdal, Aricept, Predinisone, Omeprazole, Promethazine with codeine, Clonazepam, Nytroglycerin patch, Xoponex, Albuterol-ipratropium, Advair Diskus

### Social and Occupational History

Mr Dzebic was born and raised in Velika Kladusa, Bosnia where he completed high school and electrician training. He worked as an electrician in Bosnia, until he immigrated to US in 1996.

Until April 2007, he reported working as a contractor full time, primarily doing tile and electrical work. He reported using the Stand and Seal grout sealer in the past, since 2005, for sealing the tile work, but for

much briefer period of time than it was in April 2007. He has not been able to work since April 2007, and is on disability.

He lives with his wife Fikreta who is his caregiver. They have two children, a 13 year daughter and a three year old son.

## Behavioral Observations

Mr. Dzebic is a 46 year old, somewhat overweight, Caucasian man, neatly dressed and groomed, who appears older than his age. He came to the appointment on time, accompanied by his wife.

Due to Mr Dzebic's limited command of English language the interview and evaluation were conducted in his native language. He did not initiate much spontaneous speech, but was able to appropriately answer questions asked in Bosnian. His expressive speech in Bosnian was often characterized by word finding difficulties. In general, he benefited from having longer time to respond, and from repetition and /or simplifications of the questions and/or the information presented. In addition, on several occasions he needed to be reminded of issues discussed earlier in the session.

He was oriented to month, year and place but not to date. His affect was restricted in range, and at times anxious when discussing his concerns. He reported continued feelings of depression, decreased sleep, fatigue, and being irritable and short-tempered. There was no evidence of delusional thought processes, auditory or visual hallucinations.

### Motivation and Cooperation

Mr Dzebic's performance on Test of Memory and Malingering (TOMM), which is a test sensitive to the level of effort exerted, was within normal expectations (Trial1: 44/50; Trial2: 49/50). He did appear to exert his best effort during the evaluation, and performed in a consistent manner on tests assessing comparable cognitive domains. The present evaluation appears to be a valid reflection of his current level of functioning.

## Test Results Discussion

### Performance Level Classification

| Performance Level | T-score | Z-score | Percentile |
|---|---|---|---|
| Severe | ≤19 | ≤-3.1 | ≤0.1% |
| Moderate to Severe | 20 – 24 | -3 to -2.6 | < 0.5% |
| Moderate | 25 – 29 | -2.5 to -2.1 | 0.5% to 2% |
| Mild to Moderate | 30 – 34 | -2 to -1.5 | 2% to 6% |
| Mild | 35 – 39 | -1.5 to -1.1 | 7% to 14% |
| Below Average | 40 – 44 | -1 to -0.6 | 15% to 28% |
| Average | 45 – 54 | -0.5 to 0.4 | 29% to 67% |
| Above Average | 55 – 59 | 0.5 to 0.9 | 68% to 83% |
| High Average | 60 – 64 | 1 to 1.4 | 84% to 92% |
| Superior | 65 – 69 | 1.5 to 1.9 | 93% to 97% |
| Very Superior | ≥70 | ≥2 | ≥98% |

Test results are shown in percentiles and z scores (mean is 0 and standard deviation is 1).
The last column represents a z score change between Mr Dzebic's performance on different tests in April 2008 and November 2009. Change of more than 1 z score (1sd ) is generally considered significant.

**Attention, Concentration and Psychomotor Speed**

| Domain | Test | April 2008 | | | November 2009 | | | Z Score Change |
|--------|------|-----------|------|----------|--------------|------|---------|----------------|
| | | Raw Score | %ile | Z-Score | Raw Score | %ile | Z-Score | |
| Immediate Attention – Auditory | Digit Span | 10 | 16 | -1.0 | 9 | 9% | -1.3 | -0.3 |
| Visual Scanning and Sequencing | Color Trails 1 | 176 sec | <1% | -3.1 | 174sec | <1% | -3.1 | 0 |

Mr Dzebic's performance on measures of attention and concentration was consistent with his performance in April 2008.

On a digit span test assessing auditory attention and concentration, he performed in the mildly impaired range, at the 9th percentile of his age group. His digit span was up to 5 digits forward and up to 4 digits backwards.

Consistent with previous evaluation, he continued to have difficulty on tasks requiring visual scanning and sequencing, and visuo-motor processing speed. On the Color Trails 1 test, requiring visually scanning a page of randomly distributed numbers and rapidly connecting them in order, he performed in the severely impaired range with regards to speed, below the 1st percentile of his age group.

**Learning and Memory**

| Domain | Test | April 2008 | | | November 2009 | | | Z Score Change |
|--------|------|-----------|------|---------|--------------|--------|---------|----------------|
| | | Raw Score | %ile | Z-score | Raw Score | %ile | Z-score | |
| Verbal Learning | HVLT Trials 1 – 3 Tot. Recall | 17 | <1% | -2.7 | 24 | 14% | -1.1 | 1.6 |
| Delayed Verbal Memory | HVLT Delayed Recall | 5 | <1% | -2.5 | 5 | <1% | -2.4 | 0.1 |
| | HVLT Rec. Disc. Index | 2 | <1% | -3.0 | 8 | <1% | -3.0 | 0 |
| Visual Learning | BVMT-R Trials 1-3 Tot Recall | 16 | 4% | -1.8 | 13 | 1% | -2.3 | -0.5 |
| Delayed Visual Memory | BVMT-R Delayed Recall | 5 | <1% | -2.4 | 4 | <1% | -2.8 | -0.4 |
| | BVMT-R Rec Disc. Index | 6 | >16% | > -1.0 | 5 | 11-16% | -1.2 - -1 | N/A |

Mr Dzebic's performance on measures of verbal and visual learning and memory was generally consistent with his performance in April 2008, and he continued to have significant difficulties in learning and recalling new information.

Neuropsychological Consultation
Hilmija Dzebic

On a word list- learning test (HVLT R- presented in Bosnian) requiring him to learn a list of 12 words with 3 repetition trials, he had a mildly impaired learning curve (14th percentile), which represented an improvement relative to his performance in April 2008. However, both his 30 minute delayed recall and recognition were in the lowest 1st percentile of his age group, and consistent with his previous testing.

On a visual memory test (BVMTR), during which he had 3 trials to learn and reproduce 6 simple designs, his performance was consistent with his previous evaluation. He had a slow learning curve (1st percentile), and his 30 minute delayed recall was in the moderately to severely impaired range (1st percentile).

### Language

| Domain | Test | April 2008 | | | November 2009 | | | |
| | | Raw Score | %ile | Z-Score | Raw Score | %ile | Z-Score | Z Sc Change |
|---|---|---|---|---|---|---|---|---|
| Verbal Generative ability (fluency) | DKEFS Category Fluency | 23 | < 1% | -2.7 | 18 | <1 | -3.0 | -0.3 |

Mr Dzebic's did not initiate much conversational speech either in Bosnian or in English. He was generally able to appropriately answer questions asked in Bosnian. His expressive speech in his native language was often characterized by word finding difficulties. His semantic fluency (naming quickly, in one minute, clothing and names in Bosnian) was in the moderately to severely impaired range, below the 1st percentile of his age group and consistent with the previous evaluation.

### Motor Functions

| Domain | Test | April 2008 | | | November 2009 | | | |
| | | Raw Score | %ile | Z-Score | Raw Score | %ile | Z-Score | Z Sc Change |
|---|---|---|---|---|---|---|---|---|
| Motor Speed and Dexterity – Dominant Hand | Grooved Pegboard | 133 sec | <1% | -3.0 | 152 | <1% | -3.2 | -0.2 |
| Motor Speed and Dexterity – Non-Dominant Hand | Grooved Pegboard | 137 sec | <1% | -2.9 | 160 | <1% | -2.7 | 0.2 |

Mr Dzebic's fine motor speed and dexterity for both hands was at the 1st percentile of his age group, and consistent with his previous evaluation.

### Executive Functions

| Domain | Test | April 2008 | | | November 2009 | | | |
|--------|------|-----------|------|-----------|---------------|------|---------|----------|
| | | Raw Score | %ile | Z-Score | Raw Score | %ile | Z-Score | Z Sc Change |
| Generative Ability - Verbal Fluency | Category Fluency | 23 | 1% | -2.7 | 18 | <1 | -3.0 | -0.3 |
| Generative Ability – Design Fluency | Design Fluency Total Correct (Cond. 1+2) | 10 | 9% | -1.3 | 11 | 16% | -1.0 | 0.3 |
| Mental Flexibility | Color Trails 2 time | 270 sec | <1% | -3.1 | 219 sec | <1% | -3.1 | 0 |
| | Color Trails 2 errors | 3 color errors | <1% | | 3 color errors | <1% | | N/A |
| | Category Switching - Design Fluency | 4 | 16% | -1.0 | 4 | 16% | -1.0 | 0 |
| | Category Switching - Verbal Fluency | 11 | 9% | -1.33 | 8 | 1% | -2.3 | -1.0 |
| Inhibition | Inhibition – Color Word Interference | 110 sec | <1% | -3.0 | 104 | <1% | -3.0 | 0 |
| Complex Multi-tasking | Inhibit /Switch Color Word Interference | 173 sec | <1% | -3.0 | 165 | <1% | -3.0 | 0 |

Mr. Dzebic's performance on different domains of executive functioning was generally consistent with his previous evaluation. He continued to have significant difficulty on tasks requiring him to inhibit an automatic, over learned response (DKEFS Inhibition – Color Word Interference), complex multitasking (DKEFS Inhibition/Switching – Color Word Interference), verbal generative ability, and mental flexibility (Color Trails 2; Category Switching Verbal Fluency). In the above domains he performed at or below the 1st percentile of his age group. With the exception to the verbal category switching task on which he performed somewhat worse, his performance was generally comparable to the one in April 2008.


### Emotional Functioning

Mr Dzebic's gave the impression of a man who is clinically depressed and concerned about his health and cognitive symptoms. His affect was restricted in range, and at times anxious when discussing his concerns. On Beck depression Inventory II he scored in the severely depressed range (raw score=33). He reported feelings of pessimism, anhedonia, loss of interest in daily activities, loss of energy, decreased sleep, fatigue, concentration difficulty, crying easily and being more irritable and short-tempered since the exposure. Similarly, in April 2008 his BDI II score was 39, which was also in the severely depressed range.

## Summary and Impressions

Mr Hilmija Dzebic is a 46 year old Bosnian man with a history of exposure to Stand and Seal grout sealer in April 2007, and multiple medical problems including acute and chronic lung injury, hypoxia, cognitive impairment and depression. In March and April 2008 Mr Dzebic had neuropsychological evaluation by this examiner and was found to have significant cognitive difficulties in the domains of memory, executive functioning, and psychomotor speed, and to be clinically depressed. He was diagnosed with unspecified cognitive disorder likely related to hypoxia and major depression.

Consistent with the previous evaluation, on the present neuropsychological evaluation, Mr Dzebic continues to experience significant cognitive difficulties that are particularly prominent in the domains of memory, executive functioning, and psychomotor speed. His performance continued to be impaired on tasks requiring learning and recall new information, mental flexibility, multitasking, psychomotor speed, generative ability and inhibition. He also continues to be clinically depressed and experience feelings of pessimism, anhedonia, loss of interest in daily activities, decreased sleep, fatigue, irritability, concentration difficulty, and crying easily.

In my opinion Mr Dzebic's cognitive symptoms are most likely related to acute and chronic hypoxia. His symptoms of depression and anxiety may have contributed to some of his cognitive difficulties, particularly in the concentration domain, and made it more difficult for him to compensate, however, his cognitive symptoms can not be explained by his depression. Neuropsychological consequences of hypoxia often include impairments in memory, attention, executive function and speed of processing information (ie Hopkins, R. and Bigler, E. 2001, 2008; Lezak et al 2004, p.282), which are some of the main areas of Mr. Dzebic's difficulty.

Thank you very much for allowing me to participate in Mr. Dzebic's care. If you have any questions, please don't hesitate to contact me.

Tatjana Novakovic-Agopian, Ph.D
Licensed Psychologist- PSY 14601
Qualified Medical Evaluator 984548
Assistant Professor, Department of Neurology, UCSF

References cited:

Hartman, D. (1995). *Neuropsychological Toxicology*. Plenum Press, New York.

Hopkins, R. and Bigler, E. (2008) *Hypoxic and Anoxic Conditions and CNS*. In: Morgan and Ricker editors: Textbook of Clinical Neuropsychology, pp 521-535. Taylor & Francis, New York.

Hopkins, R. and Bigler, E. (2001) *Pulmonary Disorders* In: Tarter, Butters and Beers editors: Medical Neuropsychology, p.25-50. Plenum Publishers, New York.

Lezak, M., Howieson, D., & Loring, D. (2004) Chronic Oxygen Deprivation. In Lezak, M., Howieson, D., & Loring: Neuropsychological Assessment, p 282. Oxford University Press.

 **TNA**   Tatjana Novakovic-Agopian, Ph.D.
Clinical Psychology and Neuropsychology

## NEUROPSYCHOLOGICAL CONSULTATION

**Name:**                    Hilmija Dzebic
**Date of Birth:**           05/01/1963
**Education:**               13 years
**Handedness:**              Right
**Referral Source:**         Ana Dubrovsky, Esq
**Dates of Evaluation:**     03/27/2008, 03/28/2008 & 04/09/2008

### Identifying Information and Reason for Referral

Mr Hilmija Dzebic is a 44 year old Bosnian man with diagnoses of depression and hypoxia and symptoms of apathy, concentration and memory problems. Mr Dzebic reports experiencing these problems since April 16 2007, when he was exposed for several hours to Stand and Seal grout sealer. He was referred for neuropsychological evaluation by his attorney, Ana Dubrovsky, Esq to assess his current cognitive and emotional functioning.

### Procedures and Tests Administered

Review of available medical records; Clinical interview and history with patient and his common law wife Fikreta ; Wechsler Adult Intelligence Scale-R ( WAIS-R/ VITI- Standardized on population of former Yugoslavia); Complex Figure; Hopkins Verbal Learning Test Revised- (HVLT-R); Brief Visual Memory Test- Revised (BVMT-R); Color Trails, Color- Word Interference Test (D-KEFS); Verbal Fluency Test (DKEFS);  Design Fluency (D-KEFS); Grooved Pegboard; Test of Memory and Malingering (TOMM); Beck Depression Inventory II (BDI II) ; Mayo Portland Adaptability Inventory (MPAI) pt and significant other; MMPI-201 (Standardized on population of Former Yugoslavia).

### Relevant History

#### History of Presenting Problem

Mr Dzebic and his wife reported that on April 16 2007 he was using Stand and Seal spray grout sealer on tile work in their kitchen. Although the door was open, the room was reportedly not well ventilated. After being away for several hours, his wife indicated that she found Mr Dzebic having difficulty breathing, experiencing chest tightness, and that his lips were blue. She called the paramedics.

Per Eden Medical Center Emergency Admit record from April 16 2007 by Dr Eggleston, Mr Dzebic was placed on oxygen by paramedics and taken to the ER. Mr Dzebic was admitted to Eden Medical Center ER with a diagnosis of hypoxia secondary to chemical inhalant exposure and leukocytosis, and maintained on oxygen supplementation. Per Dr Joseph's report from April 17 2007, Mr Dzebic's oxygen saturation improved by the afternoon of April 17 2007. His chest CT was suggestive of chemical pneumonitis. After being medically stabilized, Mr Dzebic was discharged home by Dr Joseph in the afternoon of April 17 2007 with a diagnosis of acute chemical pneumonitis.

2299 Post Street, Suite 104A, San Francisco, California 94115     (415) 753-3866

APR-14-2008 09:32 From:CC&W          4154740734      To:918432169430      P.3/11
hpr 12 2008 9:58hm    latjana Novakovic-Agopian  415-333-2707          p.3

Neuropsychological Consultation
Hilmija Dzebic

On April 27 2007 Mr Dzebic was seen at Eden Medical Center Emergency by Dr Scanlon for shortness of breath and worsening symptoms of depression and irritability since his discharge on April 17. He was discharged home with the recommendation to be seen at Shuman-Lyles Clinic where he could be followed for depression.

Per Mr Dzebic and his wife, during the course of next several months he continued to experience symptoms of severe depression, emotional lability, anxiety, irritability, decreased sleep, fatigue and lack of initiation. In addition, he reported having difficulty concentrating and being very forgetful. He reported not being able to work since April 16 2007 due to shortness of breath, and the above symptoms. Mr. Dzebic and his wife report several visits to the ER for the above symptoms between May and September 2007.

On September 28 2007 Mr Dzebic was evaluated by Dr Ali Zulfiquar at Washington Hospital in Freemont, and diagnosed with exertional dyspnea - possible coronary artery disease, bronchial asthma, pulmonary hypertension and depression.

On September 13, 2007 he was seen by a psychiatrist, Dr Oreper, who diagnosed him with major depressive disorder, severe, with psychotic features and placed him on disability. Per Dr Oreper's report from March 7 2008, he has been psychiatrically following Mr Dzebic since September 2007 for medications management and brief psychotherapy. Mr Dzebic's dose of Zoloft was gradually increased to a current level of 150mg, and he was placed on Risperidal 1mg at night. During the course of several months of treatment Dr Oreper noted a slow and gradual improvement in symptoms of sadness, energy and less somnolence. Dr Oreper also noted that Mr Dzebic continued to experience symptoms of depression, fatigue, anxiety, forgetfulness, and impaired concentration, and recommended continued disability. Mr Dzebic's MMSE score on March 7 2007 was 25/30. Dr Oreper also recommended neuropsychological testing for Mr Dzebic.

Both Mr Dzebic and his wife reported some improvement in symptoms of depression, anxiety, and emotional lability since starting the treatment with Dr Oreper in September 2007. Mr Dzebic indicated that he continues to experience significant difficulties in concentration, memory, initiation, planning, and organizational abilities. He reported being easily distractible, loosing track of thought, fatiguing easily, forgetting recent events, and having difficulty planning his daily tasks. He has not been driving since April of last year due to concentration difficulty and fear of getting lost. He spends most of his time at home, and generally leaves the house only when accompanied by his wife. He is independent in basic ADLS, but his wife manages most other daily tasks including shopping, cooking, finances, as well as managing his medical appointments and driving him. She indicated that he often needs to be prompted to initiate activities, including eating meals that she would prepare for him in advance. Recently, they have started taking daily walks together, and this has been helpful.

### Medical and Psychiatric History

Mr Dzebic's current medical history is described above. He indicated that his past medical history is significant for heartburn. His primary care physician is Dr Ali Zulfiquar.

Mr Dzebic reported experiencing depressive symptoms in 2005, and that he was prescribed an antidepressant, Zoloft 50mg, by his primary care physician, Dr Ali Zulfiquar, which helped. He denied history of any additional psychiatric treatment and/or hospitalizations prior to April 2007.

He reported no current tobacco use. He indicated that he smoked tobacco for a number of years in the past (approximately 5-6 cigarettes per day). He denied any alcohol or nonprescription drug use.

### Current Medications

Zoloft 150 mg, Risperdal 1 mg at bedtime, Proair Inhaler, Asmanex, Albuterol

Neuropsychological Consultation
Himije Dzebic

### Social and Occupational History

Mr Dzebic was born and raised in Velika Kladusa, Bosnia. He has four brothers and a sister.

Mr Dzebic reported that he graduated from high school with straight A's, and completed training as an electrician. He worked as an electrician in Bosnia, until he immigrated to US in 1996.

Until April 2007, he worked as a contractor full time, primarily doing tile and electrical work. Of note is that he reports using the Stand and Seal grout sealer in the past, since 2006, for sealing the tile work, but that it has always been for much briefer period of time than it was in April 2007. He has not been able to work since April 2007, and is on disability.

He and his common-law wife Fikreta have been together for 14 years, and have two children, 11 year daughter and one year old son. He also has adult children from a previous marriage.

His longstanding hobby has been playing music, including on occasion, for large celebrations and gatherings. He reported not being able to play since April of last year.

### Behavioral Observations

Mr. Dzebic is a 44 year old Caucasian man, neatly dressed and groomed who appears slightly older than his age. He came to the appointments on time, accompanied by his wife.

Mr Dzebic's command of English language is limited, and the evaluation was conducted in his native language. Whenever feasible, tests standardized on the population of former Yugoslavia were used.

He did not initiate much conversational speech either in Bosnian or in English, but was able to appropriately answer questions asked in Bosnian. His expressive speech in Bosnian was often characterized by word finding difficulties. At times, he benefited from repetition and /or simplifications of questions/information, and having longer time to respond. He was unable to complete a lengthy questionnaire in his native language on his own, and required this examiner's help in reading aloud questions asked, in order to help him track the questions. In addition, on several occasions he forgot and needed to be reminded of issues discussed earlier in the session.

He gave the impression of a bright man who is concerned about his health and cognitive difficulties. His affect was restricted in range, and at times anxious when discussing his concerns. He reported feelings of depression, deceased sleep, fatigue, and being more irritable and short-tempered since the exposure. There was no evidence of delusional thought processes, auditory or visual hallucinations.

### Motivation and Cooperation

Mr Dzebic's performance on Test of Memory and Malingering (TOMM), which is a test sensitive to the level of effort exerted, was within normal expectations (Trial1: 45/50; Trial2: 48/50). He did appear to exert his best effort during the evaluation, and performed in a consistent manner on tests assessing comparable cognitive domains. The present evaluation appears to be a valid reflection of his current level of functioning.

APR-14-2008 09:32 From:CC&W        4154740734        To:918432169430        P.5/11
Apr 12 2008 9:59AM   Tatjana Novakovic-Agopian  415-333-2707        p.5

Neuropsychological Consultation
Hilmija Dzabic

## Test Results Discussion

### Performance Level Classification

| Performance Level | T-score | Z-score | Percentile |
|---|---|---|---|
| Severe | ≤19 | ≤-3.1 | ≤0.1% |
| Moderate to Severe | 20 – 24 | -3 to -2.6 | < 0.5% |
| Moderate | 25 – 29 | -2.5 to -2.1 | 0.5% to 2% |
| Mild to Moderate | 30 – 34 | -2 to -1.5 | 2% to 6% |
| Mild | 35 – 39 | -1.5 to -1.1 | 7% to 14% |
| Below Average | 40 – 44 | -1 to -0.6 | 15% to 28% |
| Average | 45 – 54 | -0.5 to 0.4 | 29% to 67% |
| Above Average | 55 – 59 | 0.5 to 0.9 | 68% to 83% |
| High Average | 60 – 64 | 1 to 1.4 | 84% to 92% |
| Superior | 65 – 69 | 1.5 to 1.9 | 93% to 97% |
| Very Superior | ≥70 | ≥2 | ≥96% |

*Differences of more than 1 z score between different domains are indicative of areas of strength or weakness.*

### Intellectual Domain

| WAIS-R (standardized on population of former Yugoslavia -VITI) | Raw Score | IQ | Perf. Level | %ile | Z-Scores |
|---|---|---|---|---|---|
| Full Scale IQ | 101 | 100 | Average | 50% | 0.0 |
| Verbal IQ | 62 | 106 | Average | 66% | 0.4 |
| Performance IQ | 39 | 93 | Average | 32% | -0.5 |

| WAIS-R Verbal Sub-tests | Raw Score | Perf. Level | %ile | Z-Scores |
|---|---|---|---|---|
| Information | 22 | Average | 63% | 0.3 |
| Vocabulary | 64 | High Average | 84% | 1.0 |
| Comprehension | 23 | Above Average | 75% | 0.7 |
| Similarities | 19 | Average | 63% | 0.3 |
| Digit Span | 10 | Below Average | 16% | -1.0 |
| Arithmetic | 9 | Below Average | 25% | -0.7 |

APR-14-2008 09:32 From:CC&W                    4154740734        To:918432169430         P.6/11
      Apr 12 2008 8:59AM   Tatjana Novakovic-Agopian   415-333-2707                        p.6

Neuropsychological Consultation
Hlimije Dzebic

| WAIS-R Performance Sub-tests | Raw Score | Perf. Level | %ile | Z-Scores |
|---|---|---|---|---|
| Picture Completion | 9 | Below Average | 16% | -1.0 |
| Digit Symbol | 17 | Mild to Moderate | 2% | -2.0 |
| Block Design | 36 | Average | 50% | 0.0 |
| Object Assembly | 29 | Average | 50% | 0.0 |
| Picture Arrangement | 9 | Below Average | 25% | -0.7 |

Mr Dzebic's was administered a Weschler Adult Intelligence Scale -R (WAIS-R) version standardized and normed for the population of former Yugoslavia. His overall cognitive functioning (Full Scale IQ), was assessed with a measure consisting of 11 subtests, each measuring somewhat different aspects of cognitive function. His Full Scale IQ was in the average range, at the 50th percentile, and likely consistent with his pre-morbid functioning.

His Verbal IQ (which measures overall verbal functioning by way of language based tests), and his Performance IQ (which measures nonverbal abilities by way of visuo-spatial and visuomotor tests), were in the average range, respectively at the 66th and 32nd percentile. His Verbal IQ was 13 points higher than his Performance IQ, which is unusual and significant at 0.05 level.

Furthermore, there was a significant degree of variability in his performance on subtests assessing different cognitive domains. For example, there was a difference of 3 standard deviations between his performance on tests assessing word knowledge, and verbal comprehension (Vocabulary and Comprehension), and tests assessing processing speed (Digit Symbol). This degree of discrepancy is highly unusual and suggestive of cognitive deterioration.

### Attention, Concentration and Psychomotor Speed

| Domain | Test | Raw Score | Perf. Level | %ile | Z-Score |
|---|---|---|---|---|---|
| Immediate Attention – Auditory | Digit Span | 10 | Below Average | 16 | -1.0 |
| Visual Scanning and Sequencing | Color Trails 1 | 176 sec | Severe | <1% | -3.1 |
| Psychomotor Speed | Digit Symbol | 17 | Mild to Moderate | 2% | -2.0 |
|  | Rey Complex Figure Copy Time | 388 sec |  | <1% |  |

Mr Dzebic's performance on measures of attention and concentration was in general below what is expected of someone with his pre-morbid functioning.

On a digit span test requiring him to listen to a sequence of numbers, and then recite them back verbatim, or in reverse order, he performed in the 16th percentile. His digit span was up to 5 digits forward and only up to 3 digits backwards.

On the Color Trails 1 tests requiring visually scanning a page of randomly distributed numbers and connecting them in order, he performed in the severely impaired range with regards to speed, below the 1st percentile of his age group.

To assess graphomotor processing speed, he was presented with a template of numbers which were each paired with a unique symbol (Digit Symbol subtest). He was presented with additional rows of numbers with symbols missing, and asked to draw appropriate symbol beneath each number, in the 90 seconds allotted. He performed in the mild to moderately impaired range (2nd percentile).

Similarly, his copy of a complex design was accurate, but it took him a very long time to draw the design (388 seconds;1st percentile of his age group)

In summary, Mr Dzebic's performance on measures of attention and concentration was variable. His auditory attention span was in the below average range and is an area of relative strength. On the other hand, in several other areas he performed significantly lower than this, and below what is expected. In particular, he had difficulty on tasks requiring visual scanning and sequencing, sustained attention and visuomotor processing speed.

### Learning and Memory

| Domain | Test | Raw Score | Perf. Level | %ile | Z-score |
|---|---|---|---|---|---|
| Immediate Verbal Recall | HVLT Trail 1 | 4 | Moderate | 2% | -2.1 |
| Verbal Learning | HVLT Trials 1 – 3 Tot. Recall | 17 | Moderate to Severe | <1% | -2.7 |
| Delayed Verbal Memory | HVLT Delayed Recall | 5 | Moderate to Severe | <1% | -2.5 |
| | HVLT Recognition Discrimination Index | 2 | Moderate to Severe | <1% | -3.0 |
| Immediate Visual Recall | Rey Complex Figure Immediate Recall | 21 | Average | 46% | -0.1 |
| | BVMT-R Trial 1 | 3 | Mild to Moderate | 5% | -1.6 |
| Visual Learning | BVMT-R Trials 1-3 Tot Recall | 16 | Mild to Moderate | 4% | -1.8 |
| Delayed Visual Memory | Rey Complex Figure Delayed Recall | 14.5 | Mild | 7% | -1.5 |
| | Rey Complex Figure Delayed Recognition | 20 | Average | 31% | -0.5 |
| | BVMT-R Delayed Recall | 5 | Moderate | <1% | -2.4 |
| | BVMT-R Recognition Discrimination Index | 6 | Within Normal Limits | >16% | > -1.0 |

Mr Dzebic's ability to learn and recall new information was impaired. However, his ability to learn visually presented material appeared somewhat stronger than verbal material.

On a word list- learning test (HVLT- presented in Bosnian) requiring him to learn a list of 12 words with 3 repetition trials, he had a slow learning curve (below 1st percentile). Similarly, both his 30 minute delayed recall and recognition were in the lowest 1st percentile of his age group.

On a visual memory test (BVMTR), during which he had 3 trials to learn and reproduce 6 simple designs, he had a slow learning curve (4th percentile), and his 30 minute delayed recall was in the moderately impaired range (1st percentile). His delayed recognition was WNL.

On another test requiring him to copy and reproduce from memory a complex abstract visual design (Rey Complex Figure), his copy was accurate, but it took him a very long time to draw the design (388 seconds ;1st percentile of his age group). His immediate recall was in the average range (46th percentile), while his 30 minute delayed recall was in the mildly impaired range (7th percentile). His delayed recognition was in the average range. This suggests that he benefits from having a longer exposure time to material in order to learn it.

APR-14-2008 09:33 From:CCBW 4154740734 To:918432169430 P.8/11
APR 12 2008 9:59AM Tatjana Novakovic-Agopian 415-333-2707 p.8

Neuropsychological Consultation
Hilmja Dzebic

## Visuospatial and Visuoconstructional abilities

| Domain | Test | Raw Score | Perf. Level | %ile | Z-Score |
|---|---|---|---|---|---|
| Visuospatial /Constructional Abilities | Rey Complex Design Copy Accuracy | 35 | Within Normal Limits | >16% | |
| | Rey Complex Design Time | 388 sec. | Moderate | 1% | |
| | Picture Completion | 9 | Below Average | 16% | -1.0 |
| | Block Design | 36 | Average | 50% | 0.0 |
| | Object Assembly | 29 | Average | 50% | 0.0 |

Mr Dzebic's did not exhibit any right-left confusion or visual neglect during testing. His ability to copy a complex visual design was within normal limits with respect to accuracy, but impaired with respect to the time it took him to complete the task (388 seconds; 1st percentile of his age group). His ability to perceive detail and identify a missing part of a picture (Picture Completion) was in the below average range, at the 16th percentile. He performed in the average range (50th percentile) on a test of visual constructional skills and nonverbal reasoning (Block Design).

## Verbal Abilities

| Domain | Test | Raw Score | Perf. Level | %ile | Z-Score |
|---|---|---|---|---|---|
| Verbal Generative ability (fluency) | DKEFS Category Fluency | 23 | Moderate to Severe | < 1% | -2.7 |
| Vocabulary | WAIS-R | 64 | High Average | 84% | 1.0 |
| Comprehension | WAIS-R | 23 | Above Average | 75% | 0.7 |

Mr Dzebic's did not initiate much conversational speech either in Bosnian or in English. He was generally able to appropriately answer questions asked in Bosnian. On tests of word knowledge (vocabulary) and comprehension in Bosnian he performed in the 84th and 75th percentiles of his age group respectively.

His expressive speech in his native language was often characterized by word finding difficulties. His semantic fluency (quickly, in one minute, naming animals and first names in Bosnian) was in the moderately impaired range, at the 1st percentile. His writing and spelling were not formally assessed during this evaluation.

Page 7 of 10

APR-14-2008 09:33 From:CC&W          4154740734          To:918432169430          P.9/11
       Apr 12 2008 8:58AM   Tatjana Novakovic-Agopian  415-333-2707          p.9

Neuropsychological Consultation
Hilmija Dzebic

## Motor Functions

| Domain | Test | Raw Score | Perf. Level | %ile | Z-Score |
|--------|------|-----------|-------------|------|---------|
| Motor Speed and Dexterity – Dominant Hand | Grooved Pegboard | 133 sec | Moderate to Severe | <1% | -3.0 |
| Motor Speed and Dexterity – Non-Dominant Hand | Grooved Pegboard | 137 sec | Moderate to Severe | <1% | -2.9 |

Mr Dzebic's fine motor speed and dexterity for both hands was in the moderately impaired range, at the 1 percentile of his age group.

## Executive Functions

| Domain | Test | Raw Score | Perf. Level | %ile | Z-Score |
|--------|------|-----------|-------------|------|---------|
| Abstraction -Verbal | WAIS-R Similarities | 19 | Average | 63% | 0.3 |
| Abstraction -Nonverbal | WAIS-R Block Design | 36 | Average | 50% | 0.0 |
| Generative Ability -Verbal Fluency | D KEFS Category Fluency | 23 | Moderate | 1% | -2.3 |
| Generative Ability – Design Fluency | DKEFS Design Fluency Total Correct (Cond. 1+2) | 10 | Mild | 9% | -1.3 |
| Mental Flexibility | Color Trails 2 | 270 sec | Severe | <1% | -3.1 |
| Inhibition | DKEFS Inhibition – Color Word Interference | 110 sec | Moderate to Severe | <1% | -3.0 |
| Complex Multi-tasking | DKEFS Inhibition/Switching – Color Word Interference | 173 sec | Moderate to Severe | <1% | -3.0 |
| Comprehension –Nonverbal Sequencing | WAIS-R Picture Arrangement | 9 | Below Average | 25% | -0.7 |
| Comprehension -Verbal | WAIS-R Comprehension | 23 | Above Average | 75% | 0.7 |

Mr. Dzebic's performance on different domains of executive functioning was variable. His areas of strength included verbal comprehension, and verbal and nonverbal abstraction in which he respectively performed in the above average and average ranges.

He had difficulty on tasks requiring verbal and nonverbal generative ability (generating words or designs in a given category in 60 seconds), in which he performed respectively in the 1st and 9th percentiles of his age group.

He also had a lot of difficulty on tasks requiring him to inhibit an automatic, over learned response (DKEFS Inhibition – Color Word Interference), complex multitasking (DKEFS Inhibition/Switching – Color Word Interference) and mental flexibility (Color Trails 2). In the above domains he performed at or below the 1st percentile of his age group.

### Emotional Functioning

Mr Dzebic's personality evaluation was generally consistent with his history and clinical presentation. He gave the impression of a bright man who is clinically depressed and concerned about his health and cognitive symptoms. His affect was restricted in range, and at times anxious when discussing his concerns. He reported feelings of sadness, anhedonia, decreased sleep, fatigue, concentration difficulty


Neuropsychological Consultation
Hilmija Dzebic

and being more irritable and short-tempered since the exposure. On Beck depression inventory II he scored in the severely depressed range (raw score=39). His MMPI 201 profile was valid, and indicated an individual who is severely depressed, feels overwhelmed and has limited coping resources.

## Summary and Recommendations

Mr Hilmija Dzebic is a 44 year old Bosnian man with diagnoses of depression and hypoxia, and symptoms of apathy, concentration and memory problems, thought to be related to several hours of inhalation exposure to Stand and Seal grout sealer on April 16 2007. He was referred for neuropsychological evaluation by his attorney, Ana Dubrovsky, Esq to assess his current cognitive and emotional functioning.

Consistent with his self-report, on the present neuropsychological evaluation Mr Dzebic continues to experience significant cognitive difficulties that are particularly prominent in the domains of memory, executive functioning and psychomotor speed. His performance was impaired on tasks requiring him to learn and recall new information, particularly when presented in the verbal domain. In addition, he had prominent difficulties on tasks requiring initiation, sustained attention, psychomotor speed, generative ability, inhibition, mental flexibility, and multitasking. His areas of strength included tasks assessing old "crystallized" knowledge, such as good vocabulary and verbal comprehension which are also representative of his pre-morbid abilities, and least susceptible to the effects of brain injury.

His personality evaluation was generally consistent with his history and clinical presentation. He gave the impression of a bright man who is clinically depressed, has limited coping resources and feels overwhelmed by a number of stressors, including concerns regarding his health and cognitive symptoms. His symptoms of depression and anxiety may have contributed to some of his cognitive difficulties, particularly in the concentration domain, and made it more difficult for him to compensate for them. However, his cognitive symptoms can not be explained by his depression.

Of note is that neuropsychological consequences of hypoxia often include impairments in memory, attention, executive function and speed of processing information (ie Hopkins, R. and Bigler, E., 2008), which are some of the main areas of Mr. Dzebic's difficulty. Additionally, the Stand and Seal grout sealer to which Mr Dzebic was exposed to, contains a petroleum hydrocarbon solvent. Solvent exposure has been associated with a number of cognitive and psychiatric symptoms, the severity of which appears to depend on the severity and duration of exposure, as well as the type of solvent (Hartman, D. 1995). Follow up by a specialist in toxicology may be helpful in further clarifying these.

### Diagnostic Impression (DSM IV)

Axis I        Cognitive Disorder NOS, moderate
              Major Depression, Severe Without Psychotic Features

Axis II       Deferred

Axis III      History of hypoxia secondary to chemical inhalant (Stand and Seal grout sealer), April 2007;

Axis IV       Unemployment

Axis V        GAF 45

### Recommendations:

1. I have discussed with Mr Dzebic and his wife a number of compensatory strategies focusing on memory and organizational skills. These include:

   a) Utilizing daily planner/organizer on a regular basis: including both writing daily task/activity schedule the evening before, as well as relevant information as it occurs, and reviewing it several times daily.

Neuropsychological Consultation
Hilmija Dzebic

    b) Breaking complex activities into a list of subtasks that he can check-off after completion.

    c) Utilizing alarm as cue/reminder to initiate activities.

If feasible, working with a speech and/or occupational therapist in learning to implement these may be helpful.

Additionally, resuming to practice playing music which is something he enjoyed in the past, may also be helpful.

2. He clearly benefits from the current psychiatric treatment by Dr Oreper, and this should continue. If possible, given the severity of his depressive symptoms, he could benefit from more frequent cognitive behavioral therapy.

3. Comprehensive neurological evaluation and a brain MRI may be helpful in better characterizing his neurological functioning, and potentially guiding rehabilitation. One possible referral source may be UCSF Neurological Rehabilitation Clinic.

4. He may benefit from evaluation for pharmacotherapy to help with his attentional and memory difficulties. Cholinergic medication, such as aricept may be appropriate as short-term adjuncts to support his recovery.

Thank you very much for allowing me to participate in Mr. Dzebic's care. If you have any questions, please don't hesitate to contact me.

Tatjana Novakovic-Agopian, Ph.D
Licensed Psychologist- PSY 14601
Qualified Medical Evaluator 984548
Assistant Professor, Department of Neurology, UCSF

References cited:

Hartman, D. (1995). *Neuropsychological Toxicology*. Plenum Press, New York.

Hopkins, R. and Bigler, E. (2008) *Hypoxic and Anoxic Conditions and CNS*. In: Morgan and Ricker editors: Textbook of Clinical Neuropsychology, pp 521-535. Taylor & Francis, New York.

Scanning Header Sheet

Page 1 of 1



# File Name: **654297**

**Document Title:** Medical Record
**Document Date:** 4/12/2008
**Category:** Medicals
**Type:** Physician Report
**Entered By:** Brinkley, Stephanie M
**MRID:** 420236.000
**Client Name:** dzebic, hilmija

**Description:** Dzebic Report by Dr. T. Novakovic-Agopian (Clinical Psychology and Neuropsychology)

**Imaged By:** _____     Date: _____
**QC Check By:** _____     Date: _____



# EXHIBIT   2

Case No.: No. 4:10-CV-02363-PJH; Case No.: No. 4:10-CV-02364-PJH
Plaintiff's  HILMIJA DZEBIC, AND  FIKRETA OSMANKIC
**PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION TO
DISMISS AND MEMORANDUM IN SUPORT**

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | | |
|---|---|---|
| IN RE STAND 'N SEAL | ) | MDL DOCKET NO. 1804 |
| PRODUCT LIABILITY LITIGATION | ) | 1:07-MD-1804-TWT |
| | ) | |
| HILMIJA DZEBIC, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:08-cv-00553-TWT |
| | ) | |
| ROANOKE COMPANIES, | ) | |
| GROUP, INC., ET AL., | ) | |
| Defendants, | ) | |
| | ) | |
| ***************************** | ) | |
| FIKRETA OSMANIK, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:08-cv-00554-TWT |
| | ) | |
| ROANOKE COMPANIES GROUP, | ) | **ORAL ARGUMENT REQUESTED** |
| INC., ET AL. | ) | |
| Defendant. | ) | |

COMES NOW Plaintiffs, Hilmija Dzebic and Fikreta Osmankic and respectfully file this Response in Opposition to Defendants' Joint Motion to Exclude Testimony of M. Eric Gershwin, M.D. and Tatjana Novakovic-Agopian, Ph.D.

## I.   FACTUAL BACKGROUND

In these actions, Plaintiffs' counsel agreed to the Consent Order entered by the Court on October 16, 2009. (Consent Order Regarding Deadlines for Discovery, Dzebic ECF # 97, Osmanik ECF # 96). Due to a calendaring error and confusion on behalf of Plaintiffs' counsel as to the deadline, Plaintiffs' submission of their "case specific" experts' reports was untimely. Plaintiffs' discovery of this error and oversight was immediately disclosed to Defendants on October 28, 2009 via a telephone call and e-mail from Plaintiffs' Counsel Kevin Dean to Michael Turiello, John MacNaughton, Seslee Mattson, and Tom Terry (attached hereto as Exhibit A).

Confusion surrounding the agreement at the status conference stemmed from the discussion that Plaintiffs in the instant matters would have two weeks after the Bell Plaintiffs' case specific deadlines to comply, however the Consent Order allocated only one week to Plaintiffs. (See October 29, 2009 e-mail from Plaintiffs' Counsel Meghan Carter to Michael Turiello, John MacNaughton, Seslee Mattson, Tom Terry, and Denise Dickerson attached hereto as Exhibit B). Plaintiffs' mistaken deadline date is reflected in Plaintiffs' counsel Kevin Dean's October 4, 2009 e-mail to Defense counsel Tom Terry and Seslee Mattson, stating

that Plaintiffs may serve Dr. Gershwin's expert report prior to their current November 1, 2009 deadline. (Attached hereto as Exhibit C).

Regardless, Defendants have known at the very least of Dr. Eric Gershwin's presence in these actions for over sixteen months due to Plaintiffs' identification of him as early as June 24, 2008. (See Plaintiff Dzebic's Answers to Defendant Home Depot's Second Interrogatories and First Requests for Production, Interrogatory No. 6, attached hereto as Exhibit D; See Plaintiff Osmankic's Answers to Defendant Home Depot's Second Interrogatories and First Requests for Production, Interrogatory No. 6, attached hereto as Exhibit E). Defendants have acknowledged Dr. Gershwin's presence as an expert in these matters well in advance of the October 26, 2009 deadline. (See Exhibit C, October 4, 2009 e-mail from Seslee Mattson to Kevin Dean, Tom Terry, & Denise Dickerson).

Similarly, Dr. Tatjana Novakovic-Agopian's presence was known in this action as early as June 2, 2008 and her report was served in June, 2008 as well. (See Plaintiff Dzebic's Answers to Home Depot's First Interrogatories, Interrogatories Nos. 2 & 3, attached hereto as Exhibit F). In the same vein, defendants' also acknowledged Dr. Novakovic-Agopian's identification as an expert on October 4, 2009. (See Exhibit C, October 4, 2009 e-mail from Seslee Mattson to Kevin Dean, Tom Terry, & Denise Dickerson).

Subsequently, upon discovery of their inadvertent calendaring error, Plaintiffs' disclosed Dr. Gershwin and Dr. Tatjana Novakovic-Agopian in their 26(a) (1)(A) supplemental disclosures dated October 29, 2009. To date, Dr. Gershwin has not been noticed for deposition despite Plaintiffs giving two dates within the agreed upon window. Dr. Tatjana Novakovic-Agopian has been noticed and has been cooperating with defense counsel's requests to copy and send notes to their retained neuropsychologist. (See e-mails between Seslee Mattson and Anna Dubrovsky October 6-14, 2009, attached hereto as Exhibit G). In fact, defense counsel Michael Turiello corresponded as to the need to take Dr. Novakovic-Agopian's deposition as early as September 21, 2009 and Defendants' requested her raw data on October 14, 2009, well before the October 26, 2009 deadline. (See Sept. 21, 2009 e-mail from Mike Turiello to Kevin Dean, attached hereto as Exhibit H; see also Exhibit G). At that time, defendants had already retained a neuropsychologist. See Exhibit G. Accordingly, Defendants had knowledge of Drs. Gershwin and Novakovic-Agopian and initiated discovery procedures as to both of Plaintiffs' case specific experts long before the October 26, 2009 deadline.

## II. LEGAL AUTHORITY

Fed. R. Civ. Pro. 37(c)(1) provides:

If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information of

witness to supply evidence on a motion, at a hearing, or at a trial unless the failure was substantially justified or is harmless. In addition to or instead of this sanction, the court, on motion and after giving an opportunity to be heard:

(A) may order payment of the reasonable expenses, including attorney's fees, caused by the failure;

(B) may inform the jury of the party's failure; and

(C) may impose other appropriate sanctions, including any of the orders listed in Rule 37 (b)(2)(A)(i)-(vi).

District Courts have broad discretion to determine whether a violation of Rule 26(a) is harmless. *See Vinson v. P&G Mftg. Co.*, No. CV 108-003, U.S. Dist. LEXIS 101627 at *17 (S.D. Ga. Oct. 30, 2009), citing *Woodworker's Supply, Inc. v. Principal Mutual Life Ins. Co.*, 170 F.3d 985, 993 (10th Cir. 1999). Indeed, "[t]he purpose of the Rule 26(a) disclosure requirements is to provide notice to opposing counsel as to what an expert witness will testify." *Vinson*, U.S. Dist. LEXIS 101627 at *17. The promulgated "[n]otice permits opposing counsel the opportunity to prepare adequate and effective cross-examination, and ensures that there will be no unfair surprise." *Id.* at *17-18, citing *Reed v. Binder*, 165 F.R.D. 424, 429 (D.N.J. 1996). Similar to the instant matter, "[a] party's failure to properly disclose an expert witness is harmless when no prejudice results to the opposing party." *Id.* at *18, citing *Nguyen v. IBP, Inc.*, 162 F.R.D. 675, 680 (D. Kan. 1995).

"Most commonly, the harm associated with untimely expert witness disclosures is the non-disclosing party's inability to adequately prepare its case by deposing the witness during the discovery period." *Morrison v. Mann*, 244 F.R.D. 668, 672 (N.D. Ga. 2007). Similarly, the majority of cases where courts have issued the harsh sanction of striking the untimely disclosed expert occurred <u>after</u> the discovery period has been closed. *See egs. Bearint ex rel. Bearint v. Dorell Juvenile Group, Inc.*, 389 F.3d 1339, 1349 (11th Cir. 2004); *Morrison*, 244 F.R.D. 668, 671 (N.D. Ga. 2007) (over a month after discovery closed); *Scott v. Gwinnett Hosp. Sys., Inc.*, 2005 U.S. Dist. LEXIS 45975 at *60 (N.D. Ga. Dec. 9, 2005) (two months after discovery closed); *Jones v. USMoney Source, Inc.*, No. 1:99-CV-1522A-JEC, 2000 U.S. Dist. LEXIS 20400 at *49 (N.D. Ga. Aug. 9, 2000) (two months after discovery closed). Similarly, N.D. Ga. Local Rule 26.2(c) provides in pertinent portion, "[a]ny party who desires to use the testimony of an expert witness shall designate the expert sufficiently early in the discovery period to permit the opposing party the opportunity to depose the expert. . . ."

"Failure to make the required expert witness disclosures is harmless 'when there is no prejudice to the party entitled to the disclosure.'" *GRV Aviation v. Hale Aircraft, Inc.*, No. 1:00-CV-1978-WBH, 2003 U.S. Dist. LEXIS 27573 at *12-13 (N.D. Ga. January 31, 2003) (citations omitted) (where defendant had two

opportunities to depose the witness and had possession of his report, untimely disclosure of expert did not necessitate "impos[ing] the extreme sanction of evidence preclusion"). Finally, District courts have discretion to admit untimely reports. *See Bearint ex rel. Bearint*, 389 F.3d at 1349, citing *Grimm v. Lane*, 895 F. Supp. 907, 913 (S.D. Ohio 1995) (admitting untimely expert evidence because no risk of unfair surprise existed).

Based upon prevailing law and Fed. R. Civ. P. 37(c)(1), Defendants have suffered no prejudice by Plaintiffs' harmless calendaring error. Defendants have had knowledge for over 16 months that Dr. Gershwin had performed independent medical examinations of both Plaintiffs in relation to their exposure to SNS. See Exhibits D & E. Tellingly, Defendants have acknowledged Dr. Gershwin's designation as an expert in these matters. (See Exhibit C, October 4, 2009 e-mail from Seslee Mattson to Kevin Dean, Tom Terry, & Denise Dickerson).

Likewise, Defendants have known for a longer period of time that Plaintiff Dzebic had consulted Dr. Novakovic-Agopian regarding his condition attributable to his exposure to SNS. See Exhibit F. She too has been recognized by Defendants as an expert in Mr. Dzebic's case previous to the October 26, 2009 deadline. (See Exhibit C, October 4, 2009 e-mail from Seslee Mattson to Kevin Dean, Tom Terry, & Denise Dickerson). Dr. Novakovic-Agopian's deposition has

been noticed for deposition and she is actively cooperating with defendants'
records requests for their retained neuropsychologist. See Exhibit G.

Consequently, Defendants cannot legitimately cry prejudice. Defendants
have had notice that both Dr. Gershwin and Dr. Novakovic-Agopian were
Plaintiffs' experts in this matter, have acknowledged this fact, and have retained
experts to challenge their testimony. Nonetheless, sufficient time remains for
Defendants to prepare adequate cross-examination. Though Defendants have not
yet noticed Dr. Gershwin's deposition, ample time remains to do so since the
Consent Order does not require case specific depositions to be concluded until
December 18, 2009 with the understanding that the parties may agree to complete
said depositions beyond this date as may be necessary. (See Consent Order
Regarding Deadlines for Discovery, Dzebic ECF # 97, Osmanik ECF # 96).
Finally, to prevent prejudice, Plaintiffs have offered Defendants additional time for
their expert disclosures in the phone call on October 28, 2009 and by e-mail. See
Exhibit B. Accordingly, Plaintiffs' harmless error does not plague prejudice upon
Defendants.

Defendants' prayer for relief that Plaintiffs' experts' testimony be stricken as
a consequence of Plaintiffs' harmless error is too harsh. Rule 37 sanctions allow
judges "broad discretion to fashion *appropriate* sanctions for violation of

discovery orders." *Malautea v. Suzuki Motor Co., Ltd.*, 987 F.2d 1536, 1542 (11th Cir. 1993), *cert. denied* 510 U.S. 863, 114 S. Ct. 181, 126 L. Ed. 2d 140 (1993) (emphasis supplied). Here, striking Plaintiffs' experts' testimony would effectually dismiss Plaintiffs' actions since case specific expert testimony is mandatory. As such, "[v]iolation of a discovery order caused by simple negligence, misunderstanding, or inability to comply will not satisfy a Rule 37 . . . dismissal." *Malautea*, 987 at 1542. "Such a 'severe sanction is appropriate only as a last resort. . . .'" *Snow v. Bellamy Mfg. & Repair*, 1995 U.S. Dist. LEXIS 22112 at *4 (N.D. Ga. Sept. 26, 1995), quoting *Malautea*, 987 at 1542. Likewise, "[d]ismissal is appropriate only where 'noncompliance with discovery orders is due to willful or bad faith disregard for those orders.'" *Id.*, citing *Wouters v. Martin County, Fla.*, 9 F.3d 924, 934 (11th Cir. 1993). Finally, the opposing party must be prejudiced by the non-complying party. *See id.*

In the matter *sub judice*, Plaintiffs' discovery of their calendaring error was immediately disclosed to defendants, both experts were disclosed in the supplemental disclosures filed the following day, and defendants still have sufficient time to take both depositions before the close of discovery. Indeed, Defendants have suffered zero prejudice from Plaintiffs' misunderstanding and confusion as to the deadline to disclose experts. More importantly, Plaintiffs'

counsels' conduct does not rise to the requisite level of bad faith or willful disregard to warrant exclusion of Plaintiffs' experts' testimony.

## III.  CONCLUSION

Accordingly, this Honorable Court should exercise its broad discretion and find that Plaintiffs' violation of Rule 26(a) was harmless, avoiding the drastic sanction of striking Plaintiffs' experts testimony.    Thus, Defendants' motion should be denied.   Plaintiffs' respectfully request an oral argument on this matter.

Respectfully submitted this 23rd day of November 2009,

s/ Kevin R. Dean, Esq.
Georgia Bar No. 214855
Attorney for Plaintiff
Motley Rice LLC
28 Bridgeside Blvd.
Mount Pleasant, SC  29464
Telephone: (843) 216-9000
Facsimile: (843) 216-9440
Email: kdean@motleyrice.com

Anna Dubrovsky, Esquire
Claude Wyle, Esquire
Choulos, Choulos & Wyle, LLP
425 California Street, Ste. 1800
San Francisco, CA  94104
(415) 474-7800
(415) 474-0734 (Facsimile)
Email: adubrovsky@ccwlawyers.com

**Counsel for Plaintiffs Hilmija Dzebic &
Fikreta Osmankic**

## Johnson Carter, Meghan

**From:** Dean, Kevin R.
**Sent:** Wednesday, October 28, 2009 10:37 AM
**To:** Turiello, Michael P.; John P. MacNaughton; 'Seslee S. Mattson'; Tom Terry
**Cc:** 'Will Maiberger'; 'Anna Dubrovsky'; Johnson Carter, Meghan; Brinkley, Stephanie M.
**Subject:** Dzebic and Osmanik-expert reports

There is some confusion on our end internally as to deadlines as to expert reports. It may very well be that you guys think ours has passed and I just do not have the emails and/or orders (whether signed or not/agreed too) in front of me. We have one primary retained expert Dr. Gershwin, the rest are just in the normal course as treating physicians. You know Dr. Gershwin's name, we just owe you an report. Please permit us if you believe the deadline to have passed (which I thought we had time of 2 weeks beyond the watts firm dates to have our expert complete his as he was out of pocket and anna in a trial) to get this to you, will you please agree to not complain if it gets to you by Monday, Nov. 3.

Thank you,

**Kevin R. Dean** | Attorney at Law | Motley Rice LLC
28 Bridgeside Blvd. | Mt. Pleasant, SC 29464 | kdean@motleyrice.com
**o.** 843.216.9152 | **c.** 843.834.1130 | **f.** 843.216.9267

## Johnson Carter, Meghan

| | |
|---|---|
| **From:** | Johnson Carter, Meghan |
| **Sent:** | Thursday, October 29, 2009 8:26 PM |
| **To:** | 'John P. MacNaughton'; Turiello, Michael P.; Seslee S. Mattson; Tom Terry; 'Denise Dickerson' |
| **Cc:** | Will Maiberger; Anna Dubrovsky; Brinkley, Stephanie M.; Dean, Kevin R.; 'Chris Carey'; 'Cathy M. Ellington'; 'Medina, Josefina'; Thornton, Mitchell B. |
| **Subject:** | Dzebic Supplemental Disclosures |
| **Attachments:** | Dzebic Rule 26 Supp'l Responses.pdf; Supp'l Disclosures Exhibit A.pdf; Supp'l Disclosures Exhibit B.pdf; Supp'l Disclosures Exhibit C.pdf; Supp'l Disclosures Exhibit D.pdf; Supp'l Disclosures Exhibit E.pdf; Supp'l Disclosures Exhibit F.pdf |

Please find attached Plaintiff Dzebic's Supplemental Disclosures. The attachments were too big to attach on ecf/pacer. None of the experts that were included are new, as all have been disclosed as treating physicians or providers of independent medical exams. We had originally calendared our deadlines as two weeks behind the Watts cases for these particular deadlines as Judge Thrash had said this was ok. We did not catch this in the draft sent around and we apologize for this. We are not trying to prejudice Defendants in any way and have always been accommodating with any deadline requests from defendants. We would certainly adjust any necessary deadlines if our request is granted.

Concerning the doctor's depositions, we have also been calling the doctors everyday but have had a difficult time getting through. If we cannot get dates soon then we will work with Defense Counsel on getting subpoenas.

On another note, Kevin had a seizure and is currently in the hospital. At this time we do not anticipate that we will need a continuance or any other accommodations but we will keep you updated. Thank you for your consideration.

**Meghan Johnson Carter** | Attorney at Law | Motley Rice LLC
28 Bridgeside Blvd. | Mt. Pleasant, SC 29464 | mjohnson@motleyrice.com
**o.** 843.216.9383 | **c.** 843.834.4497 | **f.** 843.216.9450

## Johnson Carter, Meghan

| | |
|---|---|
| **From:** | Seslee S. Mattson [ssm@mmmlaw.com] |
| **Sent:** | Sunday, October 04, 2009 7:47 PM |
| **To:** | Dean, Kevin R.; tterry@sutter-law.com; Denise Dickerson |
| **Cc:** | mturiello@pretzel-stouffer.com; Johnson Carter, Meghan; Brinkley, Stephanie M.; adubrovsky@ccwlawyers.com |
| **Subject:** | RE: IMEs |

Kevin,

Thanks for the update. I'd appreciate your or Anna clarifying whether Dr. Gershwin is the case specific expert for both Ms. Osmanik and Mr. Dzebic. My understanding from previous discovery responses is that Dr. Gershwin is the expert in Ms. Osmanik's case only. Also, as I mentioned in my email to Anna last week, the weeks of Nov. 2 and 16 do not work for Defendants. I think that looking at dates in December for Dr. Gershwin will work better and prevent conflicts. Any idea when we'll be able to start the depositions of the treating physicians?

In addition, it is my understanding from Mr. Dzebic's deposition that he has been evaluated and treated by a neuropsychogist, a Dr. Agopian I believe. To the extent that Mr. Dzebic is claiming damages in his lawsuit for neuropsychological/cognitive injuries and has seen a neuropsychologist/neuropsychiatrist for testing and/or treatment, the Defendants will need the name and address of this person as soon as possible so that we can retain an appropriate psychologist/psychiatrist. National ethical rules governing neruopsychologists/neuropsychiatrists prevent them from releasing any records to anyone other than another licensed neuropsychogist/neuropsychiatrist. If you have any questions, please let me know at your earliest convenience.

Seslee

-----Original Message-----
From: Dean, Kevin R. [mailto:kdean@motleyrice.com]
Sent: Sunday, October 04, 2009 1:36 PM
To: tterry@sutter-law.com; Seslee S. Mattson
Cc: mturiello@pretzel-stouffer.com; Johnson Carter, Meghan; Brinkley, Stephanie M.;
adubrovsky@ccwlawyers.com
Subject: Re: IMEs

Yes, dr gershwin and treating physicians are in the process of getting depo dates confirmed for nov time frame, and we may serve dr gershwin's report prior to our current deadline of nov 1.


----- Original Message -----
From: Tom Terry <tterry@sutter-law.com>
To: Seslee S. Mattson <ssm@mmmlaw.com>; Dean, Kevin R.
Cc: Turiello, Michael P. <mturiello@pretzel-stouffer.com>
Sent: Sun Oct 04 13:10:17 2009
Subject: RE: IMEs

Kevin


Any idea how long it will take you to identify your expert? We are all on a short string.


From: Seslee S. Mattson [mailto:ssm@mmmlaw.com]
Sent: Sunday, October 04, 2009 12:06 PM
To: Tom Terry

1

Cc: 'Turiello, Michael P.'
Subject: RE: IMEs


Did you get this information?

---

From: Dean, Kevin R. [mailto:kdean@motleyrice.com]
Sent: Wednesday, September 16, 2009 6:12 PM
To: Tom Terry; Will Maiberger; Seslee S. Mattson
Cc: Turiello, Michael P.; John P. MacNaughton; Cathy M. Ellington; Anna Dubrovsky; Johnson
Carter, Meghan; Norton, Michelle; Brinkley, Stephanie M.; Adria Martinez; Mikal Watts; Joe
Gibson; Scott Callahan; Kimberly Barrera; Denise Dickerson
Subject: RE: IMEs

Tom, sorry I was in court today.


We certainly will get on this tomorrow.


Thanks.


Kevin R. Dean  | Attorney at Law | Motley Rice LLC
28 Bridgeside Blvd. | Mt. Pleasant, SC 29464 | kdean@motleyrice.com o. 843.216.9152 | c.
843.834.1130 | f. 843.216.9267

## Johnson Carter, Meghan

| | |
|---|---|
| **From:** | Seslee S. Mattson [ssm@mmmlaw.com] |
| **Sent:** | Wednesday, October 14, 2009 10:51 AM |
| **To:** | 'Anna Dubrovsky' |
| **Cc:** | Dean, Kevin R.; Johnson Carter, Meghan; John P. MacNaughton; 'Turiello, Michael P.'; 'Tom Terry'; Denise Dickerson; Sean Nation; Cathy M. Ellington |
| **Subject:** | RE: IMEs |

Anna:

I appreciate your efforts to get the raw testing data from Dr. Agopian.  Defendants will
have to receive this data before her deposition can proceed as planned on December 7.  In
an effort to expedite this process, Defendants have retained a consulting
neuropsychologist who will request this data directly from Dr. Agopian.

Seslee

-----Original Message-----
From: Anna Dubrovsky [mailto:adubrovsky@ccwlawyers.com]
Sent: Tuesday, October 13, 2009 6:14 PM
To: Seslee S. Mattson
Cc: Dean, Kevin R.; Johnson, Meghan
Subject: Re: IMEs

I don't believe there are any more records after November of 2007.  I will try to get raw
data from the doctor prior to her deposition.  Anna
----- Original Message -----
From: "Seslee S. Mattson" <ssm@mmmlaw.com>
To: "'Anna Dubrovsky'" <adubrovsky@ccwlawyers.com>
Sent: Tuesday, October 13, 2009 2:30 PM
Subject: RE: IMEs


Please email me Dr. Agopian's reports.  I'd appreciate your getting the raw testing data
from her and sending that to me as well.  Her deposition is set for Monday, December 7 at
2pm PT.

Dr. Agcaoili's deposition is set for Tuesday, Dec. 1 at 2pm PT.  Defendants don't have
many records at this time from Dr. Agcaoili and have nothing after November 29, 2007.
We'd appreciate all of Dr. Agcaoili's records for Mr. Dzebic.

Thanks.

-----Original Message-----
From: Anna Dubrovsky [mailto:adubrovsky@ccwlawyers.com]
Sent: Wednesday, October 07, 2009 1:51 PM
To: Seslee S. Mattson
Subject: Re: IMEs

Do you want me to e-mail you her reports?  I do not have the raw date but I will try to
get it from the doctor.  Also, you do not have listed as medical provider for Mr. Dzebic
Dr. Carmen Agcaoili who is a pulmonologist who treated him after the exposure.  Do you
want me to get her on calendar as well?  Do you have her records?
----- Original Message -----
From: "Seslee S. Mattson" <ssm@mmmlaw.com>
To: "'Anna Dubrovsky'" <adubrovsky@ccwlawyers.com>
Sent: Wednesday, October 07, 2009 6:35 AM
Subject: RE: IMEs


Anna,

Defendants will want to take the deposition of Dr. Agopian once we get her

report and underlying testing data.  The parties have agreed to do
depositions of case specific experts after the Dec. 18 close of discovery
deadline.  Since you're targeting to get the depositions of Mr. Dzebic's and
Ms. Osmanik's treating physicians done the week of Nov. 30-Dec. 4, I think
looking at dates after Dec. 18 makes sense.  Just let me know what Dr.
Agopian's availability looks like, and we'll get it on the calendar.
Thanks.

Seslee

-----Original Message-----
From: Anna Dubrovsky [mailto:adubrovsky@ccwlawyers.com]
Sent: Tuesday, October 06, 2009 3:52 PM
To: Seslee S. Mattson
Subject: Re: IMEs

Seslee, I believe you have all of the neurophsychological testing.  There is
the name and the address of the neurophsychologist.  Let me know if you want
to take her deposition?
----- Original Message -----
From: "Seslee S. Mattson" <ssm@mmmlaw.com>
To: "'Dean, Kevin R.'" <kdean@motleyrice.com>; <tterry@sutter-law.com>;
"Denise Dickerson" <ddickerson@sutter-law.com>
Cc: <mturiello@pretzel-stouffer.com>; "Johnson Carter, Meghan"
<mjohnson@motleyrice.com>; "Brinkley, Stephanie M."
<sbrinkley@motleyrice.com>; <adubrovsky@ccwlawyers.com>
Sent: Sunday, October 04, 2009 4:47 PM
Subject: RE: IMEs


Kevin,

Thanks for the update.  I'd appreciate your or Anna clarifying whether Dr.
Gershwin is the case specific expert for both Ms. Osmanik and Mr. Dzebic.
My understanding from previous discovery responses is that Dr. Gershwin is
the expert in Ms. Osmanik's case only.  Also, as I mentioned in my email to
Anna last week, the weeks of Nov. 2 and 16 do not work for Defendants.  I
think that looking at dates in December for Dr. Gershwin will work better
and prevent conflicts.  Any idea when we'll be able to start the depositions
of the treating physicians?

In addition, it is my understanding from Mr. Dzebic's deposition that he has
been evaluated and treated by a neuropsychogist, a Dr. Agopian I believe.
To the extent that Mr. Dzebic is claiming damages in his lawsuit for
neuropsychological/cognitive injuries and has seen a
neuropsychologist/neuropsychiatrist for testing and/or treatment, the
Defendants will need the name and address of this person as soon as possible
so that we can retain an appropriate psychologist/psychiatrist.  National
ethical rules governing neruopsychologists/neuropsychiatrists prevent them
from releasing any records to anyone other than another licensed
neuropsychogist/neuropsychiatrist.  If you have any questions, please let me
know at your earliest convenience.

Seslee

-----Original Message-----
From: Dean, Kevin R. [mailto:kdean@motleyrice.com]
Sent: Sunday, October 04, 2009 1:36 PM
To: tterry@sutter-law.com; Seslee S. Mattson
Cc: mturiello@pretzel-stouffer.com; Johnson Carter, Meghan; Brinkley,
Stephanie M.; adubrovsky@ccwlawyers.com
Subject: Re: IMEs

Yes, dr gershwin and treating physicians are in the process of getting depo
dates confirmed for nov time frame, and we may serve dr gershwin's report
prior to our current deadline of nov 1.

2

----- Original Message -----
From: Tom Terry <tterry@sutter-law.com>
To: Seslee S. Mattson <ssm@mmmlaw.com>; Dean, Kevin R.
Cc: Turiello, Michael P. <mturiello@pretzel-stouffer.com>
Sent: Sun Oct 04 13:10:17 2009
Subject: RE: IMEs

Kevin


Any idea how long it will take you to identify your expert?  We are all on a
short string.

---

From: Seslee S. Mattson [mailto:ssm@mmmlaw.com]
Sent: Sunday, October 04, 2009 12:06 PM
To: Tom Terry
Cc: 'Turiello, Michael P.'
Subject: RE: IMEs


Did you get this information?

---

From: Dean, Kevin R. [mailto:kdean@motleyrice.com]
Sent: Wednesday, September 16, 2009 6:12 PM
To: Tom Terry; Will Maiberger; Seslee S. Mattson
Cc: Turiello, Michael P.; John P. MacNaughton; Cathy M. Ellington; Anna
Dubrovsky; Johnson Carter, Meghan; Norton, Michelle; Brinkley, Stephanie M.;
Adria Martinez; Mikal Watts; Joe Gibson; Scott Callahan; Kimberly Barrera;
Denise Dickerson
Subject: RE: IMEs

Tom, sorry I was in court today.


We certainly will get on this tomorrow.


Thanks.


Kevin R. Dean  | Attorney at Law | Motley Rice LLC
28 Bridgeside Blvd. | Mt. Pleasant, SC 29464 | kdean@motleyrice.com
o. 843.216.9152 | c. 843.834.1130 | f. 843.216.9267


3

# EXHIBIT   3

Case No.: No. 4:10-CV-02363-PJH; Case No.: No. 4:10-CV-02364-PJH
Plaintiff's  HILMIJA DZEBIC, AND  FIKRETA OSMANKIC
**PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION TO
DISMISS AND MEMORANDUM IN SUPORT**

# MATERIAL SAFETY DATA SHEET

STAND N SEAL SPRAY ON GROUT SEALER                                    Page:    1

PRODUCT NAME: STAND N SEAL SPRAY ON GROUT SEALER
HMIS CODES: H F R P: 2 4 1 X

## ═══════════ SECTION I - MANUFACTURER IDENTIFICATION ═══════════

MANUFACTURER'S NAME: Tile Perfect, Inc.

| | |
|---|---|
| ADDRESS | : 1105 S. Frontenac Rd |
| | Aurora, IL 60504 |
| CHEMTREC | : 800-424-9300  (Outside USA) 703-527-3887 |
| EMERGENCY PHONE | : 800-552-6225        DATE REVISED   : 05/31/2005 |
| INFORMATION PHONE | : 800-552-6225        NAME OF PREPARER : Tile Perfect, Inc. |

## ═══════ SECTION II - HAZARDOUS INGREDIENTS/SARA III INFORMATION ═══════

| REPORTABLE COMPONENTS | CAS NUMBER | VAPOR PRESSURE mm Hg @ TEMP | WEIGHT PERCENT |
|---|---|---|---|
| D-LIMONENE | N/A | | N/A |
| N-BUTYL ACETATE | 123-86-4 | | <5 |
| PROPANE | 74-98-6 | | 10 |
| ISOBUTANE | 75-28-5 | | <5 |
| C8-C9 PETROLEUM HYDROCARBON SOLVENT | 8032-32-4 | | 80 |

***No toxic chemical(s) subject to the reporting requirements of section 313 of Title III and 40 CFE 372 are present.***

## ═══════════ SECTION III - PHYSICAL/CHEMICAL CHARACTERISTICS ═══════════

BOILING RANGE: 133°F                    SPECIFIC GRAVITY: (H$_2$O=1): 0.7
VAPOR DENSITY: >1  (air=1)              EVAPORATION RATE: <1 (N-Butyl acetate=1)
COATING V.O.C: 6.44 LBS/IMP GAL    5.36 LBS/US GAL    642 GMS/LTR
MATERIAL V.O.C: 3.72 LBS/IMP GAL   3.10 LBS/US GAL    371 GMS/LTR
VISCOSITY: N/A                          MATERIAL pH: N/A
SOLUBILITY IN WATER: Not soluble        VOLATILE: % (% Wt)
COEFFICIENT OF WATER/OIL DIST: N/A      ODOR THRESHOLD: N/A

APPEARANCE AND ODOR: Colorless clear liquid / mild citrus odor.

## ═══════════ SECTION IV - FIRE AND EXPLOSION HAZARD DATA ═══════════

FLASH POINT: Of Propellant: -156° F    Of Concentrate: 68° F    METHOD: Tag Closed cup
FLAMMABLE LIMITS IN AIR BY VOLUME- LOWER: 0.9%       UPPER: 6.7%

EXTINGUISHING MEDIA: Alcohol Foam---CO$_2$---Dry Chemical---Water Fog
SPECIAL FIREFIGHTING PROCEDURES: Water spray may be ineffective, but water spray may be used to cool containers exposed to heat or fire to prevent pressure build up. Self-contained breathing apparatus should be used if product is involved in fire.

UNUSUAL FIRE AND EXPLOSION HAZARDS: Closed containers may explode due to pressure build up from extreme heat or fire.  Aerosol spray is extremely flammable.

# MATERIAL SAFETY DATA SHEET

STAND N SEAL SPRAY ON GROUT SEALER                                    Page:    2

FLAMMABILITY - T.D.G.R CLASS
CONSUMER COMMODITY ORM-D, NPPA 30B, LEVEL 3 AEROSOL
WHNIS INFORMATION: YES - FLAMMABLE AEROSOL UNDER CONDITIONS OF SPARKS, FLAME, OR HOT
SURFACES.
SENSITIVITY TO IMPACT: N/A
SENSITIVITY TO STATIC DISCHARGE: N/A

## SECTION V - REACTIVITY DATA

STABILITY: Stable

CONDITIONS TO AVOID: Heat, sparks, flame, and contact with strong oxidizing agents.
INCOMPATIBILITY (MATERIALS TO AVOID): Avoid contact with strong oxidizing agents
HAZARDOUS DECOMPOSITION OR BYPRODUCTS: Carbon Monoxide and unidentified organic
compounds may be formed during combustion.

HAZARDOUS POLYMERIZATION: Will not occur

## SECTION VI - HEALTH HAZARD DATA

HEALTH HAZARDS (ACUTE AND CHRONIC)

PRIMARY ROUTE(s) OF ENTRY:
Skin contact, eye contact, ingestion or inhalation.

INHALATION HEALTH RISKS AND SYMPTOMS OF EXPOSURE:
High vapor concentrations may result in Central Nervous System (NCS) Depression.

SKIN AND EYE CONTACT HEALTH RISKS AND SYMPTOMS OF EXPOSURE:
SKIN: Slight to moderate irritation, prolonged or repeated contact can result in
defatting and drying of the skin which may result in skin irritation and dermatitis.
EYES: Non-irritating to practically non-irritating.
SKIN ABSORPTION HEALTH RISKS AND SYMPTOMS OF EXPOSURE:
Ingestion of product may result in vomiting; aspiration into lungs must be avoided as
even small quantities may result in aspiration pneumonitis.
INGESTION/INHALATION HEALTH RISKS AND SYMPTOMS OF EXPOSURE: Ingestion of product may
result in vomiting; aspiration into lungs must be avoided as even small quantities may
result in aspiration pneumonitis.
HEALTH HAZARDS (ACUTE AND CHRONIC): N/A
CARCINOGENICITY:  NTP CARCINOGEN: No  IARC MONOGRAPHS: No  OSHA REGULATED: No
TERATOGENICITY: N/A
MUTAGENICITY: N/A
TOXICOLOGICALLY SYNERGISTIC PRODUCTS: N/A
MEDICAL CONDITIONS GENERALLY AGGRAVATED BY EXPOSURE: Skin conditions, breathing
problems.
EMERGENCY AND FIRST AID PROCEDURES:
        INGESTION: DO NOT INDUCE VOMITING. If vomiting occurs spontaneously, keep head
        below hips to prevent aspiration of liquid into lungs.
        EYES: Immediately flush eyes with plenty of water for at least 15 minutes while
        holding eyelids open.
        SKIN: Remove clothing/shoes & wipe excess from skin. Flush skin with water.
        Follow by washing with soap & water. Do not reuse clothing until cleaned.
        INHALATION: Remove victim to fresh air. If not breathing, give artificial
        respiration. If breathing is difficult, oxygen should be administered by
        qualified person.
        GET MEDICAL ATTENTION IF NECESSARY.

# MATERIAL SAFETY DATA SHEET

STAND N SEAL SPRAY ON GROUT SEALER                                         Page:   3

============= **SECTION VII - PRECAUTIONS FOR SAFE HANDLING AND USE** =============

STEPS TO BE TAKEN IN CASE MATERIAL IS RELEASED OR SPILLED
REMOVE ALL SOURCES OF INGNITION – FLAMES, SPARKS, STATIC ELECTRICITY & ELECTRICAL.
VENTILATE AREA, AVOID RUN INTO SEWER BY DIKING, AND SOAK UP WITH INERT ABSORBENT USING
NON-SPARKING TYPE TOOLS.

WASTE DISPOSAL METHOD
Dispose of in accordance with local, state and federal regulations. Do not incinerate
closed containers.

PRECAUTIONS TO BE TAKEN IN HANDLING AND STORING
Do not store above 120° F / 49° C. Do not store or use near heat, sparks or flame.

OTHER PRECAUTIONS
KEEP OUT OF REACH OF CHILDREN. Empty containers retain residue and can be dangerous. Do
not pressurize, cut, weld, braze, solder, drill, grin or expose such containers to
heat, flame, sparks, static electricity or other sources of ignition. Do not get in
eyes. Do not breathe vapors. Use with adequate ventilation. Avoid skin contact. Do not
take internally. Smoking while using this product must be strictly PROHIBITED.

================ **SECTION VIII - CONTROL MEASURES** ================

OCCUPATIONAL EXPOSURE LIMITS

| | ACGIH TLV | ACGIH TLV-C | ACGIH STEL | OSHA STEL | OSHA PEL |
|---|---|---|---|---|---|
| D-LIMONENE | N/E | N/E | N/E | N/E | N/E |
| N-BUTYL ACETATE | 150 PPM | N/E | N/E | N/E | 150 PPM |
| PROPANE | 800 PPM | N/E | N/E | N/E | 800 PPM |
| ISOBUTANE | 600 PPM | N/E | N/E | N/E | 600 PPM |
| C8-C9 PETROLEUM HYDROCARBON SOLVENT | 300 PPM | N/E | N/E | N/E | 300 PPM |

RESPIRATORY PROTECTION
Outdoors – Recommend an approved mechanical particulate filter to remove any airborne
overspray. *In restricted areas with poor ventilation, use a NIOSH approved
Organic Cartridge Respirator. For concentrations above the exposure limit, use
a positive air supplied respirator.*
VENTILATION
ALL APPLICATION AREAS SHOULD BE ADEQUATELY VENTILATED IN ORDER TO KEEP THE ITEMS IN
SECTION II BELOW THEIR EXPOSURE LIMITS. Exhaust air may need to be cleaned by scrubbers
or filters to reduce environmental contamination.
PROTECTIVE GLOVES
Test data indicates the best protection is provided by neoprene, nitrile and natural
rubber gloves.
EYE PROTECTION
Use chemical safety goggles and/or full face shield where splashing is possible.
Contact lenses should not be worn.
OTHER PROTECTIVE CLOTHING OR EQUIPMENT
Impervious apron may be worn. Eye wash fountain and safety shower.
WORK/HYGIENIC PRACTICES
Do not breathe vapors. Avoid skin or eye contact. Wash contaminated clothing before re-
use. Local mechanical exhaust as needed to maintain exposure levels below TLV or PEL.

# MATERIAL SAFETY DATA SHEET

STAND N SEAL SPRAY ON GROUT SEALER
Page:  4

======================= **SECTION IX - REGULATORY INFORMATION** =======================

This material fits the EPA Hazard Category definition of Immediate (Acute) and Delayed
(Chronic) Health Hazards under SARA Section 311, 312.
SARA Section 313 toxic chemicals: None
Chemical substances have been reported to the EPA Office of Toxic Substance Control Act
(Title 40 CFR 710)
California Prop 65 Chemicals: none known

======================= **SECTION X - DISCLAIMER** =======================

Tile Perfect, Inc. believes that the information and recommendations contained herein
are accurate as of this date. NO WARRANTY OF FITNESS FOR ANY PARTICULAR PURPOSE,
WARRANTY OF MERCHANTABILITY, OR ANY OTHER WARRANTY, EXPRESSED OR IMPLIED, IS MADE
CONCERNING THE INFORMATION PROVIDED HEREIN. Further, since the conditions and methods
of use of the product and of the information referred to herein are beyond the control
of Tile Perfect, Inc. Tile Perfect, Inc. expressly disclaims any and all liability as
to any injury, results obtained or arising from any use of the product or reliance on
such information.

http://www.maxwelloil.com/material_safety_data_sheets_files/vmp_naphtha_66_3_special_naphtholite_msds.pdf



# Special Naphtholite 66/3
# Material Safety Data Sheet

**CITGO Petroleum Corporation**
**1701 Golf Road, Suite 1-1101**
**Rolling Meadows, IL 60008-4295**

**MSDS No.** 19021
**Revision Date** 11/12/2004

**IMPORTANT: Read this MSDS before handling or disposing of this product and pass this information on to employees, customers and users of this product.**

| Hazard Rankings | | |
|---|---|---|
| | HMIS | NFPA |
| Health Hazard | * 1 | 1 |
| Fire Hazard | 3 | 3 |
| Reactivity | 0 | 0 |

\* = Chronic Health Hazard

## Emergency Overview

| | |
|---|---|
| **Physical State** | Liquid. |
| **Color** | Transparent, colorless. |
| **Odor** | Characteristic hydrocarbon solvent odor. |

**WARNING:**
**Flammable liquid; vapor may cause flash fire.**
**Harmful or fatal if swallowed - can enter lungs and cause damage.**
**Can cause eye, skin or respiratory tract irritation.**
**Overexposure can cause central nervous system (CNS) depression and/or other target organ effects.**
**Harmful to aquatic organisms.**

### Protective Equipment

Minimum Recommended
See Section 8 for Details



# SECTION 1. PRODUCT IDENTIFICATION

| | | | |
|---|---|---|---|
| **Trade Name** | Special Naphtholite 66/3 | **Technical Contact** | (800) 967-7601 (8am - 4pm CT M-F) |
| **Product Number** | 19021 | **Medical Emergency** | (832) 486-4700 |
| **CAS Number** | 64742-89-8, 64742-48-9 or 8032-32-4 | **CHEMTREC Emergency (United States Only)** | (800) 424-9300 |
| **Product Family** | Petroleum hydrocarbon solvent | | |
| **Synonyms** | Former Name: AMSCO® Solv 1101; Naphtholite; VM&P Naphtha; Varnish Makers' and Painters' Naphtha; Solvent (C8 - C9); Petroleum hydrocarbon solvent (C8 - C9) CITGO® Material No.: 19021; Former Name: Solvent 2021 | | |

# SECTION 2. COMPOSITION

This product may be composed, in whole or in part, of any of the following refinery streams:

VM&P Naphtha [CAS No.: 8032-32-4]
Light aliphatic solvent naphtha (petroleum) [CAS No.: 64742-89-8]
Heavy hydrotreated naphtha (petroleum) [CAS No.: 64742-48-9]

This product contains the following chemical components:

| Component Name(s) | CAS Registry No. | Concentration (%) |
|---|---|---|
| Nonane, all isomers | Mixture | 50 - 70 |
| Octanes, all isomers | Mixture | 30 - 50 |

**Special Naphtholite 66/3**

http://www.maxwelloil.com/material_safety_data_sheets_files/vmp_naphtha_66_3_special_naphtholite_msds.pdf

# SECTION 3. HAZARDS IDENTIFICATION

**Also see Emergency Overview and Hazard Ratings on the top of Page 1 of this MSDS.**

**Major Route(s) of Entry**  Skin contact.  Inhalation.

**Signs and Symptoms of Acute Exposure**

| | |
|---|---|
| **Inhalation** | Breathing high concentrations may be harmful.  Mist or vapor can irritate the throat and lungs.  Breathing this material may cause central nervous system depression with symptoms including nausea, headache, dizziness, fatigue, drowsiness, or unconsciousness.  Breathing high concentrations of this material, for example, in an enclosed space or by intentional abuse, can cause irregular heartbeats which can cause death. |
| **Eye Contact** | This product can cause transient mild eye irritation with short-term contact with liquid sprays or mists.  Symptoms include stinging, watering, redness, and swelling. |
| **Skin Contact** | This material can cause skin irritation.  The degree of irritation will depend on the amount of material that is applied to the skin and the speed and thoroughness that it is removed.  Symptoms include redness, itching, and burning of the skin.  Repeated or prolonged skin contact can produce moderate irritation (dermatitis). |
| **Ingestion** | If swallowed, this material may irritate the mucous membranes of the mouth, throat, and esophagus.  It can be readily absorbed by the stomach and intestinal tract.  Symptoms include a burning sensation of the mouth and esophagus, nausea, vomiting, dizziness, staggering gait, drowsiness, loss of consciousness, and delirium, as well as additional central nervous system (CNS) effects.  Due to its light viscosity, there is a danger of aspiration into the lungs during vomiting.  Aspiration can result in severe lung damage or death. |
| **Chronic Health Effects Summary** | Chronic effects of ingestion and subsequent aspiration into the lungs may cause pneumatocele (lung cavity) formation and chronic lung dysfunction. |
| | Reports have associated repeated and prolonged occupational overexposure to solvents with irreversible brain and nervous system damage (sometimes referred to as "Solvent or Painter's Syndrome").  Intentional misuse by deliberately concentrating and inhaling this product may be harmful or fatal. |
| **Conditions Aggravated by Exposure** | Disorders of the following organs or organ systems that may be aggravated by significant exposure to this material or its components include: Skin, Respiratory System, Liver, Kidneys, Central Nervous System (CNS) |
| **Target Organs** | May cause damage to the following organs: kidneys, lungs, liver, mucous membranes, upper respiratory tract, skin, eyes, central nervous system (CNS) |
| **Carcinogenic Potential** | This product is not known to contain any components at concentrations above 0.1% which are considered carcinogenic by OSHA, IARC or NTP. |

**OSHA Hazard Classification is indicated by an "X" in the box adjacent to the hazard title.  If no "X" is present, the product does not exhibit the hazard as defined in the OSHA Hazard Communication Standard (29 CFR 1910.1200).**

| OSHA Health Hazard Classification | | | OSHA Physical Hazard Classification | | | | | |
|---|---|---|---|---|---|---|---|---|
| Irritant | X | Sensitizer | | Combustible | | Explosive | | Pyrophoric | |
| Toxic | | Highly Toxic | | Flammable | X | Oxidizer | | Water-reactive | |
| Corrosive | | Carcinogenic | | Compressed Gas | | Organic Peroxide | | Unstable | |

**Special Naphtholite 66/3**

http://www.maxwelloil.com/material_safety_data_sheets_files/vmp_naphtha_66_3_special_naphtholite_msds.pdf

# SECTION 4.  FIRST AID MEASURES

**Take proper precautions to ensure your own health and safety before attempting rescue or providing first aid. For more specific information, refer to Exposure Controls and Personal Protection in Section 8 of this MSDS.**

| | |
|---|---|
| **Inhalation** | Immediately move victim to fresh air.  If victim is not breathing, immediately begin rescue breathing.  If heart has stopped, immediately begin cardiopulmonary resuscitation (CPR).  If breathing is difficult, 100 percent humidified oxygen should be administered by a qualified individual.  Seek medical attention immediately. |
| **Eye Contact** | Check for and remove contact lenses.  If irritation or redness develops, flush eyes with cool, clean, low-pressure water for at least 15 minutes.  Hold eyelids apart to ensure complete irrigation of the eye and eyelid tissue.  Do not use eye ointment.  Seek medical attention immediately. |
| **Skin Contact** | Remove contaminated shoes and clothing.  Flush affected area with large amounts of water.  If skin surface is damaged, apply a clean dressing and seek medical attention.  Do not use ointments.  If skin surface is not damaged, clean affected area thoroughly with mild soap and water.  Seek medical attention if tissue appears damaged or if pain or irritation persists. |
| **Ingestion** | Do not induce vomiting.  If spontaneous vomiting is about to occur, place victim's head below knees.  If victim is drowsy or unconscious, place on the left side with head down.  Never give anything by mouth to a person who is not fully conscious.  Do not leave victim unattended.  Seek medical attention immediately. |
| **Notes to Physician** | INHALATION:  Inhalation overexposure can produce toxic effects.  Monitor for respiratory distress.  If cough or difficulty in breathing develops, evaluate for upper respiratory tract inflammation, bronchitis, and pneumonitis.  Administer supplemental oxygen with assisted ventilation, as required. |

This material (or a component) sensitizes the heart to the effects of sympathomimetic amines. Epinephrine and other sympathomimetic drugs may initiate cardiac arrhythmias in individuals exposed to this material.  Administion of sympathomimetic drugs should be avoided.

INGESTION:  If ingested, this material presents a significant aspiration and chemical pneumonitis hazard.  Induction of emesis is not recommended.  Consider activated charcoal and/or gastric lavage.  If patient is obtunded, protect the airway by cuffed endotracheal intubation or by placement of the body in a Trendelenburg and left lateral decubitus position.

# SECTION 5.  FIRE FIGHTING MEASURES

| | |
|---|---|
| **NFPA Flammability Classification** | NFPA Class-IB flammable liquid. |
| **Flash Point** | Closed cup: 18°C (65°F). (Tagliabue.) |
| **Lower Flammable Limit** | AP 0.9 %          **Upper Flammable Limit**    AP 6.7 % |
| **Autoignition Temperature** | 232°C (450°F) |
| **Hazardous Combustion Products** | Carbon dioxide, carbon monoxide, smoke, fumes, and/or unburned hydrocarbons. |
| **Special Properties** | Flammable Liquid!   This material releases vapors at or below ambient temperatures.  When mixed with air in certain proportions and exposed to an ignition source, its vapor can cause a flash fire.  Use only with adequate ventilation.  Vapors are heavier than air and may travel long distances along the ground to an ignition source and flash back.   A vapor and air mixture can create an explosion hazard in confined spaces such as sewers.  If container is not properly cooled, it can rupture in the heat of a fire. |

**Special Naphtholite 66/3**

| | |
|---|---|
| **Extinguishing Media** | SMALL FIRE: Use dry chemicals, carbon dioxide, foam, water fog, or inert gas (nitrogen). LARGE FIRE: Use foam, water fog, or water spray. Water fog and spray are effective in cooling containers and adjacent structures. However, water can cause frothing and/or may not extinguish the fire. Water can be used to cool the external walls of vessels to prevent excessive pressure, autoignition or explosion. DO NOT use a solid stream of water directly on the fire as the water may spread the fire to a larger area. |
| **Protection of Fire Fighters** | Firefighters must use full bunker gear including NIOSH-approved positive pressure self-contained breathing apparatus to protect against potential hazardous combustion or decomposition products and oxygen deficiencies. Evacuate area and fight the fire from a maximum distance or use unmanned hose holders or monitor nozzles. Cover pooling liquid with foam. Containers can build pressure if exposed to radiant heat; cool adjacent containers with flooding quantities of water until well after the fire is out. Withdraw immediately from the area if there is a rising sound from a venting safety device or discoloration of vessels, tanks, or pipelines. Be aware that burning liquid will float on water. Notify appropriate authorities if liquid enter sewers or waterways. |

# SECTION 6. ACCIDENTAL RELEASE MEASURES

**Take proper precautions to ensure your own health and safety before attempting spill control or clean-up. For more specific information, refer to the Emergency Overview on Page 1, Exposure Controls and Personal Protection in Section 8 and Disposal Considerations in Section 13 of this MSDS.**

Flammable Liquid! Release causes an immediate fire or explosion hazard. Evacuate all non-essential personnel from immediate area and establish a "regulated zone" with site control and security. A vapor-suppressing foam may be used to reduce vapors. Eliminate all ignition sources. All equipment used when handling this material must be grounded. Stop the leak if it can be done without risk. Do not touch or walk through spilled material. Remove spillage immediately from hard, smooth walking areas. Prevent spilled material from entering waterways, sewers, basements, or confined areas. Absorb or cover with dry earth, sand, or other non-combustible material and transfer to appropriate waste containers. Use clean, non-sparking tools to collect absorbed material.

For large spills, secure the area and control access. Prevent spilled material from entering sewers, storm drains, other drainage systems, and natural waterways. Dike far ahead of a liquid spill to ensure complete collection. Water mist or spray may be used to reduce or disperse vapors; but, it may not prevent ignition in closed spaces. This material will float on water and its run-off may create an explosion or fire hazard. Verify that responders are properly HAZWOPER-trained and wearing appropriate respiratory equipment and fire-resistant protective clothing during cleanup operations. In an urban area, cleanup as soon as possible; in natural environments, cleanup on advice from specialists. Pick up free liquid for recycle and/or disposal if it can be accomplished safely with explosion-proof equipment. Collect any excess material with absorbant pads, sand, or other inert non-combustible absorbent materials. Place into appropriate waste containers for later disposal. Comply with all laws and regulations.

# SECTION 7. HANDLING AND STORAGE

| | |
|---|---|
| **Handling** | A spill or leak can cause an immediate fire or explosion hazard. Keep containers closed and do not handle or store near heat, sparks, or any other potential ignition sources. Do not contact with oxidizable materials. Do not breathe vapor. Use only with adequate ventilation and personal protection. Never siphon by mouth. Avoid contact with eyes, skin, and clothing. Prevent contact with food and tobacco products. Do not take internally. |

When performing repairs and maintenance on contaminated equipment, keep unnecessary persons away from the area. Eliminate all potential ignition sources. Drain and purge equipment, as necessary, to remove material residues. Use gloves constructed of impervious materials and protective clothing if direct contact is anticipated. Provide ventilation to

## Special Naphtholite 66/3

maintain exposure potential below applicable exposure limits. Promptly remove contaminated clothing. Wash exposed skin thoroughly with soap and water after handling.

A static electrical charge can accumulate when this material is flowing through pipes, nozzles or filters and when it is agitated. A static spark discharge can ignite accumulated vapors particularly during dry weather conditions. Always bond receiving containers to the fill pipe before and during loading. Always keep nozzle in contact with the container throughout the loading process. Do not fill any portable container in or on a vehicle. Do NOT use compressed air for filling, discharging or other handling operations.

Product container is not designed for elevated pressure. Do not pressurize, cut, weld, braze solder, drill, or grind on containers. Do not expose product containers to flames, sparks, heat or other potential ignition sources. Empty containers may contain product residues that can ignite with explosive force. Observe label precautions. Consult appropriate federal, state and local authorities before reusing, reconditioning, reclaiming, recycling or disposing of empty containers and/or waste residues of this product.

**Storage**

Store and transport in accordance with all applicable laws. Keep containers tightly closed and store in a cool, dry, well-ventilated place, plainly labeled, and out of closed vehicles. Keep away from all ignition sources. Ground all equipment containing this material. Containers should be able to withstand pressures expected from warming and cooling in storage. This flammable liquid should be stored in a separate safety cabinet or room. A refrigerated room is preferable for materials with a flash point temperature lower than 70°F (21°C). All electrical equipment in areas where this material is stored or handled should be installed in accordance with applicable regulatory requirements and the National Electrical Code.

# SECTION 8.  EXPOSURE CONTROLS AND PERSONAL PROTECTION

**Engineering Controls**

Provide exhaust ventilation or other engineering controls to keep the airborne concentrations of vapor or mists below the applicable workplace exposure limits indicated below. All electrical equipment should comply with the National Electric Code. An emergency eye wash station and safety shower should be located near the work-station.

**Personal Protective Equipment**

Personal protective equipment should be selected based upon the conditions under which this material is used. A hazard assessment of the work area for PPE requirements should be conducted by a qualified professional pursuant to OSHA regulations. The following pictograms represent the minimum requirements for personal protective equipment. For certain operations, additional PPE may be required.



**Eye Protection**

Safety glasses equipped with side shields are recommended as minimum protection in industrial settings. Chemical goggles should be worn during transfer operations or when there is a likelihood of misting, splashing, or spraying of this material. Suitable eye wash water should be readily available.

**Hand Protection**

Avoid skin contact. Use heavy duty gloves constructed of chemical resistant materials such as Viton® or heavy nitrile rubber. Wash hands with plenty of mild soap and water before eating, drinking, smoking, use of toilet facilities or leaving work. DO NOT use gasoline, kerosene, solvents or harsh abrasives as skin cleaners.

## Special Naphtholite 66/3

| | |
|---|---|
| **Body Protection** | Avoid skin contact. Wear long-sleeved fire-retardant garments (e.g., Nomex®) while working with flammable and combustible liquids. Additional chemical-resistant protective gear may be required if splashing or spraying conditions exist. This may include an apron, boots and additional facial protection. If product comes in contact with clothing, immediately remove soaked clothing and shower. Promptly remove and discarded contaminated leather goods. |
| **Respiratory Protection** | Odor is not an adequate warning for potentially hazardous air concentrations. For unknown vapor concentrations, use a positive-pressure, pressure-demand, self-contained breathing apparatus (SCBA), especially when entering a confined space or area where the oxygen concentration may be reduced because of an accumulation of gas vapors. For known vapor concentrations above the occupational exposure guidelines (see below), use a NIOSH-approved organic vapor respirator, if adequate protection is provided. Respirators should be used in accordance with OSHA requirements (29 CFR 1910.134). |
| **General Comments** | Warning! Use of this material in spaces without adequate ventilation may result in generation of hazardous levels of combustion products and/or inadequate oxygen levels for breathing. Odor is an inadequate warning for hazardous conditions. |

**Occupational Exposure Guidelines**

| Substance | Applicable Workplace Exposure Levels |
|---|---|
| VM&P Naphtha | **ACGIH TLV (United States).** TWA: 300 ppm |
| | **NIOSH (United States).** TWA: 350 ppm |
| Nonane, all isomers | **ACGIH (United States).** TWA: 200 ppm |
| Octanes, all isomers | **ACGIH (United States).** TWA: 300 ppm |
| | **OSHA (United States).** TWA: 500 ppm |

# SECTION 9.  PHYSICAL AND CHEMICAL PROPERTIES (TYPICAL)

| | | | | | |
|---|---|---|---|---|---|
| **Physical State** | Liquid. | **Color** | Transparent, colorless. | **Odor** | Characteristic hydrocarbon solvent odor. |
| **Specific Gravity** | 0.76 (Water = 1) | **pH** | Not Applicable. | **Vapor Density** | 4.1  (Air = 1) |
| **Boiling Range** | 127 to 144°C (260 to 291°F) | | | **Melting/Freezing Point** | Not available. |
| **Vapor Pressure** | 0.7 kPa (5 mm Hg) (at 20°C) 2.8 Torr @ 68° F by Isoteniscope | | | **Volatility** | 759 g/l VOC (w/v) |
| **Solubility in Water** | Very slightly soluble in cold water. (<0.1 % w/w) | | | **Viscosity (cSt @ 40°C)** | <5 |
| **Flash Point** | Closed cup: 18°C (65°F). (Tagliabue.) | | | | |
| **Additional Properties** | Paraffin, Isoparaffin and Cycloparaffin Hydrocarbons Content = >99 Wt.% (ASTM D-1319); Aromatic Hydrocarbon Content = <1 Wt. % (ASTM D-1319); Average Density at 60°F = 6.32 lbs./gal. (Calculated); Aniline Cloud Point Temperature = 143 °F (62°C) (ASTM D-611); Kauri-Butanol (KB) Value = 35 (ASTM D-1133); Dry Point Temperature = 291°F (144°C) (ASTM D-86); Evaporation Rate  = 1.0 (n-Butyl acetate = 1.0); Heat Value = 20,158 Btu. per pound | | | | |

**Special Naphtholite 66/3**

# SECTION 10. STABILITY AND REACTIVITY

| | |
|---|---|
| **Chemical Stability** | Stable.      **Hazardous Polymerization**   Not expected to occur. |
| **Conditions to Avoid** | Keep away from heat, sparks, flame and strong oxidizing materials |
| **Materials Incompatibility** | Strong acids, alkalies, and oxidizers such as liquid chlorine and oxygen. |
| **Hazardous Decomposition Products** | No additional hazardous decomposition products were identified other than the combustion products identified in Section 5 of this MSDS. |

# SECTION 11. TOXICOLOGICAL INFORMATION

**For other health-related information, refer to the Emergency Overview on Page 1 and the Hazards Identification in Section 3 of this MSDS.**

**Toxicity Data**    Studies on laboratory animals have associated similar materials with eye and respiratory tract irritation. Studies on laboratory animals have shown similar materials to cause skin irritation after repeated or prolonged contact. Repeated direct application of Stoddard Solvent to the skin can produce defatting dermatitis and kidney damage in laboratory animals. Rats developed kidney damage and elevated blood urea nitrogen levels when exposed to a concentration of 1.9 mg/L for 65 days. The kidney damage occurred only in male rats and appeared to involve both the tubules and glomeruli. The significance of these animal study results to human health is unclear.

# SECTION 12. ECOLOGICAL INFORMATION

| | |
|---|---|
| **Ecotoxicity** | This mixture contains components that are potentially toxic to freshwater and saltwater ecosystems. |
| **Environmental Fate** | This mixture will normally float on water with its lighter components evaporating rapidly. In stagnant or slow-flowing waterways, a hydrocarbon layer can cover a large surface area. As a result, this covering layer might limit or eliminate natural atmospheric oxygen transport into the water. With time, if not removed, oxygen depletion in the waterway might be enough to cause a fish kill or create an anaerobic environment. This coating action can also be harmful or fatal to plankton, algae, aquatic life, and water birds. |

# SECTION 13. DISPOSAL CONSIDERATIONS

**Hazard characteristic and regulatory waste stream classification can change with product use. Accordingly, it is the responsibility of the user to determine the proper storage, transportation, treatment and/or disposal methodologies for spent materials and residues at the time of disposition.**

Maximize material recovery for reuse or recycling. Recovered non-usable material may be regulated by US EPA as a hazardous waste due to its ignitibility (D001) and/or its toxic (D018) characteristics. Conditions of use may cause this material to become a "hazardous waste", as defined by federal or state regulations. It is the responsibility of the user to determine if the material is a RCRA "hazardous waste" at the time of disposal. Transportation, treatment, storage and disposal of waste material must be conducted in accordance with RCRA regulations (see 40 CFR 260 through 40 CFR 271). State and/or local regulations may be more restrictive. Contact the RCRA/Superfund Hotline at (800) 424-9346 or your regional US EPA office for guidance concerning case specfic disposal issues.

Special Naphtholite 66/3

# SECTION 14. TRANSPORT INFORMATION

The shipping description below may not represent requirements for all modes of transportation, shipping methods or locations outside of the United States.

**US DOT Status**  This material is regulated by the U.S. Department of Transportation.

**Proper Shipping Name**  Petroleum Distillates, n.o.s. (Naphtha Solvent), 3, UN1268 PG II

**Hazard Class**  3

**Packing Group(s)**  II

**UN/NA Number**  UN1268

**Reportable Quantity**  RQ 20,000 lbs. (3100 gallons) [Based upon maximum Xylene concentration of 0.5% and an RQ of 100 lbs.]

**Placard(s)**



FLAMMABLE LIQUID

3

**Emergency Response Guide No.**  128

**HAZMAT STCC No.**  4910256

**MARPOL III Status**  Not a DOT "Marine Pollutant" per 49 CFR 171.8.

# SECTION 15. REGULATORY INFORMATION

**TSCA Inventory**  This product and/or its components are listed on the Toxic Substances Control Act (TSCA) inventory.

**SARA 302/304 Emergency Planning and Notification**  The Superfund Amendments and Reauthorization Act of 1986 (SARA) Title III requires facilities subject to Subparts 302 and 304 to submit emergency planning and notification information based on Threshold Planning Quantities (TPQs) and Reportable Quantities (RQs) for "Extremely Hazardous Substances" listed in 40 CFR 302.4 and 40 CFR 355. No components were identified.

**SARA 311/312 Hazard Identification**  The Superfund Amendments and Reauthorization Act of 1986 (SARA) Title III requires facilities subject to this subpart to submit aggregate information on chemicals by "Hazard Category" as defined in 40 CFR 370.2. This material would be classified under the following hazard categories:

fire, Acute (Immediate) Health Hazard, Chronic (Delayed) Health Hazard

**SARA 313 Toxic Chemical Notification and Release Reporting**  This product contains the following components in concentrations above de minimis levels that are listed as toxic chemicals in 40 CFR Part 372 pursuant to the requirements of Section 313 of SARA: No components were identified.

**CERCLA**  The Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA) requires notification of the National Response Center concerning release of quantities of "hazardous substances" equal to or greater than the reportable quantities (RQ's) listed in 40 CFR 302.4. As defined by CERCLA, the term "hazardous substance" does not include petroleum, including crude oil or any fraction thereof which is not otherwise specifically designated in 40 CFR 302.4. Chemical substances present in this product or refinery stream that may be subject to this statute are:
2,2,4-Trimethylpentane [CAS No.: 540-84-1] RQ = 1000 lbs. (453.6 kg) Concentration: 1 - 5%
Xylene, all isomers [CAS No.: 1330-20-7] RQ = 100 lbs. (45.36 kg) Concentration: <0.5%
Ethylbenzene [CAS No.: 100-41-4] RQ = 1000 lbs. (453.6 kg) Concentration: <0.1%
Benzene [CAS No.: 71-43-2] RQ = 10 lbs. (4.536 kg) Concentration: <0.005%

**Special Naphtholite 66/3**

| | |
|---|---|
| **Clean Water Act (CWA)** | This material is classified as an oil under Section 311 of the Clean Water Act (CWA) and the Oil Pollution Act of 1990 (OPA).  Discharges or spills which produce a visible sheen on waters of the United States, their adjoining shorelines, or into conduits leading to surface waters must be reported to the EPA's National Response Center at (800) 424-8802. |
| **California Proposition 65** | This material may contain the following components which are known to the State of California to cause cancer, birth defects or other reproductive harm, and may be subject to the requirements of California Proposition 65 (CA Health & Safety Code Section 25249.5): Ethylbenzene: <0.1% Toluene: <0.01% Benzene: <0.005% |
| **New Jersey Right-to-Know Label** | For New Jersey R-T-K labeling requirements, refer to components listed in Section 2. |
| **Additional Regulatory Remarks** | Federal Hazardous Substances Act, related statutes, and Consumer Product Safety Commission regulations, as defined by 16 CFR 1500.14(b)(3) and 1500.83(a)(13):  This product contains "Petroleum Distillates" which may require special labeling if distributed in a manner intended or packaged in a form suitable for use in the household or by children. Precautionary label dialogue should display the following:  **DANGER:  Contains Petroleum Distillates!  Harmful or fatal if swallowed!  Call Physician Immediately.  KEEP OUT OF REACH OF CHILDREN!** |

# SECTION 16. OTHER INFORMATION

**Refer to the top of Page 1 for the HMIS and NFPA Hazard Ratings for this product.**

REVISION INFORMATION

| | |
|---|---|
| **Version Number** | 4.2 |
| **Revision Date** | 11/12/2004 |
| **Print Date** | Printed on 11/12/2004. |

**ABBREVIATIONS**

AP: Approximately     EQ: Equal     >: Greater Than     <: Less Than     NA: Not Applicable     ND: No Data     NE: Not Established

ACGIH:  American Conference of Governmental Industrial Hygienists     AIHA:  American Industrial Hygiene Association

IARC:  International Agency for Research on Cancer     NTP:  National Toxicology Program

NIOSH:  National Institute of Occupational Safety and Health     OSHA:  Occupational Safety and Health Administration

NPCA:  National Paint and Coating Manufacturers Association     HMIS:  Hazardous Materials Information System

NFPA:  National Fire Protection Association     EPA:  US Environmental Protection Agency

**DISCLAIMER OF LIABILITY**

THE INFORMATION IN THIS MSDS WAS OBTAINED FROM SOURCES WHICH WE BELIEVE ARE RELIABLE. HOWEVER, THE INFORMATION IS PROVIDED WITHOUT ANY WARRANTY, EXPRESSED OR IMPLIED REGARDING ITS CORRECTNESS.  SOME INFORMATION PRESENTED AND CONCLUSIONS DRAWN HEREIN ARE FROM SOURCES OTHER THAN DIRECT TEST DATA ON THE SUBSTANCE ITSELF.  THIS MSDS WAS PREPARED AND IS TO BE USED ONLY FOR THIS PRODUCT.  IF THE PRODUCT IS USED AS A COMPONENT IN ANOTHER PRODUCT, THIS MSDS INFORMATION MAY NOT BE APPLICABLE.  USERS SHOULD MAKE THEIR OWN INVESTIGATIONS TO DETERMINE THE SUITABILITY OF THE INFORMATION OR PRODUCTS FOR THEIR PARTICULAR PURPOSE.

THE CONDITIONS OR METHODS OF HANDLING, STORAGE, USE, AND DISPOSAL OF THE PRODUCT ARE BEYOND OUR CONTROL AND MAY BE BEYOND OUR KNOWLEDGE.  FOR THIS AND OTHER REASONS, WE DO NOT ASSUME RESPONSIBILITY AND EXPRESSLY DISCLAIM LIABILITY FOR LOSS, DAMAGE OR EXPENSE ARISING OUT OF OR IN ANY WAY CONNECTED WITH HANDLING, STORAGE, USE OR DISPOSAL OF THE

# MATERIAL SAFETY DATA SHEET

**devon**

http://www.devonenergy.com/CorpResp/ehs/Documents/msds/DVN%20MSDS%20NA%20-%20Isobutane.pdf

## 1. Product and Company Identification

| Material name | Iso-Butane |
|---|---|
| Version # | 01 |
| Revision date | 06-02-2010 |
| CAS # | Mixture |
| Product use | Fuel. |
| Manufacturer/Supplier | Devon US Operations<br>20 North Broadway<br>Oklahoma City, OK 73102-8260<br>Telephone: (405) 235-3611<br>-<br>Devon Canadian Operations<br>Calgary, AB. T2P 4H2<br>2000, 400 – 3rd Avenue SW.<br>Telephone: (403) 232-7100 |
| Emergency | Emergency Chemtrec:<br>Within the USA (800) 424-9300<br>Outside the USA (703) 527-3887<br>Devon Canada Emergency Phone:<br>(403) 232-7100 |

## 2. Hazards Identification

| | |
|---|---|
| Physical state | Gas. |
| Appearance | Gas under normal atmospheric conditions; liquid under pressure. |
| Emergency overview | DANGER |
| | Extremely flammable gas - may cause flash fire. Contents under pressure. Vapors may cause flash fire or explosion. Will be easily ignited by heat, spark or flames. Containers may explode when heated. May cause eye and respiratory tract irritation. High concentrations: May cause central nervous system effects. |
| OSHA regulatory status | This product is hazardous according to OSHA 29CFR 1910.1200. |
| **Potential health effects** | |
| Routes of exposure | Inhalation. |
| Eyes | May cause eye irritation. Direct contact with concentrated gas may cause minor irritation. Pressurized gas can cause mechanical injury to the eye. |
| Skin | Not likely to cause a problem due to high volatility of the product. Contact with rapidly expanding gas may cause burns or frostbite. |
| Inhalation | May cause respiratory tract irritation. This product is an asphyxiant gas which can cause unconsciousness/death if OXYGEN levels are sufficiently reduced. In high concentrations, vapors are narcotic and may cause headache, fatigue, dizziness and nausea. |
| Ingestion | This material is a gas under normal atmospheric conditions and ingestion is unlikely. |
| Target organs | Central nervous system. |
| Chronic effects | May cause central nervous system disorder (e.g., narcosis involving a loss of coordination, weakness, fatigue, mental confusion, and blurred vision) and/or damage. |
| Signs and symptoms | Narcosis. Decrease in motor functions. |
| Potential environmental effects | The product components are not classified as environmentally hazardous. However, this does not exclude the possibility that large or frequent spills can have a harmful or damaging effect on the environment. |

## 3. Composition / Information on Ingredients

| Components | CAS # | Percent |
|---|---|---|
| Isobutane | 75-28-5 | 95-99 |
| n-Butane | 106-97-8 | 1-5 |

| Composition comments | All concentrations are in percent by weight unless ingredient is a gas. Gas concentrations are in percent by volume. |

## 4. First Aid Measures

**First aid procedures**

| Eye contact | In case of contact, immediately flush eyes with fresh water for at least 15 minutes while holding the eyelids open. Remove contact lenses if worn. Get medical attention if irritation persists. |
| Skin contact | Not expected to be absorbed through the skin but may cause slight irritation. High pressure injection through the skin requires immediate medical attention. Treat frostbite area of skin by immersing the affected area in warm water (between 100F/38C and 110F/43C, not exceeding 112F/44C). Keep immersed for 20 to 40 minutes. Seek medical assistance. |
| Inhalation | Move injured person into fresh air and keep person calm under observation. If breathing is difficult, give oxygen. Get medical attention if any discomfort continues. |
| Ingestion | This material is a gas under normal atmospheric conditions and ingestion is unlikely. |
| Notes to physician | Provide general supportive measures and treat symptomatically. |
| General advice | Ensure that medical personnel are aware of the material(s) involved, and take precautions to protect themselves. |

## 5. Fire Fighting Measures

| Flammable properties | Extremely flammable gas. Gas forms mixtures with air which can catch fire and burn with explosive violence. Vapors are heavier than air and invisible mixture spreads easily and may accumulate in low or confined areas, travel considerable distance to source of ignition and flash back. Runoff to sewer may create fire or explosion hazard. |

**Extinguishing media**

| Suitable extinguishing media | Extinguish with carbon dioxide, dry powder or water fog. |
| Unsuitable extinguishing media | Not applicable. |

**Protection of firefighters**

| Specific hazards arising from the chemical | Fire may produce irritating, corrosive and/or toxic gases. |
| Protective equipment and precautions for firefighters | Do not extinguish fires unless gas flow can be stopped safely; explosive re-ignition may occur. Promptly isolate the scene by removing all persons from the vicinity of the incident. No action shall be taken involving any personal risk or without suitable training. For fires involving this material, do not enter any enclosed or confined fire space without proper protective equipment, including self-contained breathing apparatus. Stop flow of material. Use water to keep fire exposed containers cool and to protect personnel effecting shutoff. If a leak or spill has not ignited, use water spray to disperse the vapors and to protect personnel attempting to stop leak. Prevent runoff from fire control or dilution from entering streams, sewers or drinking water supply. |
| Special protective equipment for fire-fighters | Fire-fighters should wear appropriate protective equipment and self-contained breathing apparatus (SCBA) with full face-piece operated in positive pressure mode. Use approved gas detectors in confined spaces. |
| Specific methods | In the event of fire and/or explosion do not breathe fumes. Evacuate area. Check oxygen content before entering area. Water spray should be used to cool containers. Remove pressurized gas cylinders from the immediate vicinity. Turn leaking cylinder with the leak up to prevent escape of gas in liquid state. Containers can burst violently when heated, due to excess pressure build-up. |
| Hazardous combustion products | Carbon monoxide and carbon dioxide. |

## 6. Accidental Release Measures

| Personal precautions | Eliminate all sources of ignition in vicinity of released vapors. Evacuate all non-essential personnel to an area upwind. Stop leak if possible without any risk. Ventilate enclosed areas to prevent formation of toxic, flammable or oxygen deficient atmospheres. Water spray may be used to reduce vapors. Avoid vapor cloud even with proper respiratory protective equipment. Use suitable protective equipment (section 8). Follow all fire-fighting procedures (section 5). |
| Environmental precautions | Prevent further leakage or spillage if safe to do so. Prevent material from entering drains, sewers or low lying areas. See section 13 for waste disposal information. |
| Methods for containment | Stop leak if you can do so without risk. Prevent entry into waterway, sewers or confined areas. |
| Methods for cleaning up | Stop the flow of gas. Allow to dissipate with adequate ventilation. |
| Other information | These gases may be used as an auxiliary fuel or disposed of by burning in a properly designed flare or incinerator in accordance with federal or local requirements. |

## 7. Handling and Storage

| | |
|---|---|
| **Handling** | Put on appropriate personal protective equipment (see section 8). Special precautions should be taken when entering or handling equipment in this type of gas service because of possible radioactive contamination. All equipment should be checked for radioactivity or opened to the atmosphere and have forced ventilation applied for at least 4 hours prior to entry or handling. Avoid direct skin contact with any surface. Avoid generation of dust, smoke, fumes, etc. in the work area, or if they cannot be avoided, a tested and certified radionuclide dust respirator should be worn. Smoking, eating, or drinking should be prohibited when working with the equipment. Employees should wash thoroughly with soap and water and discard contaminated clothing after entering or handling the equipment. Workers should wash hands and face before eating, drinking and smoking. Use only with adequate ventilation. Wear appropriate respirator when ventilation is inadequate. Do not enter enclosed areas and confined space unless adequately ventilated. Store and use away from heat, sparks, open flame or any other ignition source. Use explosion-proof electrical (ventilating, lighting and material handling) equipment. Pumping and transferring operations must be electrically grounded and bonded to dissipate static build up. |
| **Storage** | Keep away from heat, spark, and open flame. Store storage containers in cool, well-ventilated areas away from direct sunlight, heat or flame. Thoroughly test gas lines for leakage before use, especially in confined spaces. Store away from strong oxidizing materials. Vapors containing benzene may accumulate during storage or transport. |

## 8. Exposure Controls / Personal Protection

**Occupational exposure limits**

**ACGIH**

| Components | Type | Value |
|---|---|---|
| Isobutane (75-28-5) | TWA | 1000 ppm |
| n-Butane (106-97-8) | TWA | 1000 ppm |

**U.S. - OSHA**

| Components | Type | Value |
|---|---|---|
| n-Butane (106-97-8) | TWA | 800 ppm |
| | | 1900 mg/m3 |

**Canada - Alberta**

| Components | Type | Value |
|---|---|---|
| n-Butane (106-97-8) | TWA | 1000 ppm |

**Canada - British Columbia**

| Components | Type | Value |
|---|---|---|
| n-Butane (106-97-8) | STEL | 750 ppm |
| | TWA | 600 ppm |

| | |
|---|---|
| **Engineering controls** | Explosion proof exhaust ventilation should be used. Use process enclosures, local exhaust ventilation, or other engineering controls to control airborne levels below recommended exposure limits. Provide adequate ventilation and minimize the risk of inhalation of gas. |

| **Personal protective equipment** | |
|---|---|
| Eye / face protection | If eye contact is likely, safety glasses with side shields or chemical type goggles should be worn. |
| Skin protection | No special requirements under ordinary conditions of use. |
| Respiratory protection | Wear approved respiratory protection when working with this material unless ventilation is adequate to keep airborne concentrations below recommended exposure standards. |
| General hygiene considerations | Always observe good personal hygiene measures, such as washing after handling the material and before eating, drinking, and/or smoking. Routinely wash work clothing and protective equipment to remove contaminants. Observe any medical surveillance requirements. |

## 9. Physical & Chemical Properties

| | |
|---|---|
| **Appearance** | Gas under normal atmospheric conditions; liquid under pressure. |
| **Color** | Colorless. |
| **Odor** | Odorless at low concentrations, may have gasoline odor at high concentrations |
| **Odor threshold** | Not available. |
| **Physical state** | Gas. |
| **Form** | Gas under normal atmospheric conditions; liquid under pressure. |
| **pH** | Not available. |
| **Melting point** | Not available. |

| | |
|---|---|
| Freezing point | Not available. |
| Boiling point | 10.4 °F (-12 °C) |
| Flash point | -117 °F (-82.8 °C) Tag Closed Cup |
| Evaporation rate | > 1 (Water=1) |
| Flammability | Not available. |
| Flammability limits in air, upper, % by volume | 8.4 |
| Flammability limits in air, lower, % by volume | 1.8 |
| Vapor pressure | 72 psi (38°C/100°F) |
| Vapor density | 2.1 |
| Specific gravity | 0.563 (Water=1) |
| Solubility (water) | Slightly soluble in water. |
| Partition coefficient (n-octanol/water) | No data available. |
| Auto-ignition temperature | 863.6 °F (462 °C) |
| Decomposition temperature | Not available. |

## 10. Chemical Stability & Reactivity Information

| | |
|---|---|
| Chemical stability | Stable under normal temperature conditions. |
| Conditions to avoid | Heat, flames and sparks. |
| Incompatible materials | Strong oxidizing agents. |
| Hazardous decomposition products | Carbon Dioxide. Carbon monoxide. |
| Possibility of hazardous reactions | Hazardous polymerization does not occur. |

## 11. Toxicological Information

**Toxicological data**

| Components | Test Results |
|---|---|
| n-Butane (106-97-8) | Acute Inhalation LC50 Rat: 658 mg/l 4 Hours |
| Isobutane (75-28-5) | Acute Inhalation LC50 Mouse: 52 mg/l 1 Hours |

| | |
|---|---|
| Toxicological information | This product may contain detectable but varying quantities of the naturally occurring radioactive substance radon 222. The amount in the gas itself is not hazardous, but since radon rapidly decays (t1/2 = 3.82 days) to form other radioactive elements including lead 210, polonium 210, and bismuth 210, equipment may be radioactive. The radon daughters are solids and therefore may attach to dust particles or form films and sludges in equipment. Inhalation, ingestion or skin contact with radon daughters can lead to the deposition of radioactive material in the lungs, bone, blood forming organs, intestinal tract, kidney and colon. Occupational exposure to radon and radon daughters has been associated with an increased risk of lung cancer in underground uranium miners. Follow the special precautions listed in handling and storage section of this document (see section 7). |
| Acute effects | This product is an asphyxiant gas which can cause unconsciousness/death if OXYGEN levels are sufficiently reduced. Contact with liquefied gas can cause damage (frostbite) due to rapid evaporative cooling. |
| Local effects | May cause central nervous system effects. |
| Sensitization | Not a skin sensitizer. |
| Chronic effects | Prolonged exposure may cause chronic effects. |
| Carcinogenicity | No data available. |
| Epidemiology | No data available. |
| Mutagenicity | No data available. |
| Neurological effects | Central and/or peripheral nervous system damage. |
| Reproductive effects | No data available. |
| Teratogenicity | No data available. |

## 12. Ecological Information

| | |
|---|---|
| **Ecotoxicity** | The product components are not classified as environmentally hazardous. However, this does not exclude the possibility that large or frequent spills can have a harmful or damaging effect on the environment. The product contains volatile organic compounds which have a photochemical ozone creation potential. |
| **Environmental effects** | Ecological injuries are not known or expected under normal use. |
| **Persistence and degradability** | No data available. |
| **Bioaccumulation / Accumulation** | No data available. |
| **Partition coefficient (n-octanol/water)** | No data available. |
| **Mobility in environmental media** | The product is a volatile substance, which may spread in the atmosphere. |

## 13. Disposal Considerations

| | |
|---|---|
| **Waste codes** | D001: Waste Flammable material with a flash point <140 °F |
| **Disposal instructions** | Dispose of this material and its container at hazardous or special waste collection point. Must be incinerated in a suitable incineration plant holding a permit delivered by the competent authorities. Do not allow this material to drain into sewers/water supplies. |

## 14. Transport Information

**DOT**

**Basic shipping requirements:**

| | |
|---|---|
| UN number | UN1969 |
| Proper shipping name | Isobutane |
| Hazard class | 2.1 |
| Labels required | 2.1 |

**Additional information:**

| | |
|---|---|
| Special provisions | 19, T50 |
| Packaging exceptions | 306 |
| Packaging non bulk | 304 |
| Packaging bulk | 314, 315 |
| ERG number | 115 |

**IATA**

**Basic shipping requirements:**

| | |
|---|---|
| UN number | 1969 |
| Proper shipping name | Isobutane |
| Hazard class | 2.1 |

**IMDG**

**Basic shipping requirements:**

| | |
|---|---|
| UN number | 1969 |
| Proper shipping name | ISOBUTANE |
| Hazard class | 2.1 |
| Environmental hazards | |
| Marine pollutant | No |
| EmS No. | F-D, S-U |

**TDG**

**Basic shipping requirements:**

| | |
|---|---|
| Proper shipping name | ISOBUTANE |
| Hazard class | 2.1 |
| UN number | UN1969 |

**Additional information:**

| | |
|---|---|
| Special provisions | 29 |



**DOT**



**IATA**



**IMDG**



**TDG**

## 15. Regulatory Information

**US federal regulations**          This product is a "Hazardous Chemical" as defined by the OSHA Hazard Communication
Standard, 29 CFR 1910.1200.
All components are on the U.S. EPA TSCA Inventory List.

**CERCLA (Superfund) reportable quantity (lbs)**
Isobutane 100
n-Butane 100

**Superfund Amendments and Reauthorization Act of 1986 (SARA)**

**Hazard categories**          Immediate Hazard - No
Delayed Hazard - Yes
Fire Hazard - Yes
Pressure Hazard - No
Reactivity Hazard - No

**Section 302 extremely**          No
**hazardous substance**

**Section 311 hazardous**          No
**chemical**

**Drug Enforcement Agency**          Not controlled
**(DEA)**

**Canadian regulations**          This product has been classified in accordance with the hazard criteria of the CPR and the MSDS
contains all the information required by the CPR.

**WHMIS status**          Controlled

**WHMIS classification**          A - Compressed Gas
B1 - Flammable/Combustible

**WHMIS labeling**

 

**State regulations**          This product does not contain a chemical known to the State of California to cause cancer, birth
defects or other reproductive harm.

**US - California Hazardous Substances (Director's): Listed substance**
n-Butane (CAS 106-97-8)          Listed.
**US - Massachusetts RTK - Substance: Listed substance**
Isobutane (CAS 75-28-5)          Listed.
**US - New Jersey Community RTK (EHS Survey): Reportable threshold**
Isobutane (CAS 75-28-5)          500 LBS

n-Butane (CAS 106-97-8)                              500 LBS
**US - New Jersey RTK - Substances: Listed substance**
    Isobutane (CAS 75-28-5)                          Listed.
**US - Pennsylvania RTK - Hazardous Substances: Listed substance**
    Isobutane (CAS 75-28-5)                          Listed.

## 16. Other Information

| | |
|---|---|
| **Further information** | HMIS® is a registered trade and service mark of the NPCA. |
| **HMIS® ratings** | Health: 1*<br>Flammability: 4<br>Physical hazard: 0 |
| **NFPA ratings** | Health: 1<br>Flammability: 4<br>Instability: 0 |
| **Disclaimer** | This information is provided without warranty. The information is believed to be correct. This information should be used to make an independent determination of the methods to safeguard workers and the environment. |
| **Issue date** | 06-02-2010 |



# MATERIAL SAFETY DATA SHEET

# VALERO

## 1. Product and Company Identification    http://www.valero.com/V_MSDS/309%20-%20Propane.pdf

| | |
|---|---|
| **Material name** | Propane |
| **Revision date** | 03-22-2011 |
| **Version #** | 01 |
| **CAS #** | 74-98-6 |
| **MSDS Number** | 309 |
| **Product use** | Organic synthesis. Fuel. Industrial use. Solvent. Refrigerant. Gas enricher. Propellant. Mixture for bubble chambers. |
| **Synonym(s)** | Dimethylmethane; propane (dot); propyl hydride; dimethyl methane<br>See section 16 for complete information. |
| **Manufacturer/Supplier** | Valero Marketing & Supply Company and Affiliates<br>P.O. Box 696000<br>San Antonio, TX 78269-6000<br>General Assistance 210-345-4593 |
| **Emergency** | 24 Hour Emergency 866-565-5220<br>1-800-424-9300 (CHEMTREC USA) |

## 2. Hazards Identification

| | |
|---|---|
| **Physical state** | Gas. |
| **Appearance** | Colorless liquefied gas. |
| **Emergency overview** | DANGER |
| | Extremely flammable gas. High pressure gas. Gas reduces oxygen available for breathing. |
| | Contact with liquefied gas might cause frostbites, in some cases with tissue damage. In a fire or if heated, a pressure increase will occur and the container may burst or explode. |
| **OSHA regulatory status** | This product is hazardous according to OSHA 29 CFR 1910.1200. |
| **Potential health effects** | |
|    **Routes of exposure** | Inhalation. Eyes. Skin. |
|    **Eyes** | Exposure to rapidly expanding gas or vaporizing liquid may cause frostbite ("cold burn"). |
|    **Skin** | Exposure to rapidly expanding gas or vaporizing liquid may cause frostbite ("cold burn"). |
|    **Inhalation** | Suffocation (asphyxiant) hazard - if allowed to accumulate to concentrations that reduce oxygen below safe breathing levels. Nasal and respiratory tract irritation, central nervous system effects including excitation, euphoria, contracted eye pupils, dizziness, drowsiness, blurred vision, fatigue, nausea, headache, loss of reflexes, tremors, convulsions, seizures, loss of consciousness, coma, respiratory arrest and sudden death could occur as a result of long term and/or high concentration exposure to vapors. May also cause anemia and irregular heart rhythm. |
|    **Ingestion** | This material is a gas under normal atmospheric conditions and ingestion is unlikely. |
|    **Target organs** | Respiratory tract. Eyes. Central nervous system. |
|    **Chronic effects** | May cause central nervous system effects. Components have been shown to be weak cardiac sensitizers which can result in cardiac arrhythmia and ventricular fibrillation. |
| **Potential environmental effects** | Not expected to be harmful to aquatic organisms. |

## 3. Composition / Information on Ingredients

| Components | CAS # | Percent |
|---|---|---|
| Propane | 74-98-6 | 90-100 |
| Propylene | 115-07-1 | 0-10 |
| Ethylene | 74-85-1 | 0-1 |

## 4. First Aid Measures

**First aid procedures**

| | |
|---|---|
| **Eye contact** | Immediately flush eyes with plenty of water for at least 15 minutes. Remove contact lenses, if present and easy to do. Continue rinsing. Get medical attention immediately. |
| **Skin contact** | Wash frost-bitten areas with plenty of water. Do not remove clothing. Get medical attention immediately. |
| **Inhalation** | Move to fresh air. If breathing is difficult, give oxygen. If not breathing, give artificial respiration. Call a physician or poison control center immediately. |
| **Ingestion** | Ingestion is not a typical route of exposures for gases or liquefied gases. |
| **Notes to physician** | Treat symptomatically. |

## 5. Fire Fighting Measures

| | |
|---|---|
| **Flammable properties** | Extremely flammable gas. Gas forms mixtures with air which can catch fire and burn with explosive violence. Vapors are heavier than air and invisible mixture spreads easily and may accumulate in low or confined areas, travel considerable distance to source of ignition and flash back. Runoff to sewer may create fire or explosion hazard. |
| **Extinguishing media** | |
| **Suitable extinguishing media** | Dry chemical, CO2, water spray, fog, or foam. |
| **Fire fighting equipment/instructions** | Self-contained breathing apparatus, operated in positive pressure mode and full protective clothing must be worn in case of fire. |
| | Move container from fire area if it can be done without risk. |
| | Do not extinguish fires unless gas flow can be stopped safely; explosive re-ignition may occur. Promptly isolate the scene by removing all persons from the vicinity of the incident. No action shall be taken involving any personal risk or without suitable training. For fires involving this material, do not enter any enclosed or confined fire space without proper protective equipment, including self-contained breathing apparatus. Stop flow of material. Use water to keep fire exposed containers cool and to protect personnel effecting shutoff. If a leak or spill has not ignited, use water spray to disperse the vapors and to protect personnel attempting to stop leak. Prevent runoff from fire control or dilution from entering streams, sewers or drinking water supply. |
| **Hazardous combustion products** | Carbon oxides. |

## 6. Accidental Release Measures

| | |
|---|---|
| **Personal precautions** | Evacuate the area promptly. No action shall be taken involving any personal risk or without suitable training. Keep unnecessary personnel away. |
| | Ensure adequate ventilation. In case of inadequate ventilation, use respiratory protection. Wear appropriate personal protective equipment (See Section 8). |
| **Environmental precautions** | Should not be released into the environment. Prevent further leakage or spillage if safe to do so. Prevent from entering into soil, ditches, sanitary sewers, waterways and/or groundwater. |
| **Methods for cleaning up** | Ventilate well, stop flow of gas or liquid if possible. Immediately contact emergency personnel. |

## 7. Handling and Storage

| | |
|---|---|
| **Handling** | Wear appropriate personal protective equipment (See Section 8). Eating, drinking, and smoking should be prohibited in areas where this material is handled, stored, and processed. Do not breathe gas. Do not get in eyes, on skin, on clothing. Use only with adequate ventilation. |
| **Storage** | Store in accordance with local, regional, national, and international regulations. Secure cylinders in an upright position at all times, close all valves when not in use. Store in a cool, dry, well-ventilated place. Keep container tightly closed and sealed until ready for use. Protect cylinders from damage. |

## 8. Exposure Controls / Personal Protection

**Occupational exposure limits**

**US. ACGIH Threshold Limit Values**

| Components | Type | Value |
|---|---|---|
| Propane (74-98-6) | TWA | 1000 ppm |
| Propylene (115-07-1) | TWA | 500 ppm |

**US. OSHA Table Z-1 Limits for Air Contaminants (29 CFR 1910.1000)**

| Components | Type | Value |
|---|---|---|
| Propane (74-98-6) | PEL | 1000 ppm<br>1800 mg/m3 |

**Canada. Alberta OELs (Occupational Health & Safety Code, Schedule 1, Table 2)**

| Components | Type | Value |
|---|---|---|
| Propane (74-98-6) | TWA | 1000 ppm |
| Propylene (115-07-1) | TWA | 500 ppm<br>860 mg/m3 |

**Canada. British Columbia OELs. (Occupational Exposure Limits for Chemical Substances, Occupational Health and Safety Regulation 296/97, as amended)**

| Components | Type | Value |
|---|---|---|
| Propane (74-98-6) | TWA | 1000 ppm |
| Propylene (115-07-1) | TWA | 500 ppm |

**Canada. Ontario OELs. (Ministry of Labor - Control of Exposure to Biological or Chemical Agents)**

| Components | Type | Value |
|---|---|---|
| Propane (74-98-6) | TWA | 1000 ppm |
| Propylene (115-07-1) | TWA | 500 ppm |

**Canada. Quebec OELS. (Ministry of Labor - Regulation Respecting the Quality of the Work Environment)**

| Components | Type | Value |
|---|---|---|
| Propane (74-98-6) | TWA | 1000 ppm<br>1800 mg/m3 |

| | |
|---|---|
| **Engineering controls** | Use process enclosures, local exhaust ventilation, or other engineering controls to control airborne levels below recommended exposure limits. The engineering controls also need to keep gas, vapor, or dust concentrations below any lower explosive limits. |
| **Personal protective equipment** | |
| **Eye / face protection** | Wear approved safety glasses or goggles. |
| **Skin protection** | Wear protective clothing appropriate for the risk of exposure. |
| **Respiratory protection** | If engineering controls do not maintain airborne concentrations below recommended exposure limits (where applicable) or to an acceptable level (in countries where exposure limits have not been established), an approved respirator must be worn. |
| **General hygiene considerations** | Do not eat, drink or smoke when using the product. Wash thoroughly after handling. Provide eyewash station and safety shower. Handle in accordance with good industrial hygiene and safety practices. |

# 9. Physical & Chemical Properties

| | |
|---|---|
| **Appearance** | Colorless liquefied gas. |
| **Color** | Colorless |
| **Odor** | Faint. |
| **Odor threshold** | Not available. |
| **Physical state** | Gas. |
| **Form** | Compressed liquefied gas. |
| **pH** | Not available. |
| **Melting point** | Not available. |
| **Freezing point** | -302.6 °F (-185.89 °C) |
| **Boiling point** | -43.2 °F (-41.79 °C) |
| **Flash point** | -156 °F (-104.45 °C) Closed Cup |
| **Evaporation rate** | Not available. |
| **Flammability limits in air, upper, % by volume** | 9.5 % |
| **Flammability limits in air, lower, % by volume** | 2.3 % |

| | |
|---|---|
| **Vapor pressure** | Not available. |
| **Vapor density** | 1.6 |
| **Specific gravity** | 0.59 |
| **Solubility (water)** | Insoluble. |
| **Partition coefficient (n-octanol/water)** | Not available. |
| **Auto-ignition temperature** | 841.7 °F (449.85 °C) |
| **Decomposition temperature** | Not available. |
| **VOC** | 100 % |
| **Molecular weight** | 44.1 g/mol |
| **Molecular formula** | C3-H8 |

## 10. Chemical Stability & Reactivity Information

| | |
|---|---|
| **Chemical stability** | Stable under normal temperature conditions and recommended use. |
| **Conditions to avoid** | In a fire or if heated, a pressure increase will occur and the container may burst or explode. |
| **Incompatible materials** | Oxidizing agents. Reducing agents. Acids. Alkalies. |
| **Hazardous decomposition products** | None known. |
| **Possibility of hazardous reactions** | Polymerization will not occur. |

## 11. Toxicological Information

**Toxicological data**

| Components | Test Results |
|---|---|
| Propylene (115-07-1) | Acute Inhalation LC50 Mouse: 680 mg/l 2 Hours |
| | Acute Inhalation LC50 Rat: 658 mg/l 4 Hours |
| Propane (74-98-6) | Acute Inhalation LC50 Rat: > 1442.847 mg/l 15 Minutes |

| | |
|---|---|
| **Acute effects** | Suffocation (asphyxiant) hazard - if allowed to accumulate to concentrations that reduce oxygen below safe breathing levels. Exposure to rapidly expanding gas or vaporizing liquid may cause frostbite ("cold burn"). |
| **Chronic effects** | May cause central nervous system effects. |
| **Carcinogenicity** | |

**ACGIH Carcinogens**

| | |
|---|---|
| Propylene (CAS 115-07-1) | A4 Not classifiable as a human carcinogen. |

**IARC Monographs. Overall Evaluation of Carcinogenicity**

| | |
|---|---|
| Propylene (CAS 115-07-1) | 3 Not classifiable as to carcinogenicity to humans. |

## 12. Ecological Information

| | |
|---|---|
| **Ecotoxicity** | Not expected to be harmful to aquatic organisms. |
| **Persistence and degradability** | Not available. |
| **Bioaccumulation / Accumulation** | No data available. |
| **Partition coefficient (n-octanol/water)** | Not available. |
| **Mobility in environmental media** | No data available. |

## 13. Disposal Considerations

| | |
|---|---|
| **Waste codes** | D001: Waste Flammable material with a flash point <140 °F |
| **Disposal instructions** | Dispose in accordance with all applicable regulations. Empty containers may contain product residues. Do not puncture or incinerate even when empty. This material and/or its container must be disposed of as hazardous waste. Return the empty cylinder to the supplier. |

## 14. Transport Information

**DOT**

**Basic shipping requirements:**

| | |
|---|---|
| **UN number** | UN1075 |
| **Proper shipping name** | Petroleum gases, liquefied |
| **Hazard class** | 2.1 |
| **Labels required** | 2.1 |
| **Additional information:** | |
| **Special provisions** | T50 |
| **Packaging exceptions** | 306 |
| **Packaging non bulk** | 304 |
| **Packaging bulk** | 314, 315 |
| **ERG number** | 115 |

**DOT BULK**

**Basic shipping requirements:**

| | |
|---|---|
| **UN number** | UN1075 |
| **Proper shipping name** | Petroleum gases, liquefied |
| **Hazard class** | 2.1 |
| **Labels required** | 2.1 |
| **Additional information:** | |
| **Special provisions** | T50 |
| **Packaging exceptions** | 306 |
| **Packaging non bulk** | 304 |
| **Packaging bulk** | 314, 315 |
| **ERG number** | 115 |

**IATA**

**Basic shipping requirements:**

| | |
|---|---|
| **UN number** | 1075 |
| **Proper shipping name** | Petroleum gases, liquefied |
| **Hazard class** | 2.1 |
| **Additional information:** | |
| **ERG code** | 10L |

**IMDG**

**Basic shipping requirements:**

| | |
|---|---|
| **UN number** | 1075 |
| **Proper shipping name** | PETROLEUM GASES, LIQUEFIED |
| **Hazard class** | 2.1 |
| **EmS No.** | F-D*, S-U |

**TDG**

**Basic shipping requirements:**

| | |
|---|---|
| **Proper shipping name** | LIQUEFIED PETROLEUM GASES; or PETROLEUM GASES, LIQUEFIED |
| **Hazard class** | 2.1 |
| **UN number** | UN1075 |
| **Marine pollutant** | * |

## 15. Regulatory Information

**US federal regulations**    This product is a "Hazardous Chemical" as defined by the OSHA Hazard Communication Standard, 29 CFR 1910.1200.
All components are on the U.S. EPA TSCA Inventory List.

**TSCA Section 12(b) Export Notification(40 CFR 707, Subpt. D)**

Not regulated.

**US EPCRA (SARA Title III) Section 313 - Toxic Chemical: De minimis concentration**

Propylene (CAS 115-07-1)                    1.0 %

**US EPCRA (SARA Title III) Section 313 - Toxic Chemical: Listed substance**

Propylene (CAS 115-07-1)                    Listed.

**CERCLA (Superfund) reportable quantity (lbs) (40 CFR 302.4)**

Propane 100
Propylene 100

**Superfund Amendments and Reauthorization Act of 1986 (SARA)**

| | |
|---|---|
| **Hazard categories** | Immediate Hazard - Yes<br>Delayed Hazard - No<br>Fire Hazard - Yes<br>Pressure Hazard - Yes<br>Reactivity Hazard - No |
| **Section 302 extremely hazardous substance (40 CRF 355, Appendix A)** | Yes |
| **Section 311/312 (40 CFR 370)** | Yes |
| **Clean Water Act (CWA) Section 112(r) (40 CRF 68.130)** | Hazardous substance |
| **Drug Enforcement Administration (DEA) (21 CFR 1308.11-15)** | Not controlled |
| **Canadian regulations** | This product has been classified in accordance with the hazard criteria of the CPR and the MSDS contains all the information required by the CPR. |
| **WHMIS status** | Controlled |
| **WHMIS classification** | A - Compressed Gas<br>B1 - Flammable/Combustible<br>D2B - Other Toxic Effects-TOXIC |

**WHMIS labeling**

  

**Inventory status**

| Country(s) or region | Inventory name | On inventory (yes/no)* |
|---|---|---|
| Australia | Australian Inventory of Chemical Substances (AICS) | Yes |
| Canada | Domestic Substances List (DSL) | Yes |
| Canada | Non-Domestic Substances List (NDSL) | No |
| China | Inventory of Existing Chemical Substances in China (IECSC) | Yes |
| Europe | European Inventory of Existing Commercial Chemical Substances (EINECS) | Yes |
| Europe | European List of Notified Chemical Substances (ELINCS) | No |
| Japan | Inventory of Existing and New Chemical Substances (ENCS) | Yes |
| Korea | Existing Chemicals List (ECL) | Yes |
| New Zealand | New Zealand Inventory | Yes |
| Philippines | Philippine Inventory of Chemicals and Chemical Substances (PICCS) | Yes |
| United States & Puerto Rico | Toxic Substances Control Act (TSCA) Inventory | Yes |

*A "Yes" indicates that all components of this product comply with the inventory requirements administered by the governing country(s)

**State regulations**

**US - California Hazardous Substances (Director's): Listed substance**

Propylene (CAS 115-07-1)                    Listed.

**US - Massachusetts RTK - Substance: Listed substance**

Propane (CAS 74-98-6)                        Listed.
Propylene (CAS 115-07-1)                    Listed.

**US - New Jersey Community RTK (EHS Survey): Reportable threshold**

Propane (CAS 74-98-6)                        500 LBS
Propylene (CAS 115-07-1)                    500 LBS

**US - New Jersey RTK - Substances: Listed substance**

Propane (CAS 74-98-6)                        Listed.

Propylene (CAS 115-07-1)                    Listed.
**US - Pennsylvania RTK - Hazardous Substances: Listed substance**
Propane (CAS 74-98-6)                        Listed.
Propylene (CAS 115-07-1)                    Listed.

# 16. Other Information

| | |
|---|---|
| **Further information** | HMIS® is a registered trade and service mark of the NPCA. |
| **Other information** | Note: This Material Safety Data Sheet applies to the listed products and synonym descriptions for Hazard Communication purposes only. Technical Specifications vary greatly depending on the products and are not reflected in this document. Consult specification sheets for technical information. |
| **HMIS® ratings** | Health: 1<br>Flammability: 4<br>Physical hazard: 0 |
| **NFPA ratings** | Health: 1<br>Flammability: 4<br>Instability: 0 |
| **Disclaimer** | This Material Safety Data Sheet (MSDS) was prepared in accordance with 29 CFR 1910.1200 by Valero Marketing & Supply Co., ("VALERO"). VALERO does not assume any liability arising out of product use by others. The information, recommendations, and suggestions presented in this MSDS are based upon test results and data believed to be reliable. The end user of the product has the responsibility for evaluating the adequacy of the data under the conditions of use, determining the safety, toxicity and suitability of the product under these conditions, and obtaining additional or clarifying information where uncertainty exists. No guarantee expressed or implied is made as to the effects of such use , the results to be obtained, or the safety and toxicity of the product in any specific application. Furthermore, the information herein is not represented as absolutely complete, since it is not practicable to provide all the scientific and study information in the format of this document, plus additional information may be necessary under exceptional conditions of use, or because of applicable laws or government regulations. |
| **Issue date** | 03-22-2011 |

# Material Safety Data Sheet

 **Celanese**

| Product name | n-Butyl acetate, urethane grade | | NA/EN |
|---|---|---|---|
| MSDS number | 80015 | **Revision Date** | Oct.25.2007 |
| Revision Number | 1.01 | **Issuing date** | Jun.05.2009 |

http://www.celanese.com/msds/pdf/020-29324340.pdf

## 1.  Product and company identification

**Product name**

n-Butyl acetate

**Celanese Ltd.**
1601 W. LBJ Freeway
P.O. Box 819005
Dallas, TX  75381-9005
United States
Phone:  972 443 4000
Internet:  www.celanese.com

**Transportation emergency phone numbers:**
In USA, call  800 424 9300
Outside USA, call  703 527 3887, collect calls accepted

**End use:**
Chemical intermediate (including monomers)

## 2. Hazards identification

### Emergency Overview

WARNING!
Flammable liquid and vapor.
May cause eye irritation.
May cause respiratory tract irritation.
Vapors may cause drowsiness and dizziness.
Prolonged or repeated contact may dry skin and cause irritation.
Vapours are heavier than air and may spread along floors.

### Product Description

**Appearance**
**Form**
**Odor**
**Colour**

liquid
fruity
colourless

### Potential health effects

**Routes of exposure**
Skin, eyes, inhalation, ingestion.

**Immediate effects**

# Material Safety Data Sheet

 Celanese

| Product name | n-Butyl acetate, urethane grade | | NA/EN |
|---|---|---|---|
| MSDS number | 80015 | Revision Date | Oct.25.2007 |
| Revision Number | 1.01 | Issuing date | Jun.05.2009 |

**Inhalation** — May cause irritation of respiratory tract. Symptoms of exposure may include: Nasal discharge, hoarseness, coughing, chest pain and breathing difficulty Central nervous system depression with nausea, dizziness, headache, stupor, uncoordinated or strange behavior or unconsciousness.

**Skin** — Prolonged or repeated contact may dry skin and cause irritation. Symptoms of exposure may include: Drying, cracking or inflammation of skin.

**Eyes** — Exposure to vapors and liquid may cause eye irritation Symptoms of exposure may include: Eye irritation, burning sensation, pain, watering, and/or change of vision.

**Ingestion** — Symptoms of exposure may include: Central nervous system depression with nausea, dizziness, headache, stupor, uncoordinated or strange behavior, or unconsciousness.

**Target organ effects**
Target organ effects Central nervous system depression
Drying of the skin
Local irritation at the site of exposure

**Medical conditions which may be aggravated by exposure:**
Significant exposure to this chemical may adversely affect people with acute or chronic disease of the:
Skin
Central nervous system
Eyes
Respiratory Tract

# 3. Composition/information on ingredients

| Components | CAS-No | Percent % |
|---|---|---|
| N-BUTYL ACETATE | 123-86-4 | 99.5 |

# 4. First aid measures

General Information
Remove contaminated, soaked clothing immediately and dispose of safely. Pay attention to own protection. In any case show the physician the Safety Data Sheet.

Inhalation
Keep at rest. Move to fresh air. Call a physician immediately.

Skin
Wash off immediately with soap and plenty of water removing all contaminated clothes and shoes. If symptoms persist, call a physician.

# Material Safety Data Sheet

 **Celanese**

| Product name | n-Butyl acetate, urethane grade | | NA/EN |
|---|---|---|---|
| MSDS number | 80015 | Revision Date | Oct.25.2007 |
| Revision Number | 1.01 | Issuing date | Jun.05.2009 |

Eyes
Rinse immediately with plenty of water, also under the eyelids, for at least 15 minutes. Call a physician immediately.

Ingestion
Rinse with plenty of water. If swallowed, do not induce vomiting - seek medical advice.

## 5. Fire-fighting measures

**NFPA:**   **Health:** 2   **Flammability:** 3   **Instability:** 0

**Suitable extinguishing media**
foam, Dry chemical, carbon dioxide (CO2)

Extinguishing media which must not be used for safety reasons
Do not use a solid water stream as it may scatter and spread fire.

Special exposure hazards arising from the substance or preparation itself, its combustion products, or released gases
Under conditions giving incomplete combustion, hazardous gases produced may consist of
carbon monoxide
carbon dioxide (CO2)
Combustion gases of organic materials must in principle be graded as inhalation poisons
Vapors are heavier than air and may spread along floors

**Special protective equipment for fire-fighters**
self-contained breathing apparatus (EN 133).

Environmental precautions
Water runoff can cause environmental damage Dike and collect water used to fight fire

Other Information
Cool containers / tanks with water spray

## 6. Accidental release measures

**Personal precautions**
Avoid contact with the skin and the eyes. Keep away from heat and sources of ignition. Provide adequate ventilation.

Keep unnecessary people away; isolate hazard area and deny entry. Stay upwind; keep out of low areas. Isolate for 800 meters or 0.5 miles in all directions if tank, rail car, or tank truck in involved in fire. Evacuate downwind areas as conditions warrant to prevent exposure and to allow vapors or fumes to dissipate. Spills may expose downwind areas to toxic or flammable concentrations over considerable distances in some cases.

**Environmental precautions**
Prevent further leakage or spillage. Do not discharge into the drains/surface waters/groundwater.

**Methods for cleaning Up**
Soak up with inert absorbent material (e.g. sand, silica gel, acid binder, universal binder, sawdust). Keep in suitable, closed containers for disposal. Dispose of in accordance with local regulations.

# Material Safety Data Sheet



| Product name | n-Butyl acetate, urethane grade | | NA/EN |
|---|---|---|---|
| MSDS number | 80015 | **Revision Date** | Oct.25.2007 |
| Revision Number | 1.01 | **Issuing date** | Jun.05.2009 |

**Authority Notification**
Within the United States, call the National Response Center (800-424-8802) and appropriate state and local authorities if the quantity released over 24 hours is equal to or greater than the reportable quantity listed below:

5000lb/2270kg

## 7. Handling and storage

**Handling**
### Advice on safe handling
Provide sufficient air exchange and/or exhaust in work rooms.

### Protection - fire and explosion:
Keep away from sources of ignition - No smoking Take necessary action to avoid static electricity discharge Ground and bond containers when transferring material In case of fire, emergency cooling with water spray should be available

**Storage**
### Technical measures/Storage conditions
Keep tightly closed in a dry, cool and well-ventilated place Handle and open container with care

## 8. Exposure controls / personal protection

### OSHA Exposure Limits

| Components | TWA |
|---|---|
| N-BUTYL ACETATE | 150 PPM |

| Components | TWA |
|---|---|
| N-BUTYL ACETATE | 150 PPM |

| Components | STEL |
|---|---|
| N-BUTYL ACETATE | 200 PPM |

| Components | 2005 NIOSH IDLH |
|---|---|
| N-BUTYL ACETATE | 10,000 ppm |

### Mexico National Exposure Limits

| Components | LMPE - PPT |
|---|---|
| N-BUTYL ACETATE | 150 ppm (701 mg/m$^3$) |

| Components | STEL |
|---|---|
| N-BUTYL ACETATE | 200 ppm (950 mg/m$^3$) |

# Material Safety Data Sheet



| Product name | n-Butyl acetate, urethane grade | | NA/EN |
|---|---|---|---|
| MSDS number | 80015 | Revision Date | Oct.25.2007 |
| Revision Number | 1.01 | Issuing date | Jun.05.2009 |

## Exposure controls

### Engineering measures
General or dilution ventilation is frequently insufficient as the sole means of controlling employee exposure. Local ventilation is usually preferred. Explosion-proof equipment (for example fans, switches, and grounded ducts) should be used in mechanical ventilation systems.

**Protective Equipment**
A safety shower and eyebath should be readily available.

**General advice**
Avoid contact with skin and eyes. Do not breathe vapors or spray mist. Use only in an area equipped with a safety shower. Hold eye wash fountain available.

**Respiratory protection**
Based on workplace contaminant level and working limits of the respirator, use a respirator approved by NIOSH. The following is the minimum recommended equipment for an occupational exposure level. To estimate an occupational exposure level see Section 8 and Section 11.

For concentrations > 1 and < 10 times the occupational exposure level: Use air-purifying respirator with full facepiece and organic vapor cartridge(s) or air-purifying full facepiece respirator with an organic vapor canister or a full facepiece powered air-purifying respirator fitted with organic vapor cartridge(s). The air purifying element must have an end of service life indicator, or a documented change out schedule must be established. Otherwise, use supplied air.

For concentrations more than 10 times the occupational exposure level and less than the lower of either 100 times the occupational exposure level or the IDLH: Use Type C full facepiece supplied-air respirator operated in positive-pressure or continuous-flow mode.

For concentrations > 100 times the occupational exposure level or greater than the IDLH level or unknown concentrations (such as in emergencies): Use self-contained breathing apparatus with full facepiece in positive-pressure mode or Type C positive-pressure full facepiece supplied-air respirator with an auxiliary positive-pressure self-contained breathing apparatus escape system.

For escape: Use self-contained breathing apparatus with full facepiece or any respirator specifically approved for escape.

**Skin protection:**
Wear impervious clothing and gloves to prevent contact. Butyl rubber is recommended. Other protective material may be used, depending on the situation, if adequate degradation and permeation data is available. If other chemicals are used in conjunction with this chemical, material selection should be based on protection for all chemicals present

**Eye/face protection:**
Wear chemical goggles when there is a reasonable chance of eye contact..

## 9. Physical and chemical properties

**Appearance**
    **Form**               liquid

**Material Safety Data Sheet**

 Celanese

| Product name | n-Butyl acetate, urethane grade | | NA/EN |
|---|---|---|---|
| MSDS number | 80015 | Revision Date | Oct.25.2007 |
| Revision Number | 1.01 | Issuing date | Jun.05.2009 |

# 9. Physical and chemical properties

| | |
|---|---|
| Colour | colourless |
| Odor | fruity |
| Molecular Weight | 116.16 |
| Flash point | 24°C(72°F) |
| Method | DIN EN ISO 13736 |
| Ignition temperature | 390°C (734°F) |
| Method | DIN 51794 |
| | |
| Lower explosion limit | 1.2 Vol. % |
| Upper explosion limit | 7.5 Vol. % |
| Melting point/range | -77°C (-107°F) |
| Boiling point/range | 127°C (261°F) @ 1013 hPa |
| | |
| Density | 0.88 g/ml @ 20°C |
| pH | Neutral |
| Viscosity | 0.685 mPa*s @ 25°C |
| vapor pressure | 15 hPa @ 25°C  (11.3 mmHg) |
| | 58 hPa @ 50°C |
| vapor density | 4.0 (Air=1) |
| Water solubility | 6.8 g/l @ 20°C |
| Partition coefficient (n-octanol/water) | 1.78 (measured) |

# 10. Stability and reactivity

**Stability**
Stable under normal conditions of handling, use and transportation.

**Conditions to avoid**
Avoid any source of ignition. Avoid contact with heat, sparks, open flame, and static discharge.

**Materials to avoid**
Keep away from:
peroxides
oxidizing agents
strong acids
amines

**Hazardous Combustion or Decomposition Products:**
Thermal decomposition products may include oxides of carbon.

**Hazardous reactions**
Hazardous polymerization does not occur.

# 11. Toxicological information

# Material Safety Data Sheet

 **Celanese**

| Product name | n-Butyl acetate, urethane grade | | NA/EN |
|---|---|---|---|
| MSDS number | 80015 | **Revision Date** | Oct.25.2007 |
| Revision Number | 1.01 | **Issuing date** | Jun.05.2009 |

# 11. Toxicological information

**N-BUTYL ACETATE**

| | | |
|---|---|---|
| **Oral** | | LD50: > 5000 mg/kg, rat |
| **Dermal** | | LD50: > 5000 mg/kg, rabbit |
| **Inhalation** | | LC50: 21 mg/l, rat, 4h |
| | Method | OECD 403 |
| **Skin irritation** | | Non-irritant. |
| | Species | rabbit |
| **Skin Sensitization** | | nonsensitizer |
| | Species | guinea pig |
| | Method | Maximization |
| **Eye Irritation** | | Mild eye irritation |
| | Species | rabbit eye |
| **in vitro Mutagenicity** | | Ames test - negative with and without metabolic activation |
| | | CHO cell chromosome aberration - negative with and without metabolic activation |
| **Neurotoxicity** | | 90-day neurotoxicity screen  - negative rat |
| | Routes of exposure | oral dose-feed |

# 12. Ecological information

**N-BUTYL ACETATE**

| | | |
|---|---|---|
| **Toxicity to fish** | | LC50: 18 mg/l (96h) |
| | Species | Pimephales promelas (Fathead minnow) |
| | Method | Flow-through |
| | | LC50: 62 mg/l (96h) |
| | Species | Danio rerio (zebra fish) |
| | Method | static conditions |
| **Toxicity to daphnia** | | EC50: 44 mg/l (48h) |
| | Species | Daphnia magna |
| **Toxicity to algae** | | EC50: 674.7 mg/l (72h) |
| | Species | Scenedesmus subspicatus |
| **Toxicity to bacteria** | | EC0: 115 mg/l (16h) |
| | Species | Pseudomonas putida |
| **Biodegradation** | | 98 % (28d) of ThOD Readily biodegradable |
| | Method | OECD 301 D |
| **Chemical Oxygen Demand (COD)** | | 78 % of ThOD |
| **Bioconcentration factor (BCF)** | | 4.7 (calculated) |

**Material Safety Data Sheet**  **Celanese**

| Product name | n-Butyl acetate, urethane grade | | NA/EN |
|---|---|---|---|
| MSDS number | 80015 | Revision Date | Oct.25.2007 |
| Revision Number | 1.01 | Issuing date | Jun.05.2009 |

# 13. Disposal considerations

**Disposal Considerations:**
Dispose of spilled material in accordance with state and local regulations for hazardous waste. Recommended methods are incineration or biological treatment at a federally or state-permitted disposal facility. Note that this information applies to the material as manufactured; processing, use, or contamination may make this information inappropriate, inaccurate, or incomplete.

Note that this handling and disposal information may also apply to empty containers, liners and rinsate. State or local regulations or restrictions are complex and may differ from federal regulations. This information is intended as an aid to proper handling and disposal; the final responsibility for handling and disposal is with the owner of the waste.

**EPA Hazardous Waste Code(s):** D001

# 14. Transport information

**US Department of Transportation**

| | |
|---|---|
| UN/NA Number: | UN 1123 |
| Proper Shipping Name | Butyl acetates |
| Hazard class | 3 |
| Packing Group | III |
| Reportable Quantity (RQ) | 5000lb/2270kg |
| Emergency Resp. Guide | 128 |

**TDG**

| | |
|---|---|
| UN/NA Number: | UN 1123 |
| Proper Shipping Name | BUTYL ACETATES |
| Class: | 3 |
| Packing Group: | III |

**Mexico Transport Information**

| | |
|---|---|
| UN-No. | UN 1123 |
| Proper Shipping Name | Butyl acetates |
| Hazard Class | 3 |
| Packing Group | III |

**ICAO/IATA**

| | |
|---|---|
| UN-No. | UN 1123 |
| Proper Shipping Name | Butyl acetates |
| Hazard Class | 3 |
| Packing group | III |

**IMDG**

| | |
|---|---|
| UN/ID No. | UN 1123 |
| Proper Shipping Name | Butyl acetates |
| Hazard Class | 3 |
| Packing group | III |

# Material Safety Data Sheet



| Product name | n-Butyl acetate, urethane grade | | NA/EN |
|---|---|---|---|
| MSDS number | 80015 | Revision Date | Oct.25.2007 |
| Revision Number | 1.01 | Issuing date | Jun.05.2009 |

**EmS Code**      F-E, S-D

# 15. Regulatory information

## U.S. STATE REGULATIONS
Chemicals associated with the product which are subject to the state right-to-know regulations are listed along with the applicable state(s):

**N-BUTYL ACETATE 123-86-4**

| | |
|---|---|
| Pennsylvania | Listed |
| New York | Listed |
| New Jersey | Listed |
| Illinois | Listed |
| Massachusetts | Listed |
| Rhode Island | Listed |

## U.S. FEDERAL REGULATIONS

**TSCA Inventory:**
We certify that all components are either on the TSCA inventory or qualify for an exemption.

**Environmental Regulations:**

| N-BUTYL ACETATE 123-86-4 | |
|---|---|
| CERCLA Hazardous Substance | Listed |

**SARA 311:**

| | |
|---|---|
| Acute health: | Yes |
| Chronic health: | No |
| Fire: | Yes |
| Sudden release of pressure: | No |
| Reactive: | No |

## INTERNATIONAL REGULATIONS

**International Chemical Inventory**
Listed on the chemical inventories of the following countries or qualifies for an exemption:
AUSTRALIA,CHINA,CANADA,EUROPE,KOREA,PHILIPPINES, JAPAN

## CANADIAN REGULATIONS

**WHMIS Classification:**  Class B, Division 2. Class D, Division 2, Subdivision B.

This product has been classified in accordance with the hazard criteria of the CPR and the MSDS contains all the information required by the CPR.

# Material Safety Data Sheet

 Celanese

| Product name | n-Butyl acetate, urethane grade | | NA/EN |
|---|---|---|---|
| MSDS number | 80015 | Revision Date | Oct.25.2007 |
| Revision Number | 1.01 | Issuing date | Jun.05.2009 |

## 16. Other information

**Prepared By**
Product Stewardship Department
Celanese

| NFPA: | Health: 2 | Flammability: 3 | Instability: 0 |
|---|---|---|---|
| HMIS: | Health: 2 | Flammability: 3 | Physical hazard: 0 |

For more information, other material safety data sheets or technical data sheets please consult the Celanese homepage (www.celanese.com)

**Sources of key data used to compile the datasheet**
Information contained in this safety data sheet is based on Celanese owned data and public sources deemed valid or acceptable. The absence of data elements required by ANSI or 1907/2006 indicates, that no data meeting these requirements is available.

**Other Information:**
Observe national and local legal requirements

Changes against the previous version are marked by ***



http://www.glueit.com/pdf/D-Limonene.pdf

  

www.glueit.com    www.glueitgreen.com    www.acme-glue.com

### Material Safety Data Sheet

**Product: D-Limonene**

*Emergency Telephone:*
Transportation: 800-424-9300
Health (L A Poison Control): 800-356-3129

### Product Identification

| Di-Limonene | Non-Regulated Material | N/A |
|---|---|---|

### Component Ingredients

| Di-Limonene | 5989-27-5 | N/E | | | | |
|---|---|---|---|---|---|---|

Contains the following chemicals subject to the reporting requirements of section 313 of SARA Title III:

| NONE | |
|---|---|

### Physical Data

| 310 | 2.00 | 115 | 0.30 | 0.84 | 6.98 |
|---|---|---|---|---|---|

All temperature measurements are in Fahrenheit
Vapor Pressure: mm Mercury @ 68F
Evaporation Rate: n-Butyl Acetate=1
N/E = Not Established     N/A=Not Applicable

## Emergency First Aid

| | |
|---|---|
| Eye contact: | If irritation or redness from exposure to vapors develops, move victim from exposure and into fresh air.  For direct contact, flush eyes with clean water.  Seek medical help. |
| Skin contact: | Remove contaminated clothing.  Cleanse affected areas by washing with mild soap and water.  If irritation persists, seek medical attention. |
| Inhalation: | Move victim into fresh air.  If symptoms of exposure develop, seek medical attention.  If victim is not breathing, artificial respiration should be |
| administered. | Seek immediate medical attention. |
| Ingestion: | **Seek Immediate Medical Attention** Have physician call Los Angeles Poison Information Center (24 hrs.) (800) 356-3129 |

## Health Hazards/Routes of Entry

| | |
|---|---|
| Eye contact: | May cause eye irritation.  Direct contact may cause burning, tearing and redness. |
| Skin contact: | May cause skin irritation.  Prolonged and repeated exposure may cause redness and burning, drying and cracking of the skin and dermatitis.  Product may be |
| absorbed susceptible | through the skin.  Persons with pre-existing skin disorder may be more to the effects of this material. |
| Inhalation: | Exposure to vapors or mist may cause: Irritation of the nose and throat, signs of nervous system depression, irregular heartbeats.  Persons with impaired lung function or asthma-like conditions may experience breathing difficulties. |
| Ingestion: signs enter lungs and damage. | Ingestion of excessive quantities may cause: Irritation of the digestive tract, of nervous systems depression.  Aspiration Hazard - this material can during swallowing or vomiting and cause lung inflammation |

Comments:

## Special Protection Information

| | |
|---|---|
| Ventilation: | If current ventilation practices are not adequate to maintain airborne concentrations below the established exposure limits (see section I), additional ventilation may be required.  Where explosive mixtures may be present, systems safe for such locations should be used. |

| Respiratory Protection: | Respiratory protection is advised when concentrations exceed the established exposure limits (see Hazardous Ingredients).  Depending on the airborne concentration, use a respirator or gas mask with appropriate cartridges (NIOSH approved) or supplied air equipment. |

| Protective Gloves: prevent | Gloves impermeable to the specific material handled are advised to skin contact, possible irritation and absorption. |

| Eye Protection: | Approved eye protection to safeguard against potential eye contact, irritation or injury is recommended. |

| Other Protective Equipment: | It is suggested that an NIOSH approved eyewash be available in work area for flushing eyes and skin.  Impervious clothing should be worn as needed. |

## Reactivity Data

Stability:                              Stable

| Incompatibility | (Materials to Avoid): This product is incompatible with strong acids or bases, oxidizing agents and selected amines. |

| Hazardous Decomposition Products: | Thermal decomposition in the presence of air may yield carbon monoxide and/or carbon dioxide. |

Hazardous Polymerization:            Will Not Occur.

## Spill Or Leak Procedure

Highway or Railway Spills
Call CHEMTREC (800) 424-9300 Cont. U.S.
(Collect) (202) 483-7616 From Alaska & Hawaii

## Precautions in Case of Spill

Stay up wind and away from spill. Keep all sources of ignition and hot metal surfaces away from spill. If spill is indoors, ventilate area of spill.  Foam, especially high expansion foam, may be used to suppress vapors. Keep out of drains, sewers or waterways. Use sand or other inert material to dam and contain spill. Do not flush area with water. For small spills, do not flush with water; use absorbent pads. Call spill response team if large spill. Notify appropriate State/Local agencies.  If spill in excess of EPA reportable quantity, immediately notify the National Response Center (800-424-8802).

## Waste Disposal Method

Dispose of product in accordance with local, county, state, and federal regulations.

## Handling and Storage Precautions

Keep containers tightly closed.  Keep containers cool, dry and away from source of ignition.  Use and store this product with adequate ventilation.  Avoid inhalation of vapors and personal contact with product.  Use good personal hygiene practice.  Empty containers retain residue (liquid and/or vapor) and can be dangerous.  Do not pressurize, cut, weld, solder, braze, drill, grind or expose containers to heat, flame, sparks, or other source of ignition: They may explode.

## Fire and Explosion Information

| | |
|---|---|
| **Extinguishing Media:** | Dry chemicals, C02, or foam.  Water may be ineffective and spread fire. |
| **Hazardous Decomposition:** | May form toxic materials: carbon dioxide and carbon monoxide, various hydrocarbons, etc. |
| **Fire Fighting Procedures:** | Wear self-contained breathing apparatus with full face piece operated in pressure-demand or other positive pressure mode. |

## NFPA Hazard Ranking

| 1 | 2 | 0 |
|---|---|---|

0=Least    1=Slight    2=Moderate    3=High    4=Extreme

## Disclaimer of Expressed and Implied Warranties

The information in this document is believed to be correct as of the date issued.  **However, no warranty of merchantability, fitness for any particular purpose, or any other warranty is expressed or is implied regarding the accuracy or completeness of this information, the results to be obtained from use of this information or the product, the safety of this product, or the hazards related to its use.**  This information and product are furnished on the condition that the person receiving them shall make his own determination as to the suitability of the product for his particular purpose and on the condition that he assume the risk of his use thereof.

| |
|---|
| 4/17/09 |

# EXHIBIT   4

Case No.: No. 4:10-CV-02363-PJH; Case No.: No. 4:10-CV-02364-PJH
Plaintiff's  HILMIJA DZEBIC, AND  FIKRETA OSMANKIC
**PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION TO
DISMISS AND MEMORANDUM IN SUPORT**

http://jmh3.angelcities.com/story.html

**Janessa Michaela Horner killed in Home Depot Store**



Janessa Michaela Horner
June 27, 1996 – May 28, 2000

There are many stores each year that have injuries and fatalities with consumers and employees. Please read the stats below on the Warehouse Stores across the country:

1992 -- 3 year old little girl crushed to death by falling door at a Home Depot store in San Diego.

1994 -- 46 year old killed by a 3,000 pound pallet of ceramic tiles at a Home Base in Edmonds, Wash.

1996 -- Small child killed when a wardrobe toppled at Sam's Club in Abilene, Texas.

1997 -- Two year old girl died after a 100 pound television cabinet fell on her in A Wal-Mart store in Virginia Beach, Virginia

1997 -- 36 year old employee of Home Depot died from falling ceramic tiles/shelf collapsed in Miami, FL

1999 -- 79 year old woman killed at an L.A. Home Depot store when a forklift operator knocked over a load of lumber stacked above her.

2000 -- 41 year old man was killed at a Connecticut Home Depot when a 2,000 pound pallet of landscaping timbers fell and pinned him to the ground.

There are tons of these claims against warehouse super centers. In 1998 Home Depot was receiving 185 *injury* claims a week, many involving falling merchandise. Please be careful when you are in these stores, they may cost you or your child's life. The stores view their high stacking concepts as "a cost of doing business".

San Diego, CA, 1992 - Another 3-year-old girl was crushed to death by a falling door at a Home Depot. Los Angeles, CA, 1999

A 79-year old woman was killed at a Home Depot when a forklift operator accidentally knocked over lumber stacked above her. Edmonds, WA, 1994

A 46-year-old man was killed at a Home Base store when a 3,000-pound pallet of ceramic tiles fell on him. Abilene, TX, 1996

A small child was killed when a wardrobe fell over at a Sam's Club. Virginia Beach, VA, 1997

A 36-year-old Home Depot employee was killed by ceramic tiles that fell from a collapsing shelf. Danbury, CT, 2000

Jeffrey Mead, 41, was killed at a Home Depot when a 2,000-pound pallet of landscaping timbers fell and pinned to the ground both him and his twin brother. His brother was injured but rescued. Golden, CO, 1997 - Marlo Rice, 32, received permanent head injuries when a rack of bedding plants fell on her in Home Depot's garden department. The retailer claimed the wind had knocked the rack over. Rice said the rack was unstable because steel-framed tables had been leaned against it. A jury awarded her $1.24 million. Colorado, 2000

Boxes of vinyl siding fell at a Home Depot and struck 3-year-old Brandon Ryan on the head. The chain agreed to pay his parents $500,000. Roseville, CA, December 2000

Dan Ernest was struck on the head by a box of ceramic tiles accidentally knocked off a high shelf by a Home Depot employee removing something from the rack in the next aisle. Campbell, CA, 1996

The spine of Donald Lasher, a 40- year-old optometrist, was fractured in three places when a shrink-wrapped stack of tool boxes fell on him. St. Petersburg, FL, 1999

Milton Chambers, an appliance repair contractor, was struck by a range hood in a Home Depot when an employee heâ€™d asked to help take it down dropped it. Attempting to shield his head with his arms, Chambers ended up with injuries to his arms, neck and back.

http://www.bizjournals.com/atlanta/stories/2003/02/24/story4.html

## Risky Business: Home Depot

# How Home Depot keeps store accidents secret

**Atlanta Business Chronicle - by Jim Lovel, Staff Writer**

Date: Monday, February 24, 2003, 12:00am EST

**Little information about customer deaths or injuries at** home depot  stores ever reaches the public

And that's no accident.

When Home Depot provides attorneys with information about the frequency and severity of accidents in its stores, it demands they sign confidentiality agreements. Then experts hired by attorneys to review the information have to sign the agreements and any resulting settlements are almost always sealed, thus forbidding discussion.

The confidentiality agreements are an important part of the legal process for the company, according to attorneys who have sued Home Depot. Most clients accept the agreements to settle their claims instead of going through a jury trial.

Home Depot won't discuss its policies and procedures for handling lawsuits against the company. "We really don't go into specific legal strategies in public and I think you can understand that," said David Sandor, director of public relations.

Getting information from the company about accidents can be difficult, even after signing an agreement, attorneys say. Many of them complain that the company doesn't respond to requests for information during lawsuits until ordered by the court to provide the information.

"They like to stonewall," said Scott Callahan, a Houston attorney. He compared getting information from the company to "pulling teeth."

"They will fight and litigate even when the case is clear," he said.

Steve Rasak, a Los Angeles attorney, is one of the few to settle a case against the company without the confidentiality agreement. His clients refused to sign, but still received a $900,000 settlement from Home Depot after their mother was killed in a store in November 1999.

After a bitter court battle, a judge ordered Home Depot to provide Rasak information about accidents in its stores without the protection of a confidentiality agreement. Rasak made the information public. In 1998, Home Depot received 185 claims a week from customers injured in its stores, according to Rasak. The company has doubled its number of stores since then but no more-recent figure is available for claims.

The company has gained a reputation as a formidable opponent in court. Some attorneys who have sued the company say they won't do it again.

Spencer Stephens, an attorney in Rockville, Md., filed a lawsuit against the company in November 2001 on behalf of a woman who broke both ankles when she fell over a lumber cart in a Home Depot store. The case was dismissed at Home Depot's request in January. Stephens plans to appeal.

Stephens said he struggled to get information from the company about past accidents involving the lumber cart. He signed the confidentiality agreement but never received the information, he said. He asked the judge to force the company to provide the information but his case was dismissed before a hearing on his request.

"They play hardball when it comes to claims," Stephens said. "That's their reputation."

It was his first lawsuit against Home Depot and his last, Stephens said. He is in a firm of four lawyers and he said it was difficult to match the resources that Home Depot used. "They do that to prevent lawsuits," he said. "Unfortunately, in my case, it was successful."

Susan Keen, an attorney in Van Nuys, Calif., lost an injury claim against the company in January.

"Home Depot ran a smear campaign against my client, making it look like he did it on purpose," Keen said. "Home Depot attacked him."

Keen was representing Charles Griffin, who lost the vision in his right eye two months after he had hit his head after being knocked over by a forklift in a Woodland Hills, Calif., store.

Griffin claimed his blindness was caused by the head injury. Home Depot attributed it to a pre-existing hypertension condition and implied Griffin "staged an accident" to get money from the company, Keen said.

Keen said that she couldn't get the information she needed from the company to properly prepare her case. When she asked for the company's records on forklift accidents, company officials said they couldn't find them, Keen said. When she asked for the company's report of Griffin's accident, company officials claimed they didn't have a report until the judge ordered them to give it to her, Keen said.

"This went on throughout the trial," Keen said.

It was her first and last case against Home Depot, she said. "It's like being in a pit with a bunch of snakes," Keen said.

http://www.durabilityanddesign.com/news/?fuseaction=view&id=5709

**Paint and Coatings Industry News**

# Legal Actions Allege Sale of Non-Compliant Paints by Home Depot

Friday, June 3, 2011

The South Coast Air Quality Management District (SCAQMD) and several local governments in the Los Angeles area filed suit last week against Home Depot Inc. for allegedly selling paint products that failed to comply with the SCAQMD's stringent air-quality rules on architectural coatings.

Two related lawsuits allege that from 2007 to 2010, the big-box retailer sold paints, wood lacquers and other coatings with VOC content exceeding limits imposed in the SCAQMD's Rule 1113 on architectural and industrial maintenance coatings. The rule is the nation's toughest regulation on VOCs content in such products.

News reports on the lawsuits said the complaints alleged that the products were sold at more than two dozen stores across Southern California, even after the company was notified that it was breaking local air regulation laws.

The SCAQMD lawsuit charges Home Depot with violating the California Health and Safety code. It calls for $30 million in civil penalties. The other, filed by attorneys from Orange, Riverside and San Bernardino counties, and the city of Los Angeles, charges the company with unfair business practices and false advertising.



Lawsuits filed by the South Coast Air Quality Management District and local governments in the Los Angeles area allege that The Home Depot sold paints that did not comply with air-quality rules.

In a statement, an attorney for Home Depot said the chain cooperated with air quality regulators after it was notified of the code violations, according to news reports.

"We have fully cooperated and removed the products in question," the statement said. "We believe the government has a mistaken view of the facts, and we are fully prepared to defend our position."

The SCAQMD regulates stationary sources of VOCs and other air pollutants in the Los Angeles region, which has long been known for having the nation's poorest air quality.

The news reports did not identify specific products, brands or product manufacturers connected to the alleged violations of air-quality rules.

The SCAQMD has previously taken similar actions against big-box retailers that sell non-compliant products. Last year, the district won settlements totaling more than $3 million from Lowe's and Wal-Mart after it sued the stores for selling such products, the *Los Angeles Times* reported. The paper said prosecutors statewide have been aggressive in taking action "to crack down on pollution by large corporate stores."

City officials in Los Angeles also won a nearly $10 million settlement against Home Depot in 2007, in a case alleging improper handling of hazardous materials, the *Times* said.

# EXHIBIT   5

Case No.: No. 4:10-CV-02363-PJH; Case No.: No. 4:10-CV-02364-PJH
Plaintiff's HILMIJA DZEBIC, AND  FIKRETA OSMANKIC
**PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION TO
DISMISS AND MEMORANDUM IN SUPORT**

Dear Papa and Mama. When I last saw you, I was only 17 years old. Now I have almost 40 years of age I know I promised you that we will see in summer 2008, but unfortunately I hope you understand, what happened to my family. I have wasted so much time of the past 4 years taking care of the husband who unfortunately is a lifelong disability, and powerless to provide me with any help, and if he expressed a great desire, as always, what he did for me.

That life has literally passed me by during that time. The estimate of about 35,000 + hours of my life wasted for the last four difficult years - equivalent of about 10,000 (eight-hour days of working in my regular job, as before. All the wasted time and money taken represents countless lost opportunities. I wanted to become more dedicated to music, or hobby that you know what my hobby was in my childhood and time spent with you, but never did .... I never got the promised gifts and surprises from my husband which I wanted, due to lack of money ... and suffering imposed by some criminals.

My daughter Samantha was ill during most of time. Forgive me, but I have to promise her false promises and hopes, as she is now 14 years old and helps me a lot with taking care of my sick husband, her father. Now, the promises are futile, because Little Samantha take pills for depression, same as her father. I'm not sure what the cause of her depression, because while I and my husband worked, many times she had no where to stay, but we had brought her with us. I'm not sure, nor do I want to say that the cause of her illness the same as my husband, because doctors say that it is possible that her ages in which she is now, and it is possible poisoning with chemical poisons.

I wanted to take her to a better clinic that might have helped her, but I have no money for it. I understand that you will hardly understand, and apply all of this through what we pass, but gather strength, and endure, because we are not doing any better. I hope, that God would still find direction, to see and meet, for while you are alive. I have much more to write to you, but I have no power, because long time ago I wrote to you only beautiful things, and now my every written word, is covered with tears, which cannot be stopped.

But I ask you not to grieve, and to believe in God, who will join us one day together. I miss you a lot, and I think a lot about you, and if I forgot how you look. Your daughter, Fikreta, and your never-met grandchdren, love you very much.